# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION and CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARRAY TECHNOLOGIES, INC., ATI INTERMEDIATE HOLDINGS, LLC, JIM FUSARO, NIPUL PATEL, TROY ALSTEAD, ORLANDO D. ASHFORD, FRANK CANNOVA, RON P. CORIO, BRAD FORTH, PETER JONNA, JASON LEE, ATI INVESTMENT PARENT, LLC, OAKTREE ATI INVESTORS, L.P., OAKTREE POWER OPPORTUNITIES FUND IV, L.P., OAKTREE POWER OPPORTUNITIES FUND IV (PARALLEL), L.P., GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, GUGGENHEIM SECURITIES, LLC, CREDIT SUISSE SECURITIES (USA) LLC, BARCLAYS CAPITAL INC., UBS SECURITIES LLC, COWEN AND COMPANY, LLC OPPENHEIMER & CO. INC., JOHNSON RICE & COMPANY L.L.C., ROTH CAPITAL PARTNERS, LLC, PIPER SANDLER & CO., MUFG SECURITIES AMERICAS INC., NOMURA SECURITIES INTERNATIONAL, INC., MORGAN STANLEY & CO. LLC,<br><br>Defendants. | Civil Action No. 1:21-cv-4390-VM<br><br><br>DEMAND FOR JURY TRIAL<br><br><br><u>CLASS ACTION</u> |

## CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT FOR <u>VIOLATION OF THE FEDERAL SECURITIES LAWS</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF THE ACTION ......................................................................... 1

III.    JURISDICTION AND VENUE ......................................................................... 6

IV.     SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS ................ 7

        A.      Exchange Act Parties ............................................................................ 7

        B.      Securities Act Parties ............................................................................ 8

        C.      Company Background .......................................................................... 13

                1.      Array's Core Operations ......................................................... 13

                2.      Shortly Before the IPO, the Company Purged Employees Who
                        Management Believed Were Too Conservative with Project
                        Margins or Quality of Materials .............................................. 14

                3.      Array's "Strengths" and Competitive Position Turn on Its Ability
                        to Manage the Cost of Steel .................................................... 16

                4.      Steel Costs Rise Sharply Prior to IPO and Into 2021 ............. 17

                5.      Defendants Order Employees to Use Lower, Outdated Cost
                        Models ...................................................................................... 20

                6.      Defendants Are Forced to Concede Some Impact of Rising
                        Commodity and Freight Costs on Margins .............................. 25

                7.      Defendants Reveal the Impact of Commodity Price Increases ........ 26

                8.      FTC Solar, Array's Primary Competitor, Was Not Impacted as
                        Severely .................................................................................... 28

                9.      Defendants' Post-Mortem on the Impact of Commodity and
                        Freight Price Increases ............................................................ 28

                10.     After the Class Period, Defendants Remediate Procurement and
                        Contracting Process and Disclose Impact of the Company's Failure
                        to Manage Commodity Exposure ............................................. 29

        D.      Defendants' Materially False and Misleading Statements and Omissions .......... 31

                1.      The October 14, 2020, IPO Materials ...................................... 32

2. The November 5-6, 2020, Q3 2020 Earnings Results Statements............ 35

3. The December 2, 2020, SPO Statements ..................................................... 36

4. The March 9, 2021, Q4 2020 and Full Year 2020 Earnings Statements ................................................................................................... 37

5. The March 18-22, 2021, SPO Statements ................................................. 40

E. Additional Scienter Allegations Relevant to Exchange Act Claims..................... 42

1. The Fraud Concerns the Core Operations of Array ................................... 43

2. The Offerings Provide Motive and Opportunity for Defendants to Misrepresent the Extent and Duration of Array's Commodity Exposure ..................................................................................................... 44

F. Loss Causation/Economic Loss ........................................................................ 46

G. Applicability of Presumption of Reliance: Fraud on the Market......................... 48

H. No Safe Harbor ................................................................................................ 50

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Array and the Exchange Act Individual Defendants ........................................................ 50

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants and Oaktree ................................................................................ 51

V. SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS.............................. 52

A. The IPO and SPO Materials Violated SEC Regulation S-K................................. 55

B. False and Misleading Statements in the IPO Documents ..................................... 58

C. False and Misleading Statements in the December 2020 SPO Materials............. 61

D. False and Misleading Statements in the March 2021 SPO Materials................... 62

E. As Information that Was Incorrectly Stated in, and Omitted from the Offering Materials Is Gradually Disclosed, the True Value of Array's Common Stock Is Revealed................................................................................... 63

COUNT III For Violation of Section 11 of the Securities Act Against Array, the Securities Act Individual Defendants, and the Underwriter Defendants........................ 67

COUNT IV For Violation of Section 12(a)(2) of the Securities Act Against all Defendants ...................................................................................................................... 70

COUNT V For Violation of Section 15 of the Securities Act Against the Securities Act
  Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power
  Parallel .................................................................................................................... 72

VI.    CLASS ACTION ALLEGATIONS ................................................................ 74

PRAYER FOR RELIEF ............................................................................................. 76

JURY DEMAND ....................................................................................................... 76

## I.    INTRODUCTION

Plaintiff Plymouth County Retirement Association and the Carpenters Pension Trust Fund for Northern California (together, "Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Array Technologies, Inc. ("Array" or the "Company"), Array's filings with the U.S. Securities and Exchange Commission ("SEC"), media and analyst reports about the Company, and interviews with former Array employees.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth hereinafter a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

1.    This securities class action concerns Defendants' misrepresentations and omissions concerning the impact of rising steel costs on Array's business.

2.    Array describes itself as one of the world's largest manufacturers of ground-mounting systems used in solar energy projects. Array's principal product is an integrated system of steel supports and electric motors commonly referred to as a single-axis "tracker."  Trackers move solar panels throughout the day to maintain an optimal orientation to the sun, which significantly increases their energy production. Trackers represent between 10% and 15% of the cost of constructing a ground-mounted solar energy project and so their cost must be weighed against the increased energy production they enable.

3.    Recognizing the Company's reliance on steel to manufacture trackers, securities analysts questioned Defendants about how rising steel costs would impact the Company's

finances. In response, Defendants stated that they had high visibility into their "conservative" gross margin guidance for 2021 based on their false and misleading statements regarding the "passthrough" nature of the Company's customer contracts. Defendants thus lead investors to believe that customers, rather than Array, would bear increased steel costs.

4.     Unbeknownst to investors, however, Defendants' visibility into their guidance was clouded by the fact that the Company's financial projections utterly failed to take into account the actual cost of steel.  Rather, as confirmed by *four* former Array employees that each worked in relevant departments during the Class Period, Defendants systematically and knowingly used lower, outdated steel and logistics costs in the financial models they used to estimate costs, which they in turn used to paint a false picture of the Company's margins and business prospects.

5.     Utilizing these false steel and logistics costs in the lead up to three public offerings during the Class Period enabled the Company's founder, Ron P. Corio, and the Company's principal investor, Oaktree, to sell more than *$2.75 billion* worth of stock at inflated prices.

6.     At the end of the Class Period, Defendants were forced to withdraw their 2021 guidance issued just two months prior, leading to a dramatic *46 percent decline* in the Company's stock price.  Indeed, Array's undisclosed exposure to rising steel prices is now forecasted to impact the Company's margins until the second half of 2022.

7.     This securities class action is brought on behalf of:

(a)     All persons and entities that purchased or otherwise acquired Array securities during the period from October 14, 2020, through May 11, 2021, inclusive (the "Class Period"), and were damaged thereby, except those who are excluded below, as against the Exchange Act Defendants (as defined *infra*) for violations of the Securities Exchange Act of 1934

(the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (the "Exchange Act Class"); and

(b)     All persons and entities that purchased or otherwise acquired Array common stock pursuant, or traceable, or both, to: (i) the registration statement and prospectus (the "IPO Materials") issued in connection with the Company's October 2020 initial public offering (the "IPO"); or (ii) the registration statement and prospectus (the "December 2020 SPO Materials") issued in connection with the Company's December 2020 secondary offering (the "December 2020 SPO"); or (iii) the registration statement and prospectus (the "March 2021 SPO Materials") issued in connection with the Company's March 2021 secondary offering (the "March 2021 SPO"); or (iii) any combination of the IPO, December 2020 SPO, or March 2021 SPO (the "Securities Act Class" and, together with the Exchange Act Class, the "Class"), as against the Securities Act Defendants (as defined *infra*) for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").  Together, the IPO, December 2020 SPO, and March 2021 SPO are collectively referred to as the "Offerings."

8.     Under Sections 11 and 12(a)(2) of the Securities Act, the Securities Act Defendants are strictly liable for any false and misleading statements in the IPO Materials, the December 2020 SPO Materials, and the March 2021 SPO Materials (together, the "Array Offering Materials"). Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct as to the Securities Act claims.

9.     In the three months preceding the close of Array's IPO, steel prices increased by approximately 35%, Defendants failed to acknowledge in Array's IPO Materials or other public filings the impact of rising steel costs on Array's margins. Between the close of Array's IPO and the December 2020 SPO, steel increased by *another* 42%. Yet there was no mention of the impact

of rising steel costs on Array's margins in the Company's December 2020 SPO Materials. Between the close of the December 2020 SPO and the March 2021 SPO, steel increased by *another* 56%. Again, no mention of the impact of rising steel costs on Array's margins was made in the Company's March 2021 SPO Materials.

10.     Rather than contemporaneously disclosing the impact of rising steel costs on margins and the Company's business prospects, in the Offering Materials and throughout the Class Period, Defendants took the opposite tack, repeatedly emphasizing the passthrough nature of their customer contracts and portraying their ability to manage commodity costs as a *strength* and competitive advantage that differentiated Array from its competitors. What really differentiated Array, however, was that unlike the Company's principal competitor, FTC Solar, which locked in commodity costs contemporaneously with being awarded a contract, Array held commodity risk for up to *three months* after being awarded a contract and was unable to passthrough any cost increases to consumers during the period. Thus, despite Defendants' statements to investors that Array's exposure to increases in commodity and freight costs was limited because the Company was able to pass on those rising costs to customers, Array was the party that actually undertook that liability.

11.     To conceal the impact of rising commodity and freight costs on the Company's margins and business prospects, and unbeknownst to investors, Defendants went to extraordinary efforts to conceal their risk and allow the Company's founder and its principal investor to unload their shares. According to separate interviews with *four* former employees of the Company, employees were systematically ordered to use lower, outdated steel and logistics costs when pricing projects ahead of the Offerings. The intentional deflation of Array's costs meant that when Defendants issued margin guidance during the Company's fourth quarter and full year 2020

earnings call on March 9, 2021, their purportedly "*conservative*" estimate of 2021 margin guidance was false when made because it dramatically undervalued the impact of rising steel and logistics costs. On or about March 22, 2021, less than two weeks after Defendants issued this false margin guidance and reassured investors as to the Company's high "visibility" into margins for the year, Oaktree and Array's founder liquidated almost all of their remaining Array shares in the March SPO, for proceeds of more than $845 million.

12.    In violation of the federal securities laws, Defendants failed to disclose to investors (1) that over 50 percent of Array's cost of goods sold was steel, (2) that Defendants assumed the risk of rising steel for up to 90 days after being awarded a contract, (3) that the passthrough nature of Array's customer contracts was illusory, (4) that as a result the Company's 2021 margin guidance was false when made, and (5) that, as a result of the foregoing, Defendants' statements about the Company's business, operations, and strengths were materially misleading and/or lacked a reasonable basis when made.

13.    Details about Defendants' misrepresentations began to come to light on May 11, 2021, when Array disclosed that increases in steel prices and logistics costs were having, and would continue to have, a material impact on the Company's margins for the foreseeable future. This caused Array to miss profit expectations and withdraw its full-year outlook, leading to a dramatic *46 percent decline* in the Company's stock price on heavy trading volume, injuring investors.

14.    As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class members have suffered significant damages, as throughout the Class Period and in the Offering Materials, Defendants made materially false and/or misleading statements and failed to disclose material

adverse facts about the Company's business, operations, and the impact of rising commodity prices on the Company's margins.

15.     This action seeks to recover those damages.

## III.   JURISDICTION AND VENUE

16.     The claims asserted arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Array's stock trades on the Nasdaq Global Market, a national stock exchange located in this District. Leading up to the IPO and SPO, Array directed investors who sought information regarding the IPO and SPO to contact, *inter alia*, Goldman Sachs & Co., LLC and Guggenheim Securities, LLC at their offices in this District. Several Defendants, as set forth *infra*, have offices in this District. Many of the acts charged herein, including the preparation or dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.     SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS

### A.     Exchange Act Parties

20.     Lead Plaintiff Plymouth County Retirement Association provides retirement, disability, and survivor benefits to approximately 11,500 participants from 24 municipalities, five regional schools, 17 housing authorities, and six special districts throughout Plymouth County, Massachusetts. Plymouth County Retirement Association purchased Array securities pursuant to or traceable to the IPO and the March 2021 SPO, as set forth in its previously filed certification.

21.     Lead Plaintiff Carpenters Pension Trust Fund for Northern California is a defined benefit pension plan that provides retirement benefits and other specified benefits to carpenters and other trade professionals within 46 northern California counties. As of November 2, 2021, Northern California Carpenters managed over $4.5 billion in retirement and other assets on behalf of over 51,000 plan participants. Northern California Carpenters purchased Array securities during the Class Period and suffered damages as a result of the federal securities law violations alleged herein, as set forth in its previously filed certification.

22.     Defendant Array is a Delaware corporation with its principal executive offices located at 3901 Midway Place NE, Albuquerque, New Mexico, 87109. The Company's common stock is listed on the Nasdaq Global Market under the ticker symbol "ARRY." Array was formerly known as ATI Intermediate Holdings, LLC. Immediately prior to the effectiveness of the IPO registration statement, ATI Intermediate Holdings, LLC converted into Array pursuant to a statutory conversion and changed its name to "Array Technologies, Inc." Array is the named registrant on the registration statements for the IPO, the December 2020 SPO, and the March 2021 SPO (the "Offerings").

23.     Defendant Jim Fusaro ("Fusaro") was, at all relevant times, and is currently Array's Chief Executive Officer ("CEO") and Director of the Company. Defendant Fusaro signed the registration statements in connection with the Offerings which were filed with the SEC.

24.     Defendant Nipul Patel ("Patel") was, at all relevant times, and is currently Array's Chief Financial Officer ("CFO"). Defendant Patel signed the registration statements in connection with the Offerings which were filed with the SEC.

25.     Defendants Fusaro and Patel are collectively referred to hereinafter as the "Exchange Act Individual Defendants." The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Array's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading. The Exchange Act Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Exchange Act Individual Defendants. Array and the Exchange Act Individual Defendants are collectively referred to herein as "Defendants."

   **B.     Securities Act Parties**

26.     Lead Plaintiff Plymouth County Retirement Association and Carpenters Pension Trust Fund for Northern California are also Lead Plaintiff for the Securities Act claims.

27.     Defendant Array is the named registrant on the registration statements for the IPO, the December 2020 SPO, and the March 2021 SPO. Array is an Exchange Act and Securities Act Defendant.

28.     Defendant Fusaro and Defendant Patel are also Securities Act Defendants. Defendants Fusaro and Patel signed the registration statements in connection with the Offerings which were filed with the SEC.

29.     Defendant Troy Alstead ("Alstead") was, at all relevant times, and is currently a Director of the Company. Defendant Alstead signed the registration statements in connection with the Offerings which were filed with the SEC.

30.     Defendant Orlando D. Ashford ("Ashford") was, at all relevant times, and is currently a Director of the Company. Defendant Ashford signed the registration statements in connection with the Offerings which were filed with the SEC.

31.     Defendant Frank Cannova ("Cannova") was, at all relevant times, and is currently a Director of the Company. Defendant Cannova signed the registration statements in connection with the Offerings which were filed with the SEC.

32.     Defendant Ron P. Corio ("Corio") was, at all relevant times, and is currently a Director of the Company. Defendant Corio signed the registration statements in connection with the Offerings which were filed with the SEC.

33.     Defendant Brad Forth ("Forth") was, at all relevant times, and is currently the Chairman of the Board of Directors of the Company. Defendant Forth signed the registration statements in connection with the Offerings which were filed with the SEC.

34.     Defendant Peter Jonna ("Jonna") was, at all relevant times, a Director of the Company. Defendant Jonna signed the registration statements in connection with the Offerings which were filed with the SEC.

35.     Defendant Jason Lee ("Lee") was, at all relevant times, and is currently a Director of the Company. Defendant Lee signed the registration statements in connection with the Offerings which were filed with the SEC.

36.     Defendants Fusaro, Patel, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee are also referred to herein as the "Securities Act Individual Defendants."

37.     Defendant ATI Investment Parent, LLC ("ATI") was the former parent company of ATI Intermediate Holdings, LLC and a selling shareholder in the Offerings. ATI Investment Parent, LLC maintains an office in this District.

38.     Defendant Oaktree ATI Investors, L.P. ("Oaktree ATI") was, at all relevant times, a co-controlling member of ATI Intermediate Holdings, LLC. Oaktree ATI Investors, L.P. maintains an office in this District.

39.     Defendant Oaktree Power Opportunities Fund IV, L.P. ("Oaktree Power") was, at all relevant times, a co-controlling member of ATI Intermediate Holdings, LLC. Oaktree Power Opportunities Fund IV, L.P. maintains an office in this District.

40.     Defendant Oaktree Power Opportunities Fund IV (Parallel), L.P. ("Oaktree Power Parallel") was, at all relevant times, a co-controlling member of ATI Intermediate Holdings, LLC. Oaktree Power Opportunities Fund IV (Parallel), L.P. maintains an office in this District.

41.     Defendant Goldman Sachs & Co. LLC served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. Goldman Sachs & Co. L.L.C. maintains an office in this District.

42.     Defendant J.P. Morgan Securities LLC served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. J.P. Morgan Securities LLC maintains an office in this District.

43.     Defendant Guggenheim Securities, LLC served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. Guggenheim Securities, LLC maintains an office in this District.

44.     Defendant Credit Suisse Securities (USA) LLC served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. Credit Suisse Securities (USA) LLC maintains an office in this District.

45.     Defendant Barclays Capital Inc. served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. Barclays Capital Inc. maintains an office in this District.

46.     Defendant UBS Securities LLC served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. UBS Securities LLC maintains an office in this District.

47.     Defendant Cowen and Company, LLC served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. Cowen and Company, LLC maintains an office in this District.

48.     Defendant Oppenheimer & Co. Inc. served as an underwriter for the IPO, the December 2020 SPO, and the March 2021 SPO. Oppenheimer & Co. Inc. maintains an office in this District.

49.     Defendant Johnson Rice & Company L.L.C. served as an underwriter for the March 2021 SPO. Johnson Rice & Company L.L.C. maintains an office in this District.

50.     Defendant Roth Capital Partners, LLC served as an underwriter for the March 2021 SPO. Roth Capital Partners, LLC maintains an office in this District.

51.     Defendant Piper Sandler & Co. served as an underwriter for the March 2021 SPO. Piper Sandler & Co. maintains an office in this District.

52.     Defendant MUFG Securities Americas Inc. served as an underwriter for the IPO. MUFG Securities Americas Inc. maintains an office in this District.

53.     Defendant Nomura Securities International, Inc. served as an underwriter for the IPO. Nomura Securities International, Inc. maintains an office in this District.

54.     Defendant Morgan Stanley & Co. LLC served as an underwriter for the IPO and the December 2020 SPO. Morgan Stanley & Co. LLC maintains an office in this District.

55.     The Defendants listed in ¶¶41-54 are referred to herein as the "Underwriter Defendants."

56.     Defendants Fusaro, Patel, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee are collectively referred to hereinafter as the "Securities Act Individual Defendants." The Securities Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Array's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market. The Securities Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Securities Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading. The Securities Act Individual Defendants are liable

for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Securities Act Individual Defendants.

57.     For the purposes of the Securities Act claims alleged herein, Defendants Array, the Securities Act Individual Defendants, the Underwriter Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel, may hereafter be referred to at times as the "Securities Act Defendants."

###     C.     Company Background

####         1.     Array's Core Operations

58.     Array purports to be one of the world's largest manufacturers of ground-mounting systems used in solar energy projects. The Company's principal product is an integrated system of steel supports, electric motors, gearboxes and electronic controllers commonly referred to as a single-axis "tracker." Trackers move solar panels throughout the day to maintain an optimal orientation to the sun, which significantly increases their energy production. Solar energy projects that use trackers generate up to 25% more energy and deliver a 22% lower levelized cost of energy than projects that use "fixed tilt" mounting systems, according to BloombergNEF. In other words, Array's trackers increase the efficiency of solar energy projects, thereby reducing the cost of energy, and increasing returns. The fundamental assumption implicit in this rationale (and the viability of Array's product offering) is that the increased efficiency provided by the trackers outweighs the cost of the trackers over the term of the project.

59.     Trackers represent between 10% and 15% of the cost of constructing a ground-mounted solar energy project, and an estimated 74% of all ground-mounted solar energy projects constructed in the U.S. during 2019 utilized trackers according to BloombergNEF and IHS Markit, respectively.

60.     Array's trackers use a patented design that allows one motor to drive multiple rows of solar panels through articulated steel driveline joints. To avoid infringing on the Company's U.S. patent, Array claims that its competitors must use designs that are inherently less efficient and reliable. For example, Array claims that one of its largest competitor's design requires one motor for each row of solar panels. As a result, Array claims that its products have greater reliability, lower installation costs, reduced maintenance requirements and, importantly, "competitive manufacturing costs."



**Array's tracker system resonates with customers across Major IPPs and Utilities, Large Developers and EPCs.**

| Array Tracker System - DuraTrack® | DuraTrack® Uses Less Than 1 Motor per MW$_{DC}$ |
| --- | --- |
| A highly engineered, system oriented and optimized solution | Array trackers maximize land usage – articulated driveline joints allow rows to be vertically and horizontally offset |

Only 1 motor required for many rows

Articulating drivelines allow for rows to follow site contours

## 2.     Shortly Before the IPO, the Company Purged Employees Who Management Believed Were Too Conservative with Project Margins or Quality of Materials

61.     The Offerings were orchestrated as a means for Oaktree and Array's founder to cash-out their Array holdings.  In 2016, Oaktree invested in Array to provide the company with "capital and strategic support to expand its global footprint as a leading provider of utility-scale solar tracking solutions." That investment was followed by the 2018 appointment of Defendant Fusaro as CEO. Upon being named CEO, Defendant Fusaro, a former Honeywell executive,

cleaned house at Array and replaced many key employees and executives with former Honeywell employees, who were frequently referred to as the "Honeywell Mafia" within the Company.

62.     As an example of this purge, Confidential Witness 1[1] ("CW") recounted that Bob Bellemare, who started as CFO[2], was ultimately moved away from dealing with anything cost related. CW1 went on to relay that Bellemare was ultimately terminated in the Spring of 2021, and CW1 heard that he was terminated for being "too conservative" with pricing and project margins based on his forecasts of rising steel and shipping costs. CW1 added that Bellemare's conservativism was well-known internally and based on a deeply analytical approach to forecasting.

63.     Similarly, CW2[3] recalled that Stuart Bolland[4], the new procurement manager, and most of the executive team (now) is made up of former Honeywell employees. CW2 added that since the former Honeywell employees joined Array, a lot of Array's accounting people left. CW2 then added that the more influence and presence that the former Honeywell employees had on Array's accounting team, the more legacy accounting employees left. CW2 recalled that these former Honeywell employees were known inside Array as the Honeywell Mafia.

---

[1] CW1 was employed by Array in its finance organization from the third quarter of 2019 to the second quarter of 2021.

[2] According to publicly available sources, Bellemare was Array's CFO from August 2015 until November of 2017, Chief Operating / Commercial Officer from November 2017 to December 2018, and EVP Corporate Development until his departure from the Company in February of 2021.

[3] CW2 worked in procurement at Array from mid-2018 through mid- 2020. CW2 was responsible for coordinating the delivery and logistics of materials to customers as well as overseeing the Buyer team. CW2 reported to Chief Procurement Officer Naveen Abraham, who reported to Chief Operations Officer Stuart Bolland, who reported to CEO Jim Fusaro.

[4] According to publicly available sources, Stuart Bolland left Array in October of 2021.

64.     By eliminating employees who provided realistic margin guidance, Array was able to artificially inflate the Company's margins and margin guidance and create the false impression that Array was successfully managing increases in commodity and freight costs.

### 3.    Array's "Strengths" and Competitive Position Turn on Its Ability to Manage the Cost of Steel

65.     In its Offering Materials and throughout the Class Period, the Company touted both its "competitive manufacturing costs" and its "demonstrated ability to reduce the cost" of its products while "maintaining profit margins," specifically claiming that "we continually work to reduce the cost of our products through innovation and rigorous supply chain management. These efforts have resulted in a reduction in cost of goods sold per watt by approximately 22% from 2017 through 2020.  This has allowed us to reduce average selling prices by approximately 22% over the same period, driving significant increases in revenues, while simultaneously increasing gross profit and maintaining gross margin."

66.     Defendants' "demonstrated ability to reduce cost" while "maintaining profit margins" and "rigorous supply chain management" were critical to the Company's competitive position. Indeed, reductions in the cost associated with the Company's products increase the appeal and economic rationale supporting sales of those products to the Company's customers, particularly when one of Array's main competitor's product uses 15% less steel than Array. These statements were material to investors, in particular because they were made at a time when cost inputs, such as steel and freight costs, were undergoing dramatic price increases while concurrently prices in solar tenders across the world were falling dramatically.[5] In other words, in 2020, solar

---

[5] *See, e.g.*, S&P Global Market Intelligence, Q&A, Developers Risk 'Eating Their Own Margin' in Solar's Race to the Bottom, *available at* https://www.spglobal.com/marketintelligence/en/news-insights/blog/qa-streamlining-analytics-for-tcfd-reporting (Oct. 1, 2020).

developers who purchased Array's trackers were in a "race to the bottom," reflected in contracting margins, and were thus increasingly sensitive to increases in the cost of developing solar projects.

### 4.    Steel Costs Rise Sharply Prior to IPO and Into 2021

67.    Amid rapidly rising steel prices, Defendants failed to disclose that Array was gambling on commodity prices and was unable to passthrough rising commodity costs to the Company's customers, misleading investors into the false belief that Array had limited exposure to commodity price changes. The refusal to disclose these material facts enabled Oaktree to unload Array stock for proceeds in excess of $2.75 billion.

68.    Demand for most raw materials generally fell significantly in the early months of the Coronavirus pandemic, including the demand for steel. The sharp decline in demand caused many steel mills to curb production, which caused capacity utilization to drop to multi-year lows.  The early decreases in production, together with the continuing impact of the pandemic on supply chains and economic activity that rebounded as the country reopened, resulted in increasing prices in the steel market. In April of 2020, the benchmark hot-rolled coil steel prices fell below $500 per short ton, and prices remained depressed through July and August of 2020. Since then, and prior to Array's IPO, demand in steel-dominated industries rebounded.  As a result, HRC steel prices trended upward since September of 2020 and through the end of the Class Period.

69.    The U.S. Midwest Domestic Hot-Rolled Coil Steel ("CRU") Index, which according to CW2 was used by Array and the industry participants as a proxy for the cost of steel,[6]

---

[6] The CRU, more formally known as the CRU Index, is the most established and trusted price benchmark in North America for U.S. Midwest Domestic Hot-Rolled Coil Steel (HRC). In technical terms, the CRU Index is a segmented stock market index that helps investors track steel performance by comparing current steel price levels with past prices to calculate future market performance.

rose from $475 on July 17, 2020, to $640 on October 19, 2020, when Array's IPO closed. In other words, in the three months preceding the close of Array's IPO, steel prices **increased by approximately 35%**. No mention of the trend in steel costs and its impact on Array's margins was made in Array's IPO Materials.

70.     Similarly, between the close of Array's IPO and the close of the December 2020 SPO, the CRU index rose from $640 on October 19, 2020, to $814 on December 7, 2020. In other words, between the close of Array's IPO and the December 2020 SPO, steel prices **increased by another 42%**. No mention of the trend in steel costs and its impact on Array's margins was made in Array's December 2020 SPO Materials.

71.     Contemporaneous market commentary from Monarch Metals, Inc., published on January 27, 2021, attributed the rise in steel costs to steels mill idling furnaces and curtailing production amid demand uncertainty in early 2020 and a resurgence in demand in the last quarter of 2020 amid low supply and inventory. Based on these trends, Monarch Metals reported that "prices in the US are forecasted to continue their upward trajectory through at least the first quarter of 2021," observing further that "*[m]any of the factors that started driving steel prices higher in 2020 are still at play as we enter 2021*."

72.     Between the close of Array's December 2020 SPO on December 7, 2020, and the Company's March 2021 SPO, the CRU index rose from $814 to $1,268. In other words, between the close of the December 2020 SPO and the March 2021 SPO on March 23, 2021, steel prices **increased by another 56%**. No mention of the trend in steel costs and its impact on Array's margins was made in Array's March 2021 SPO Materials.

73.     Last, between the close of Array's March 2021 SPO and the last day of the Class Period on May 11, 2021, the CRU index rose from $1,266 to $1,519, or another 20%. In sum,



74.     However, instead of timely disclosing the impact of the increases in steel and freight costs on the Company's margins and business prospects, Defendants refused to even quantify the percentage of the Company's cost of goods sold ("COGS") subject to steel or the percentage attributable to transportations costs, generically disclosing in the various offering materials and throughout the Class Period only that "Approximately 80% of our cost of goods sold consists of purchased components, including motors, gearboxes, electronic controllers and steel tubing . . . . As a result, our business requires minimal capital investment and generates significant cash flow." Defendants continued to make these and similarly misleading representations to investors despite direct questions from analysts concerning the impact of rising steel and logistics costs from investors.

75.     Based on these and similar representations and Array's failure to disclose that it was gambling on commodity prices and that the passthrough nature of its contracts was illusory, investors believed that Array had limited exposure to increases in steel prices. For example, Roth Capital Partners on February 3, 2021, noted, "As we wrote in our initiation, ***ARRY has adopted an approach to its contracts that limits its exposure to steel prices and passes the risk on to customers***; however, this could still mean a headwind to the use of trackers in general and/or an important consideration for modeling [Average Selling Prices ("ASP")] (even if the cost gets passed on to customers), but ***generally we don't expect a margin impact for ARRY because of what we believe is the pass-through nature of its contracts***."

### 5.     Defendants Order Employees to Use Lower, Outdated Cost Models

76.     Instead of disclosing the impact of rapidly rising steel and logistics costs on the Company's margins and business prospects to investors, Defendants ordered multiple employees to revert to lower, outdated cost estimates when assessing and projecting project costs, resulting in "totally inaccurate" commodities financials. Defendants' intentional reliance on outdated cost estimates, which is corroborated by multiple confidential witnesses with respect to the price of steel and shipping, occurred in the lead up to Array's IPO and, critically, prior to the Company issuing 2021 margin guidance and the March 2021 SPO. Employees who attempted to investigate these issues, such as CW5, were marginalized or fired.

77.     CW2 was responsible for helping forecast steel prices and ensuring that people were aware of the rising steel prices.[7] CW2 adamantly stated that the rise in steel prices and the

---

[7] CW2 was responsible for generating steel pricing reports, which CW2 generated at least monthly and more often if CW2 anticipated a significant price increase. CW2 explained that steel prices were drawn from the CRU Index and the Recycled Steel Index, and that Array was contractually obligated to use the lower of the two prices. CW2 advised that he distributed these reports to Abraham and Bolland, and that towards the end of CW2's tenure [June 2020] they

Footnote continued on next page

impact on margins could not have taken Array executives by surprise. CW2 explained that Array's forecasting and cost estimates included looking at the price of steel futures, adding that CW2 would assign a percentage of risk to the forecast in the model. CW2 confirmed that executives at Array *instructed CW2 not to use the higher prices reflected in the model and instead use lower, outdated cost estimates*.

78.    CW1 recounts a similar story. CW1 recounted how CW1 expressed concerns regarding the Company's margins due to the increases in costs, but nobody would listen to CW1. CW1 went on to say that the executives preferred when CW1 used outdated cost estimates because on paper they allowed Array to project better margins. As an example, according to CW1, Array was alerted by freight forwarders, like TIBA, about increases in the cost of freight. When the attempt was made to update these costs[8], which reflected a lower margin for certain projects, shortly thereafter the executive team decided to revert to the "old and stale" freight prices. CW1 recalled that this email exchange happened in the fourth quarter of 2020 or in early 2021.

79.    In reference to cost increases being a surprise for Array's executives, CW1 stated "no way, no, no, no" and that everyone knew that costs were rising since the previous year. CW1 recounted that during the first quarter of 2021, Bellemare (prior to his departure from the company in February 2021) *told Fusaro that Array needed to hedge against steel prices and that the*

---

expressed concern over the rising steel prices. CW2 explained that although he did not observe Fusaro reading the reports because Fusaro worked remotely from Arizona, Fusaro requested that the reports have a specific formatting so that they are easily accessible, and more employees could weigh in on concerns and with ideas. CW2 stated that all pricing was tracked including issues with supply chain material. He further advised that the reports were the Company's main avenue for reflecting industry prices.

[8] CW1 elaborated that the cost model or cost sheet was the model created by Bellemare and contained information including costs, material costs, labor, and taxes for every different type of freight. CW1 went on to explain that this was the metric that was used by inside sales representatives to estimate quotes and was the "costing home" or standard for projects. CW1 added that it was the "most up to date model used in the company."

*Company needed a department to properly analyze the prices, but his idea was dismissed*. With respect to freight, CW1 explained that everyone at Array knew freight costs were increasing because freight forwarders, including one he worked with in Spain, TIBA, alerted him. CW1 added *that projects quoted in the first quarter of 2021 should have had price increases because of these factors.*

80.     Like CW2, and CW1, CW3[9] went on to recall that he participated in meetings twice a week with Fusaro, Bolland, Abraham, Executive Vice President of Global Sales Jeff Krantz, and Vice President of Engineering Lucas Creasy. According to CW3, the rising freight costs were regularly discussed in these meetings and was a cause of concern among Array leadership, and that *leadership openly stated that they would not record the accurate freight costs*. CW3 went on to say that Array's leadership would often say, "let's assume a lower freight cost." CW3 further stated that he would ask leadership if they had a quote or guarantee to support the lower freight costs, but they brushed him off. CW3 further stated that from his perspective *Array misrepresented their financial position since they did not account for accurate freight costs.*

---

[9] CW3 worked as Director of Contracts & Procurement at Array from May 2018 until April 2019. CW3 worked out of Array's Albuquerque, NM headquarters and was responsible for developing and managing Array's Contracts team. CW3 initially reported to CEO Jim Fusaro, and later reported to COO Stuart Bolland, and then former Chief Procurement Officer Naveen Abraham.

81.     CW4[10] advised that reports were generated from SAP, that the Director of Procurement would run the reports and circulate them at least once a week.[11] CW4 recalled that there was a "group huddle" for every single new project and that the price, materials on hand, and production timeline were discussed. CW4 further advised that the SAP reports also showed percentages of outstanding projects and shipping costs. CW4 also recalled that each project was discussed line by line at a daily meeting. According to CW4, CEO Jim Fusaro attended all of these meetings, "even if he had to dial in from the car while he was driving," and was definitely present for the discussions of margins and costs for every project. Like CW2, CW1, and CW3, CW4 recounted how he had been asked to use prices from 2 or 3 months prior to a project to estimate pricing.

82.     Similarly, prior to the Company's IPO, CW5[12] recalled how, in July 2020, "the supply chain broke down", and he began to receive "hourly" phone calls from one of Array's major

---

[10] CW4 was employed by Array as a Procurement Manager from June 2018 to March 2020. In his role, CW4 was responsible for managing the purchasing of steel products that were used by Array. CW4 interfaced directly with all of the companies that Array made purchases from and negotiated pricing with them. During his tenure with Array, CW4 worked at Array's New Mexico office and reported to Byron Hill who reported directly to former Array CEO Ron Corio. After Corio left Array, CW4 reported up to new CEO Jim Fusaro. When an order came in, CW4 would review the bill of goods and enter the needed products into SAP, so he knew what was needed to be ordered for the project and at what cost. He went on to recall that Array ordered hot rolled coil steel from 3 or 4 main suppliers including ones located in Pennsylvania and China.

[11] In reference to reports that showed costs for steel and forecasted steel costs, CW4 recalled that when he first started working at Array, Array was using a new system called SAP. According to CW4, management reviewed the system and checked on how much money they were making on each project. CW4 described the system as "telling everything we needed to know" and "everyone had permissions to it." According to CW4, SAP included both the engineer and project manager's estimated price for a project and the true price for the project after all materials were quoted by vendors.

[12] CW5 worked as a Senior Commodity Manager at Array from June 2020 until October 2020. CW5 worked out of Array's Chandler, AZ headquarters and was responsible for handling logistics and liaising with commodity vendors. CW5 reported to Chief Procurement Officer Naveen Abraham.

suppliers because of Covid-related supply-chain delays. CW5 went on to explain that the supplier increased the steel lead time from six weeks to two months and, as a result, the supply chain was severely delayed. CW5 went on to say that he participated in daily calls with Abraham, CEO Jim Fusaro, CFO Nipul Patel, and COO Stuart Bolland, and that the supply chain breakdown was discussed regularly. According to CW5, Array leadership was very concerned about the supply chain problems, regularly asked him questions about it, and that "everyone knew there was trouble" and "it was only a matter of time" before the business was affected by the supply chain issues. CW5 confirmed that Array's leadership was aware of rising supply chain costs well before the IPO.

83.     CW5 recounted how he began to work with an Inventory Control Specialist to consolidate Array's procurement financial information. CW5 continued to say that he and the Inventory Control Specialist attempted to forecast Array's supply chain numbers and to understand the unexplained pricing fluctuations. CW5 recalled how he and the Inventory Control Specialist started to question why Array's supply chain numbers fluctuated so drastically and why no one seemed to be able to explain the reason for the fluctuations. CW5 characterized Array's commodities financials as "*totally inaccurate*." CW5 continued to relay that he began digging around and asking other employees about the numbers.

84.     CW5 recounted how only three weeks into his tenure at Array, Abraham told him that he could no longer communicate with suppliers. CW5 further recounted how Abraham ordered CW5's team to no longer talk with CW5 and banned the Inventory Control Specialist from communicating with or helping CW5 in any capacity. CW5 added that Abraham refused to assist him in his job in any way and hired several more Senior Commodity Managers who were not similarly inquisitive and were provided plenty of assistance by Abraham.

85.     The repeated instruction by Array's management to at least *four* former employees to revert to lower, outdated pricing *despite knowledge of higher current prices*, is strong evidence of a continuous and systematic effort by Defendants to intentionally misrepresent the strength of Array's margins and business prospects.

### 6.      Defendants Are Forced to Concede Some Impact of Rising Commodity and Freight Costs on Margins

86.     Having previously ordered employees to revert to outdated, lower cost estimates for steel and freight, on March 9, 2021, in response to questions about increasing steel costs during a call with investors to discuss the Company's Q4 2020 and full year 2020 results, Defendants declined to indicate the contribution of steel to the Company's COGS and minimized any potential impact on the Company's business and margins.  Specifically, in response to a question from an analyst with Cowen and Company, LLC, touching on increased steel costs, Defendant Patel stated "we don't break out the bill of materials, obviously, for competitive products. But obviously we have -- steel is a large component, a commodity that we use in our overall tracker." Commenting on the Company's 2021 guidance, Defendant Patel also stated that "[w]hile we expect prices to normalize, and *our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by baking these costs into the low end of our guidance*, assuming a delayed return to more normalized pricing." But, having demoted Bellemare for being too "conservative" on commodity pricing and the resulting impact on margins, Defendants' "conversative approach" to margin guidance was the opposite, as it relied on outdated steel and logistics pricing that was unmoored from current market conditions.

87.     During the same call, Defendant Patel also touted that the Company had high visibility into margins, noting that Array "typically order[s] material between 6 and 12 weeks from the date of the shipment. So we keep very little inventory. So the impact obviously on the COGS

-- of the recent run on prices would impact second half more than it would first half." Similarly, in response to a direct question from an analyst from Credit Suisse asking whether "the cost of steel [is] becoming a problem for you," Defendant Fusaro provided an evasive answer and touted the Company's productivity measures, stating "***So we obviously manage and monitor all commodities accordingly***. And then we build in productivity measures to address that to continue to drive our value" and that "I mean there's always going to be pressure on cost. That's pretty much market-agnostic and product-agnostic. But that said, we've actually built out -- we continue to build out our supply chain. . . . So that's just going to be an area that we remain focused on going forward as we grow . . . ."

88.     Thus, not until the Company's release of its Q4 2020 and full year 2020 results did investors *begin* to understand the impact that rising commodity prices *could* have on Array's margins and business prospects notwithstanding the perceived passthrough nature of the Company's customer contracts. Specifically, Roth Capital Partners noted on March 9, 2021:

> Through our Q4'20 preview checks over recent months, many customers complained to us about high steel prices and freight. ***Our understanding was that ARRY could pass this through to customers, and, as a result, we mistakenly did not see this as a potential issue***. ARRY still has pass through pricing power, but is choosing to use it judiciously. We believe management could take a conservative approach and not pass along all the cost increase to possibly share some of the pain with its customers. So the slightly worse than expected margin outlook reflects the need to support customers for the long game. As a result, the stock may trade sideways for a bit, but look for it to eventually work.

The market's mistaken understanding regarding the impact of steel prices on Array's margins was the direct result of Defendants intentional campaign to obfuscate Array's exposure to rising steel and freight costs.

### 7.     Defendants Reveal the Impact of Commodity Price Increases

89.     Then, less than six weeks later, on May 10, 2021, the Company disclosed for the first time that steel accounted for approximately 50% of COGS and that, because of increases in

commodity costs, the Company was withdrawing its full year guidance and reviewing roughly 100 open contracts for cost increase passthrough. This disclosure occurred shortly after Array's Chief Procurement Officer Naveen Abraham[13] abruptly left the company.

90.     Summarizing management comments on contract renegotiations, an analyst at Cowen noted that it was "a complicated exercise as price increase pass-throughs may cause the customers to delay orders in the hope of a steel price decrease later in the year. Management didn't disclose the percentage of contracts outstanding that are open, but we believe is the majority and *this aspect of the business is likely a surprise to investors relative to initial positioning*."

91.     Morgan Stanley similarly commented on May 14, 2021, that Array "is experiencing steep increases in steel and freight costs and *the company is less insulated than we previously expected*. We are lowering our revenue forecast on project delays and reducing margins for exposure to input cost inflation. Reducing PT from $30 to $19 and remaining EW." Morgan Stanley added that "[w]e also think Array will face resistance in passing through the entire impact of cost inflation by way of higher prices, since solar project developers have likely already locked in power prices at thin margin levels and cost inflation throughout the supply chain will force them to push back on some price increases . . . ."

92.     In other words, investors understood for the first time on May 11, 2021, what Defendants had previously failed to disclose: Array's purported ability to pass on increased costs directly to the Company's customers was illusory and Defendants, which had two months previously reassured investors about margin visibility when issuing 2021 margin guidance, had material exposure to rising commodity prices that was impacting margins and would continue to impact margins for the foreseeable future.

---

[13] According to publicly available sources, Abraham left Array in April of 2021.

### 8.  FTC Solar, Array's Primary Competitor, Was Not Impacted as Severely

93.    Unlike Array, FTC Solar, one of Array's main competitors, provided the market with much more fulsome disclosures regarding their exposure to steel prices. Specifically, on May 17, 2021, FTC Solar issued an 8-K announcing the date of its Q1 2021 earnings release and updating investors on the impact of increasing commodity costs. Therein, FTC Solar reported:

> [W]e are certainly aware of meaningful concerns associated with increasing commodity costs, especially for steel, and increasing logistics costs for international imports. As discussed in detail in our IPO offering materials, FTC Solar is not immune to those pressures, and we have seen steel and logistics pricing continue to increase since that time. However, we are pleased to report that, during the first quarter of 2021, the financial impact of these factors on our performance was manageable. The impacts for first quarter of 2021 are primarily related to shifting a small amount of revenue from the first quarter into the second quarter as a result of a supplier production delay, as well as a small increase in expense reflecting the portion of additional logistics costs that were not passed through to customers.
>
> At FTC Solar we do not currently have any multi-project customer agreements with unprocured or unhedged steel liability. It has been our strategy to lock in our commodity pricing on a project-by-project basis to align our commodity costs with the pricing we offer to customers. . . . While we did not see a significant impact on our business from these factors during the first quarter of 2021, we continue to monitor the global commodity and logistics environment.

94.    Unlike Array, FTC Solar disclosed that it limited its commodity risk by locking in commodity pricing to align commodity costs with the pricing offered to customers and disclosed its cost structure to the market. FTC Solar's disclosures are significant because, unlike Array, FTC Solar did not hold commodity risk for up to 90 days after being awarded a contract and, therefore, did not see a significant impact on its business from commodity price increases.

### 9.  Defendants' Post-Mortem on the Impact of Commodity and Freight Price Increases

95.    Following the Company's revelations to the market about the true impact of rising steel and shipping costs on its margins, on or about May 19, 2021, Defendants held a meeting with

analysts to discuss the impact of rising commodity prices, the impact on the Company's order book, customer reactions and contract renegotiations, and the competitive landscape. During the meeting, management disclosed that while freight accounts for approximately 10% of Array's COGS, steel remained the largest and most important cost input and indicated that Array had modified its procurements process to give suppliers more visibility – instead of volume orders, the suppliers "now know specific customer orders so they can properly commit to the order." Management, acknowledging investors' concerns on the open exposure, indicated that, in the future, closer to 80% of the input would not be as flexible." Recounting the meeting with Defendants, analysts relayed:

> While no projects have been canceled, management is currently undertaking a herculean exercise to re-evaluate roughly 100 open contracts for price and timing. As pricing began to shift in April, management found itself going back once, twice, and, in some cases, three times to re-quote or adjust timelines. The company is still working through the logistics of the ~ $777mm awarded and executed contracts, with roughly half of that the open contracts. Of the 100 contracts, management indicated that it feels good on the conversion for half, while 25% have a 75% conversion probability while the balance will be commercial conversations.

### 10. After the Class Period, Defendants Remediate Procurement and Contracting Process and Disclose Impact of the Company's Failure to Manage Commodity Exposure

96.     On August 18, 2021, on the Company's Q2 2021 earnings call, Defendants stated that "Like most manufacturers, we have seen tremendous increases in input and freight costs over the past several months driven by the reopening of the global economy following the pandemic lockdowns. The magnitude of the increases, and particularly the unprecedented speed with which they have occurred, have put significant pressure on our margins. ***Our gross margin in the second quarter was down 610 basis points.***"

97.     During the Q2 2021 earnings call, Defendants also provided new, material information on the timing of the Company's steel procurement and the window during which the Company traditionally held commodity risk. Defendant Fusaro relayed:

> Historically, we would agree to a price with our customers when they would award us a project. Once the project was awarded, we would start the process of final design and engineering, the result of which was a detailed bill of materials. Once we have that bill of materials, we would place orders from suppliers. The process of finalizing the design and generating the bill of materials could take up to 90 days. The result was that if input costs moved down during that period, our expected gross margin on the order would increase. And if they moved up, it would decrease. *Historically, prices from our suppliers didn't really move much during the 90-day window. And in most cases, they actually went down. At the same time, by ordering later and only after the full bill of materials was complete, we minimized our working capital investment and the chance that we would order too much or too few of a particular component*. That changed in early April when prices for nearly every one of our inputs moved up dramatically in a very short period of time. That 90-day window, which had historically benefited us by reducing our working capital investment and giving us time to negotiate the best price from our suppliers, became a gap that could allow price and cost to become mismatched.
>
> During the second quarter, we took action to close that gap by changing our business process. Today, if a customer wants a fixed price, we offer 2 options: either we offer a price that is good for 30 days with collars around the movement of commodity pricing, if commodity prices move outside those collars, the price is no longer valid and we will requote the project using updated costs; or we offer a price that is good for 7 days only. Under both options, we now require our customers to sign an LOI and make a deposit, which enables us to procure the materials and components that are not impacted by the final design. Buying those components when the customer signs an LOI helps us to lock in our margin on the order because both price and material costs become largely fixed from the outset of the ordering process.

98.     Despite Defendants' remedial efforts, on November 12, 2021, in connection with the Company's Q3 2021 earnings, Defendants disclosed that gross profit as a percentage of revenue decreased from 19.2% for the three months ended September 30, 2020, to just 4.8% for the three months ended September 30, 2021. The Company attributed the decrease in gross margin to higher commodity prices and higher logistics costs. In the 10-Q disclosing the Company's Q3 2021 earnings results, the Company also disclosed that "[d]ue to economic conditions our industry

has seen rapid commodity price increases and strained logistics, causing us to experience temporary decreased margins and thus decreased cash from operations."

99.    In the earnings presentation accompanying the release of the Company's Q3 2021 earnings, Defendants also disclosed that the impact of "legacy" contracts on margins would continue until the second half of 2022, when the Company anticipates margins to return to historical levels. Thus, the Defendants' material and undisclosed exposure to commodity prices will continue to impact Array's margin until at least the second half of 2022, as reflected in the below chart.



### D.    Defendants' Materially False and Misleading Statements and Omissions

100.    The Class Period for Plaintiff's Exchange Act claims begins on October 14, 2020, and runs through May 11, 2021, inclusive. The portions of the statements alleged to be false and misleading are bolded and italicized.

### 1.    The October 14, 2020, IPO Materials

101.    On September 22, 2020, Array (then known as ATI Intermediate Holdings, LLC) filed a Registration Statement on Form S-1 with the SEC which was subsequently amended several times and declared effective by the SEC on October 16, 2020. On or about October 14, 2020, Array issued a Prospectus pursuant to Rule 424(b)(4). These documents are collectively the "IPO Materials." In the IPO, Array sold 7,000,000 shares of Company stock at $22.00 per share for gross proceeds of $154 million and ATI sold 40,050,000 shares of Company stock at $22.00 per share for gross proceeds of $881 million (not including the underwriters' option for additional stock sales). The Registration Statement on Form S-1 was signed by Securities Act Individual Defendants.

102.    The IPO Materials stated in relevant part that one of the Company's "Strengths" was related to its management of costs:

> **_Demonstrated ability to reduce the cost of our products while increasing profit margins._**
>
> In order to enhance the competitiveness of our products and increase our margins, **_we continually work to reduce the cost of our products through innovation and rigorous supply chain management_**. These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, **_while simultaneously increasing gross profits and gross margins_**.
>
> […]
>
> **_Rigorous supply chain management_** supported by a sophisticated enterprise resource planning ("ERP") system.
>
> **_We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold_** while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing

more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. ***To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale.***

[…]

**Highly scalable manufacturing with low capital intensity.**

We are an engineering and technology centric company with an assembly-focused manufacturing model. ***Approximately 80% of our cost of goods sold consists of purchased components, including motors, gearboxes, electronic controllers and steel tubing*** that we source from third-party suppliers. The remainder of our cost of goods sold is primarily labor to fabricate and assemble certain specialized parts of our system. As a result, our business requires minimal capital investment and generates significant cash flow, which has allowed us to make investments in research and development, repay debt and make distributions to our stockholders.

103.   With respect to the Company's "Strategy," the IPO Materials highlighted:

***Leveraging our global supply chain and economies of scale to reduce product cost.***

Purchased components are the largest contributor to our cost of goods sold. ***Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions***.

104.   Defendants' statements concerning the Company's strengths, "demonstrated ability to reduce the cost of [its] products . . . while simultaneously increasing gross profits and gross margins," its "rigorous supply chain management," that "80% of [its] cost of goods sold consists of purchased components," and that the company was "leveraging [its] supply chain and economies of scale to reduce product costs" were false or misleading when made because they failed to disclose that: (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, that (3) Defendants' instructed employees to

33

use lower, outdated prices when evaluating project costs, *see* CW allegations ¶¶76-85, and (4) at the time of the IPO steel had risen by approximately 35% since the prior quarter which *was already* having a material impact on project costs that the Company would be unable to recover from its customers.

105.     With respect to Market Risk, the IPO Materials disclosed:

**Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that ***may*** impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in steel and aluminum prices and customer concentrations.

[…]

*Commodity Price Risk*

We are subject to risk from fluctuating market prices of certain commodity raw materials, including steel and aluminum, that are used in our products. Prices of these raw materials ***may*** be affected by supply restrictions or other market factors from time to time, and we do not enter into hedging arrangements to mitigate commodity risk. Significant price changes for these raw materials ***could*** reduce our operating margins ***if*** we are unable to recover such increases from our customers, and could harm our business, financial condition and results of operations.

106.     Defendants' statements concerning the *possible* impacts of commodity price risk were false and misleading when made because they failed to disclose that (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, (3) Defendants' instructed employees to use lower, outdated prices when evaluating project costs, *see* CW allegations ¶¶76-85, and (4) at the time of the IPO steel had risen by approximately 35% since the prior quarter which *was already* having a material impact on project costs that the Company would be unable to recover from its customers.

### 2.    The November 5-6, 2020, Q3 2020 Earnings Results Statements

107.    On November 5, 2020, Array issued a press release on Form 8-K announcing the

Company's Q3 2020 results and on November 6, 2020, Array held a conference call with analysts

to discuss Q3 2020 results. During this call, Defendant Patel stated in part:

> Gross margins in the third quarter were lower than the prior year
> period as a result of ***having less revenue to absorb fixed costs as
> well as higher logistics costs***, largely driven by the global shipping
> constraints due to COVID-19.  Importantly, ***we view both of these
> dynamics as short term in nature and not indicative of longer-term
> margin pressure***. . . .
>
> [...]
>
> Now turning to our 9-month results. . . . Gross margins increased
> 24.2% from 21.3% in the prior year period, ***driven by reductions in
> purchase materials resulting from improved supplier
> arrangements and shifting volumes for certain components to new
> lower-cost suppliers*** and greater leverage of fixed costs against
> higher sales volumes. . . .

108.    On the same call, in response to analyst questions concerning average selling prices,

or ASPs, CFO Patel stated:

> **Brian K. Lee,** Goldman Sachs Group, Inc., Research Division
> Okay. That's helpful. And then you mentioned, Nipul, the ASPs
> were flat from 2Q to 3Q. I assume that's a comment on the overall
> mix of business. Would you say the trends, ASP wise, were pretty
> similar across the 2 regions?
>
> **Nipul A. Patel**, Chief Financial Officer
>
> Yes. ***We're not seeing any changes in the pricing environment..***

109.    On the same call, in response to analyst questions concerning business drivers and

trends, CEO Fusaro stated, "So our customers continue to see the value of our product, and ***those

trends really haven't changed. If anything, they continue to strengthen on the basis of our value

proposition***."

35

110.    Defendants' statements concerning logistics costs, reductions in the cost of purchased materials, and trends in the pricing environment continuing to strengthen on the basis of the Company's "value proposition" were false and misleading when made because they failed to disclose that (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, (3) Defendants' instructed employees to use lower, outdated prices when evaluating project costs, *see* CW allegations ¶¶76-85, and (4) by November 5, 2020, steel had risen in price by approximately another 11% since the IPO which *was already* having a material impact on project costs that the Company would be unable to recover from its customers.

### 3.    The December 2, 2020, SPO Statements

111.    On November 30, 2020, Array filed a Registration Statement on Form S-1 with the SEC which was subsequently amended and declared effective by the SEC on December 2, 2020. On or about December 2, 2020, Array issued a Prospectus pursuant to Rule 424(b)(4). These documents are collectively referred to as the "December 2020 SPO Materials." In the December 2020 Offering, ATI sold 40,050,000 shares of Company stock at $22.00 per share for gross proceeds of $1.1 billion (not including the underwriters' option for additional stock sales). The Registration Statement on Form S-1 was signed by Securities Act Individual Defendants.

112.    The December 2020 SPO Materials repeated verbatim the statements made in the IPO Materials.

113.    Defendants' statements in the December 2020 SPO Materials concerning the Company's strengths, "demonstrated ability to reduce the cost of [its] products . . . while simultaneously increasing gross profits and gross margins," its "rigorous supply chain management," that "80% of [its] cost of goods sold consists of purchased components," that the company was "leveraging [its] supply chain and economies of scale to reduce product costs," and

that the Company may experience commodity risk were false or misleading when made because they failed to disclose that (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, (3) Defendants' instructed employees to use lower, outdated prices when evaluating project costs, *see* CW allegations ¶¶76-85, and (4) by December 2, 2020, steel had risen in price by approximately another 27% since the IPO which *was already* having a material impact on project costs that the Company would be unable to recover from its customers.

### 4.   The March 9, 2021, Q4 2020 and Full Year 2020 Earnings Statements

114.   On March 9, 2021, Array issued a press release on Form 8-K announcing the Company's Q4 2020 and full year 2020 results. Therein, the Company disclosed for Q4 2020:

> *Gross margin decreased from 27% to 20% driven by less revenue to absorb fixed costs and project mix*.

The Company also disclosed with respect to full year 2020:

> *Gross margin was flat versus the prior year period driven by reductions in the cost of purchased materials which offset higher logistics costs in the second half of the year caused by COVID-19 related freight increases*.

The Company also disclosed full year 2021 guidance, stating:

> **Full Year 2021 Guidance**
>
> For the full year 2021 ending December 31, 2021, the Company expects:
>
> •Revenues to be in the range of $1,025 million to $1,125 million
>
> •*Adjusted EBITDA to be in the range of $164 million to $180 million*
>
> •*Adjusted net income per share to be in the range of $0.82 to $0.92*

In his prepared remarks, Defendant Patel added:

> Commodity prices and freight costs have increased significantly over the past several months as business activity levels are

increasing in response to the availability of a COVID-19 vaccine and capacity that was idled during the pandemic comes back online. ***While we currently expect commodity prices and shipping costs to normalize, the low end of our Adjusted EBITDA guidance range contemplates a delayed return to a normal pricing environment[.]***

115.    Defendants' statements concerning the causes of the decrease in gross margin and the full year 2021 EBITDA and margin guidance were false and misleading when made because they failed to disclose that (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, (3) Defendants' instructed employees to use lower, outdated prices when evaluating project costs, ¶¶76-85, and (4) by March 9, 2021, steel had risen in price by approximately another 56% since the December SPO which *was already* having a material impact on project costs that the Company would be unable to recover from its customers.

116.    On March 9, 2021, Array held a conference call with analysts to discuss Q4 2020 results. During this call, Patel stated in relevant part:

> And finally, commodity prices and freight costs have increased significantly over the past several months as a result of the re-acceleration of the global economy while certain transportation and raw material capacity remains offline as a result of the pandemic. ***While*** we expect prices to normalize and ***our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by making these cost into the low end of our guidance assuming a delayed return to more normalized pricing***.

117.    On the same call, an analyst from Goldman Sachs asked whether, given the increases in commodity costs, Defendants could continue to pass those costs onto customers in the form of increased average selling prices. Defendant Patel respond, "We've held prices relatively flat, and we think they're stable. ***However, we do have the option, as mentioned, as -- to go back into the market. We built in that range in our guidance to allow us to evaluate case by case, Brian. But yes, we do have that option***."

118.    On the same call, an analyst from Guggenheim Securities asked whether "as we sort of think about margins maybe in the medium term, say post-'21, should we assume some incremental margin compression further from what we're seeing today as you're guiding . . . [o]r should we assume maybe that 16% is a pretty good floor for our modeling purposes as we think about post-'21?" Defendant Patel responded that "With the commodity pricing as it is right now, that's -- and the investments we're making consciously for the revenues that will be coming, *we feel that that is kind of near the floor where we feel*."

119.    Continuing to focus on margins and the cost of steel, later in the same call, a different analyst asked "is the cost of steel becoming a problem for you, world steel [*sic*]?" Defendant Fusaro responded in relevant part:

> *So, we obviously manage and monitor all commodities accordingly, and then we build in productivity measures to address that to continue to drive our value.* If your question was pertaining to our supply chain, -- sorry, Michael, could you clarify your question?
>
> [Analyst]: … I'm thinking about the pressure on margins from cost inputs.
>
> [Fusaro]: *Yes. I mean, there is always going to be pressure on cost. That's pretty much market-agnostic and product-agnostic. But that said, we've actually built up, we continue to build out our supply chain.* We added 15 new suppliers in four new countries. So that's just going to be an area that we remain focused on going forward as we grow both domestic here and internationally.

120.    An analyst also asked: "[Y]ou're talking about the first half of the year fully booked based on the backlog and when would you be buying that steel[,] just as it's been moving quite a bit? So have you locked in the steel as you locked in that pricing, so you have high visibility into the margins or not necessarily so?" Defendant Patel responded, "*Yes*", indicating that the Company had high visibility into margins.

121.    An analyst also asked:

> So in the guidance, you highlight your expectation that commodity prices and freight charges to normalize over time. Just curious what drives that normalization view and then how long it would take -- how long the cost would need to remain elevated before you seriously decided are considered passing it on to customers, and then how to think about any concerns surrounding implications to demand from customers from higher costs?

Defendant Patel responded in relevant part:

> So as far as that first part of the question, as far as how long we think it is and obviously, it's unknown. . . . And as far as your second half of the question, *we're always evaluating all our pricing on our projects and we know that we have that ability and we'll look at it on a case by case basis*, so.

122.   Defendants' statements concerning the stability of ASPs, Array's ability to go back to customers and pass on the cost of increasing commodity prices, that the lower end of the 2021 margin guidance range represent a reasonable "floor," and that Defendants had high visibility into margins were false and misleading when made because they failed to disclose that (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, (3) Defendants' instructed employees to use lower, outdated prices when evaluating project costs, *see* CW allegations ¶¶76-85, and (4) by March 9, 2021, steel had risen in price by approximately 56% since the December SPO which *was already* having a material impact on project costs that the Company would be unable to recover from its customers..

### 5.   The March 18-22, 2021, SPO Statements

123.   On March 16, 2021, Array filed a Registration Statement on Form S-1 with the SEC was declared effective by the SEC March 18, 2021. On or about March 22, 2021, Array issued a Prospectus pursuant to Rule 424(b)(4). These documents are collectively referred to as the "March 2021 SPO Materials." In the March 2021 Offering, ATI sold 31,054,971 shares of Company stock at $28.00 per share for gross proceeds of $870 million (not including the underwriters' option for

additional stock sales). The Registration Statement on Form S-1 was signed by Securities Act Individual Defendants.

124.    The March 2021 SPO Materials, which incorporated by reference the Company's Annual Report on Form 10-K for fiscal year ending December 31, 2020, published on March 10, 2021 ("2020 10-K"), repeated verbatim the statements made in the IPO Materials. Defendants' statements in the March 2021 SPO Materials concerning the Company's strengths, "demonstrated ability to reduce the cost of [its] products . . . while simultaneously increasing gross profits and gross margins," its "rigorous supply chain management," that "80% of [its] cost of goods sold consists of purchased components," that the company was "leveraging [its] supply chain and economies of scale to reduce product costs," and that the Company may experience commodity risk were false or misleading when made because they failed to disclose that (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, (3) Defendants' instructed employees to use lower, outdated prices when evaluating project costs, *see* CW allegations ¶¶76-85, and (4) by March 18, 2021, steel had risen in price by approximately another 56% since the IPO which *was already* having a material impact on project costs that the Company would be unable to recover from its customers.

125.    The 2020 10-K, incorporated by reference in the March 2021 SPO Materials, also disclosed with respect to Summary Risk Factors:

> we are dependent on transportation and logistics providers to deliver our products in a cost efficient manner. Disruptions to transportation and logistics, including increases in shipping costs, ***could*** adversely impact our financial condition and results of operations;

With respect to Risks Related to Growth and Operations, the 2020 10-K disclosed:

> We are dependent on transportation and logistics providers to deliver our products in a cost efficient manner. Disruptions to transportation and logistics, including increases in shipping costs,

*could* adversely impact our financial condition and results of operations.

We rely on transportation and logistics providers for the delivery of our products. We may also incur additional shipping costs when we need to accelerate delivery times. Our ability to deliver our products in a cost efficient manner *could* be adversely impacted by shortages in available cargo capacity, changes by carriers and transportation companies in policies and practices, such as scheduling, pricing, payment terms and frequency of service or increases in the cost of fuel, taxes and labor, disruptions to shipping facilities as a result of the

COVID-19 or other epidemics, and other factors not within our control. Disruptions to transportation and logistics, including increases in shipping costs, *could* adversely impact our financial condition and results of operations.

126.   Defendants' statements in the 2020 10-K that the Company *could* be adversely impacted by transportation, logistics, and shipping cost increases were false or misleading when made because they failed to disclose that Defendants' instructed employees to use lower, outdated prices when evaluating project costs, see CW allegations ¶¶76-85, which was *already* having a material impact on project costs that the Company would be unable to recover from its customers.

###    E.    Additional Scienter Allegations Relevant to Exchange Act Claims

127.   During the Class Period, as alleged herein, the Defendants acted with scienter in that the Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

128. The Defendants permitted Array to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

### 1. The Fraud Concerns the Core Operations of Array

129. Array's core operation is the manufacture, sale, and installation of tracker systems, which account for principally all of the Company's revenues. Given the specific allegations of falsity contained herein, a strong inference exists that Array's corporate officials knew of the falsity of the alleged misstatements at the time of publication and/or failed to disclose material facts necessary not render their statements truthful. Specifically, Array tracked steel and freight costs, which information was provided to, reviewed, and discussed by the Exchange Act Individual Defendants. *See* ¶¶76-85. Defendants in turn either knowingly or recklessly ignored the impact of the prices increases when speaking about the Company's supply chain strengths, ability to manage commodity costs, and margins.

130. Specifically, CW2 participated in quarterly meetings with Fusaro in addition to occasional emergency meetings and daily meetings when Fusaro visited the Albuquerque, NM office. CW2 advised that he generated a weekly pricing and logistical report that was disseminated to the entire company, including Fusaro, and that the reports were reviewed during daily meetings. CW2 went on to say that he was not allowed to report the true, higher prices, in these reports, but that "there was no way" that Fusaro did not know that prices were higher than reported. CW2 further recalled that everyone at Array knew about the higher prices but that it was not acknowledged publicly. CW2 continued to say that, beginning in mid-2019, delivery and transit lead times, which CW2 explained as the time required to deliver materials to customers, began to increase, and continued increasing up until the time that CW2 resigned from Array in June 2020.

CW2 elaborated that lead times increased from 8 – 10 weeks to 12 – 16 weeks. CW2 continued to say that he reported the increased lead times to Abraham and COO Bolland.

131.    CW2 further recalled that forecasting and steel prices were discussed in monthly SIOAP meetings with the company's operations managers, the CEO, CFO, and Director of Procurement. CW2 explained that SIOAP stood for: Sales, Inventory, Operations, and Procurement. CW2 recounted how at those meetings, there were reports generated and disseminated. CW2 described SIOAP meetings as the coming together of "everyone involved" to discuss all parts of the Company's operations. CW2 added that "everyone involved" included Array's executive team, managers for each area of the SIOAP, and logistics.

132.    In reference to Defendants' knowledge of steel pricing trends, CW4 stated that Fusaro and Bolland knew the "head person" at two of Array's main steel vendors and would regularly coordinate with them directly and take them to monthly dinners when they were in town where they would discuss the price of steel.

> **2.      The Offerings Provide Motive and Opportunity for Defendants to Misrepresent the Extent and Duration of Array's Commodity Exposure**

133.    In 2016, Oaktree invested in Array to provide the company with "capital and strategic support to expand its global footprint as a leading provider of utility-scale solar tracking solutions." Oaktree and Array's founder, Ron P. Corio thus beneficially owned a majority of Array's common stock through ATI Investment Parent, LLC, which owned 100% of Array's common stock prior to the IPO. Following the IPO, Oaktree and Ron P. Corio beneficially owned approximately 63% of Array's total outstanding shares of common stock.  In the IPO, Oaktree and Ron P. Corio sold their Array common stock for proceeds of approximately $840 million. Array itself sold some common stock for proceeds of approximately $145 million, which it intended to use to prepay approximately $125,000,000 of the outstanding principal amount under the

Company's credit facility and for general corporate purposes. At the time of the IPO, the price of steel had risen approximately 35%. No mention of the trend in steel costs and its impact on Array's margins was made in Array's IPO Materials or other public filings, allowing Defendants to sell Array common stock at inflated prices.

134.    Between the close of Array's IPO and the December 2020 SPO, steel increased by *another* 42%. In the December 2020 SPO, Oaktree and Ron P. Corio sold Array common stock for net proceeds of approximately $1.08 billion, reducing their beneficial ownership to 32% of the company's shares of common stock. No mention of the trend in steel costs and its impact on Array's margins was made in Array's December 2020 SPO Materials.

135.    Between the close of the December 2020 SPO and the March 2021 SPO, steel increased by *another* 56%. In the March 2020 SPO, Oaktree and Ron P. Corio sold Array common stock for net proceeds of approximately $845 million, reducing their beneficial ownership to approximately 3.7% of the company's shares of common stock. Again, no mention of the impact of rising steel costs on Array's margins was made in Array's March 2021 SPO Materials.

136.    Thus, in the Offerings, Oaktree and Ron P. Corio cashed out almost all of their Array common stock for ***proceeds in excess of $2.75 billion***, providing motive and opportunity for Defendants' failure to disclose the impact of increasing steel and freight costs on the Company's margins and business prospects.

137.    As set forth herein, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Array, their control over, receipt, or modification of Array's allegedly materially misleading statements and omissions, or their positions within the Company that made them privy to confidential information concerning Array, participated in the fraudulent scheme alleged herein.

138.    The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Array securities by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding Array's business, operations, and management and the intrinsic value of Array securities and caused Plaintiff and members of the Class to purchase Array securities at artificially inflated prices.

### F.    Loss Causation/Economic Loss

139.    During the Class Period, as detailed herein, Array and the Exchange Act Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Array securities, and operated as a fraud or deceit on Class Period purchasers of Array securities by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Array securities declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Array securities during the Class Period while prices were artificially inflated due to Defendants' misrepresentations and omissions, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

140.    First, on March 9, 2021, after the close of trading, Array reported its financial results for Q4 2020 and full year 2020. For the fourth quarter of 2020, Array reported that gross margin had "decreased from 27% to 20% driven by less revenue to absorb fixed costs and project mix." For the full year 2020, Array reported that "gross margin was flat versus the prior year period driven by reductions in the cost of purchased materials which offset higher logistics costs in the second half of the year caused by COVID-19 related freight increases." The Company also issued

guidance for 2020, projecting in relevant part that for the full year 2021 ending December 31, 2021, the Company expected:

> \* Revenues to be in the range of $1,025 million to $1,125 million

> \* Adjusted EBITDA to be in the range of $164 million to $180 million

Defendant Patel added that "Commodity prices and freight costs have increased significantly over the past several months as business activity levels are increasing in response to the availability of a COVID-19 vaccine and capacity that was idled during the pandemic comes back online. While we currently expect commodity prices and shipping costs to normalize, the low end of our Adjusted EBITDA guidance range contemplates a delayed return to a normal pricing environment."

141.   Commenting on the news, Roth Capital Partners noted that "there has been a modest downward shift in the company's margin outlook. The power to pass on rising input costs to customers may not be as strong as expected." Roth Capital Partners elaborated that "ARRY still has pass through pricing power, but is choosing to use it judiciously. We believe management could take a conservative approach and not pass along all the cost increase to possibly share some of the pain with its customers. So the slightly worse than expected margin outlook reflects the need to support customers for the long game."

142.   As a result of Defendants' partial disclosure of the impact of increasing commodity costs on margins, Array's stock price decreased $1.51, or 4.31%, to close at $33.52 on March 10, 2021, injuring Class members.

143.   Then, on May 11, 2021, Array disclosed that continued increases in both steel and freight costs would significantly impact margins in Q2 and for the remainder of the year, causing Array to withdraw its guidance for 2021 as it entered negotiations with customers on how to allocate the cost increases.

144.    Guggenheim Partners noted that the "sudden headwinds" were a reminder of Array's commodity exposure, which Defendants had previously stated could be passed on to customers. Morgan Stanley similarly noted that "ARRY is experiencing steep increases in steel and freight costs and the company is less insulated than we previously expected. We are lowering our revenue forecast on project delays and reducing margins for exposure to input cost inflation. Reducing PT from $30 to $19 and remaining EW." Many analysts, including Morgan Stanley, lowered their ratings and price targets in response to the news, further noting that there "could be delays in customer projects as a result of steel price increases as developers wait for a potentially better price or find alternative suppliers." Barclays similarly downgraded Array stock from "Overweight" to "Underweight" noting concerns about volumes, margins, and earnings power. Piper Sandler downgraded its rating to "Neutral" from "Overweight" and similarly cited concerns regarding lack of visibility on revenues and margins.

145.    On this news, on May 12, 2021, Array's stock cratered by $11.49 a share, *or 46%*, to close at $13.46 a share on unusually high trading volume, injuring Lead Plaintiff and the Class.

**G.    Applicability of Presumption of Reliance: Fraud on the Market**

146.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Array securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

147.    At all relevant times, the markets for Array securities were efficient for the following reasons, among others:

(a)     as a regulated issuer, Array filed periodic public reports with the SEC;

(b)     Array regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide- ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Array was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Array securities was actively traded in an efficient market, namely the Nasdaq Global Market, under the ticker symbol "ARRY."

148.    As a result of the foregoing, the market for Array securities promptly digested current information regarding Array from publicly available sources and reflected such information in Array's stock price. Under these circumstances, all purchasers of Array securities during the Class Period suffered similar injury through their purchase of Array securities at artificially inflated prices and the presumption of reliance applies.

149.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff and the Class are entitled to a

presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).

### H.     No Safe Harbor

150.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Array who knew that the statement was false when made.

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Array and the Exchange Act Individual Defendants

151.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

153.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Array securities during the Class Period.

154.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Array securities. Lead Plaintiff and the Class would not have purchased Array securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

155.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Array securities during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants and Oaktree

156.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

157.   The Exchange Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel acted as controlling persons of Array within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Array, the Exchange Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel had the power and ability to control the actions of Array and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## V.   SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

158.   The claims set forth herein pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act are brought on behalf of persons or entities who purchased or otherwise acquired Array common stock pursuant or traceable to the Array Offering Materials. The Securities Act claims are based solely on strict liability and negligence and are not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, these claims do not allege, and do not sound in, fraud—and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims.

159.   The Securities Act claims are asserted against the Company, the Securites Act Individual Defendants who signed the registration statements, the Underwriter Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel. Each of these defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the registration statements and accompanying prospectuses. Additionally, Section 12(a)(2) claims are asserted against the Underwriter Defendants who sold shares in the Offerings on behalf of Class members who purchased common stock in the Offerings.

160.   The Securities Act claims are based on the fact that the IPO and SPO Registration Statements contained untrue statements of material fact and omitted material facts about the Company's business and operations, including misrepresentations and omissions regarding

Array's exposure to rising commodity prices and the resulting impact on the Company's margins and business prospects, as detailed *supra* in ¶¶59-99.

161.    The Securities Act claims against the Underwriter Defendants and the Director Defendants are premised upon their negligent failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements. Had the Underwriter Defendants and the Director Defendants not acted negligently, and had they conducted reasonable due-diligence investigations before the offerings, they would have uncovered that the IPO and SPO Registration Statements contained untrue statements of fact and omitted material facts.

162.    With respect to the Underwriter Defendants and the Director Defendants, Lead Plaintiffs' Securities Act claims are not based on any knowing or reckless misconduct on the part of these defendants. Thus, for purposes of the liability of these defendants, named in Counts III-V, Lead Plaintiffs' claims do not sound in fraud, and Lead Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims.

163.    As underwriters of Array's IPO, each of the Underwriter Defendants had a duty to conduct a reasonable due-diligence investigation to ensure that the offering documents did not contain any false or misleading statements or fail to disclose any material information needed to make the information provided in the offering documents not misleading. However, in their rush to bring Array to market and collect their hefty fees, the Underwriter Defendants failed to conduct a reasonable due-diligence investigation into the accuracy of the IPO and SPO Registration Statements. Had they done so, the Underwriter Defendants would have uncovered red flags that called into question the accuracy of the IPO and SPO Registration Statements.

164.     The Underwriter Defendants participated directly in drafting the IPO and SPO Registration Statements, as demonstrated by the fact that the IPO and SPO Registration Statements prominently displayed the names of each of the Underwriter Defendants on the first page of the prospectuses. Moreover, the Underwriter Defendants were responsible for setting the offering price of common stock sold in the offerings. The Underwriter Defendants were also required to deliver a copy of the IPO or SPO prospectuses to buyers who purchased in each offering, and a copy of the IPO and SPO prospectuses were made available on websites maintained by one or more of the Underwriter Defendants. Accordingly, the Underwriter Defendants were required to exercise due diligence before offering Array common stock to investors. However, the Underwriter Defendants negligently failed to conduct a reasonable investigation into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements.

165.     At the times of the IPO and the SPOs, Array had a limited audit history. The IPO and SPO Registration Statements included audited financial statements only for full-year 2018 and 2019. Moreover, Array had identified several material weaknesses in Array's internal controls over financial reporting in the context of auditing its 2018 and 2019 financial results. As Array disclosed in the IPO and SPO Registration Statements, it suffered from several material weaknesses in its internal controls over financial reporting, including:

> material weaknesses . . . related to our financial close process, reconciliation of deferred and unbilled revenue, and inventory cut-off and pricing, specifically due to lack of qualified accounting and finance personnel. In preparing our financial statements for the years ended December 31, 2018 and 2019, our internal controls failed to detect certain errors related to the classification of deferred and unbilled revenue, as well as inventory.

166.     At the time of the IPO, Array's management had not completed an assessment of the effectiveness of the Company's internal control over financial reporting and the Company's independent registered public accounting firm had not conducted an audit of the Company's

internal control over financial reporting. That these material weaknesses in internal controls over financial reporting specifically related to inventory pricing were a glaring red flag. Underscoring this red flag, Array's outside auditor expressly disclaimed any "opinion on the effectiveness of the Company's internal control over financial reporting" in its audit opinion(s) included in the Offering Materials.

167.     The existence of these material weaknesses and the lack of any external audit of Array's internal controls should have prompted the Underwriter Defendants to scrutinize Array's internal controls over financial reporting to ensure that Array's claims about the valuation of its inventory and resulting impact on margins were accurate. The foregoing red flags should have caused the Underwriter Defendants to conduct additional due diligence before drafting and disseminating the IPO and SPO Registration Statements. By overlooking these red flags, the Underwriter Defendants negligently failed to conduct reasonable due diligence into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements, and are liable for the misstatements and omissions contained in the registration statements.

### A.     The IPO and SPO Materials Violated SEC Regulation S-K

168.     Regulation S-K, 17 C.F.R. § 229.303(b)(2) ("Item 303"), requires public companies to "describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." Item 303 also requires public companies to disclose "trends or uncertainties" that the registrant reasonably expects will "have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." These disclosures must be made in the management's discussion and analysis of financial condition and results of operations ("MD&A") section of a registration statement. A company's failure to disclose information required by Item 303 in its annual and quarterly reports

filed with the SEC is actionable under the federal securities laws, including under Section 10(b) of the Exchange Act.

169.    The purpose of MD&A disclosures, according to the SEC, is to provide investors with information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." C.F.R. § 229.303(b). In particular, there are three principal objectives of the MD&A: (i) to provide an explanation of a company's financial statements that enables investors to see the company through management's eyes; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality and potential variability of a company's earnings and cash flow, so that investors can judge the extent to which past performance predicts future performance.

170.    For the past thirty years, the SEC has emphasized that public companies have a duty to disclose significant trends, risks, and uncertainties that could affect their performance in the future. First, on May 18, 1989, the SEC issued an interpretive release concerning registrants' MD&A disclosure obligations, including those arising under Item 303 (SEC Release No. 33-6835 (May 18, 1989) ("1989 Release")). The 1989 Release affirms that the MD&A sections of public company SEC filings "are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, **_with particular emphasis on the registrant's prospects for the future_**." 1989 Release, at *3.

171.    Citing Securities Act Release Nos. 6711 and 6349, the 1989 Release also states:

MD&A is intended to give the investor an opportunity to look at the company **_through the eyes of management_** by providing both a short and long-term analysis of the business of the company. . . . It is the responsibility of management to identify and address those key variables and other qualitative and

quantitative factors *which are peculiar to and necessary for an understanding and evaluation of the individual company*.

(emphasis added).

172.    Moreover, quoting the Instructions to Item 303, the 1989 Release states that the MD&A "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 1989 Release, at *4.

173.    On January 28, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 (Release Nos. 33-8182; 34-47264, ("2003 Rule")). It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." *Id.* at 2. The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show and do not show, as well as important trends and risks that have shaped the past or are reasonably likely to shape the future." *Id.*

174.    The Exchange Act Defendants' failure to disclose the impact of rising steel and freight costs which existed at the time of the Company's IPO and SPOs violated Item 303 and Section 10(b) of the Exchange Act. Without this information, investors had no ability to view Array "through the eyes of management" or know what Array's financial statements did "not show," including the "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition" and "important trends and risks that have shaped the past or are reasonably likely to shape the future."

175.    SEC Regulation S-K, 17 C.F.R. § 229.503(c) ("Item 503"), requires public companies to disclose in a registration statement, among other things, a "discussion of the ***most significant factors that make the offering speculative or risky***." Item 503 also requires public companies to "[e]xplain how the risk affects the issuer or the securities being offered." A company's failure to disclose information required by Item 503 in its registration statement is actionable under the federal securities laws, including under Section 10(b) of the Exchange Act. Array's IPO and SPO Materials failed to disclose information regarding material risks as required by Item 503, including risks related to Array's undisclosed exposure to commodity prices for up to 90 days after being awarded a contract. The disclosures in the IPO and SPO Registration Statements therefore failed to adequately alert investors to the actual risks associated with an investment in Array.

### B.    False and Misleading Statements in the IPO Documents

176.    On September 22, 2020, Array (then known as ATI Intermediate Holdings, LLC) filed a Registration Statement on Form S-1 with the SEC which was subsequently amended several times and declared effective by the SEC on October 14, 2020. On or about October 14, 2020, Array issued a Prospectus pursuant to Rule 424(b)(4). These documents are collectively the "IPO Materials." In the IPO, Array sold 7,000,000 shares of Company stock at $22.00 per share for gross proceeds of $154 million and ATI sold 40,050,000 shares of Company stock at $22.00 per share for gross proceeds of $881 million (not including the underwriters' option for additional stock sales).

177.    The IPO Materials stated in relevant part that one of the Company's "Strengths" was related to its management of costs:

> ***Demonstrated ability to reduce the cost of our products while increasing profit margins.***

In order to enhance the competitiveness of our products and increase our margins, *we continually work to reduce the cost of our products through innovation and rigorous supply chain management*. These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, *while simultaneously increasing gross profits and gross margins*.

[…]

*Rigorous supply chain management* supported by a sophisticated enterprise resource planning ("ERP") system.

*We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold* while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. *To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage*.

[…]

**Highly scalable manufacturing with low capital intensity.**

We are an engineering and technology centric company with an assembly-focused manufacturing model. *Approximately 80% of our cost of goods sold consists of purchased components, including motors, gearboxes, electronic controllers and steel tubing* that we source from third-party suppliers. The remainder of our cost of goods sold is primarily labor to fabricate and assemble certain specialized parts of our system. As a result, our business requires minimal capital investment and generates significant cash flow, which has allowed us to make investments in research and development, repay debt and make distributions to our stockholders.

178. With respect to the Company's "Strategy," the IPO Materials highlighted:

*Leveraging our global supply chain and economies of scale to reduce product cost.*

59

Purchased components are the largest contributor to our cost of goods sold. ***Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions***.

179. With respect to Market Risk, the IPO Materials disclosed:

**Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that ***may*** impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in steel and aluminum prices and customer concentrations. We do not hold or issue financial instruments for trading purposes.

[…]

*Commodity Price Risk*

We are subject to risk from fluctuating market prices of certain commodity raw materials, including steel and aluminum, that are used in our products. Prices of these raw materials ***may*** be affected by supply restrictions or other market factors from time to time, and we do not enter into hedging arrangements to mitigate commodity risk. Significant price changes for these raw materials ***could*** reduce our operating margins if we are unable to recover such increases from our customers, and could harm our business, financial condition and results of operations.

180. The IPO Materials were materially false and misleading in that they negligently failed to adequately disclose the impact of rising steel and freight costs on the Company's margins and operations. These were likely to have, and were having, an adverse effect on the Company's business and operations. The IPO Materials were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation. *See* ¶¶104, 106.

181.    Moreover, under applicable SEC rules and regulations, the IPO Materials were required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations. *See* ¶¶168-175.

      **C.**    **False and Misleading Statements in the December 2020 SPO Materials**

182.    On November 30, 2020, Array filed a Registration Statement on Form S-1 with the SEC which was subsequently amended and declared effective by the SEC on December 2, 2020. On or about December 4, 2020, Array issued a Prospectus pursuant to Rule 424(b)(4). These documents are collectively referred to as the "December 2020 SPO Materials." In the December 2020 Offering, ATI sold 31,875,000 shares of Company stock at $35.00 per share for gross proceeds of $1.1 billion (not including the underwriters' option for additional stock sales).

183.    The December 2020 SPO Materials repeated verbatim the statements made in the IPO Materials.

184.    The December 2020 SPO Materials failed to adequately disclose the impact of then-existing rise of costs related to certain supplies such as steel on the Company's margins and business model. These were likely to have, and were having, an adverse effect on the Company's business and operations. The December 2020 SPO Materials were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation. They were materially false and misleading in that they omitted to state, *inter alia*, the ongoing impact of various rising costs, and as a result of the foregoing, the Company's positive statements about its business and operations lacked a reasonable basis. *See* ¶113.

185.    Moreover, under applicable SEC rules and regulations, the December 2020 SPO Materials were required to disclose known trends, events, or uncertainties that were having, and

were reasonably likely to have, an impact on the Company's continuing operations. *See* ¶¶168-175.

**D.      False and Misleading Statements in the March 2021 SPO Materials**

186.      On March 16, 2021, Array filed a Registration Statement on Form S-1 with the SEC was declared effective by the SEC March 18, 2021. On or about March 22, 2021, Array issued a Prospectus pursuant to Rule 424(b)(4). These documents are collectively referred to as the "March 2021 SPO Materials." In the March 2021 Offering, ATI sold 31,054,971 shares of Company stock at $28.00 per share for gross proceeds of $870 million (not including the underwriters' option for additional stock sales).

187.      The March 2021 SPO Materials statements and those incorporated by reference in the March 2021 SPO Materials are identified in ¶¶124-125, *supra*.

188.      The March 2021 SPO Materials failed to adequately disclose the then-existing rise of costs related to certain supplies such as steel, as well as the Company's freight costs. These were likely to have, and were having, an adverse effect on the Company's business and operations. The March 2021 SPO Materials were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation. They were materially false and misleading in that they omitted to state, *inter alia*, the ongoing impact of various rising costs, and as a result of the foregoing, the Company's positive statements about its business and operations lacked a reasonable basis. *See* ¶¶124, 216.

189.      Moreover, under applicable SEC rules and regulations, the March 2021 SPO Materials were required to disclose known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations. *See* ¶¶168-175.

E.   **As Information that Was Incorrectly Stated in, and Omitted from the Offering Materials Is Gradually Disclosed, the True Value of Array's Common Stock Is Revealed**

190.   The Offering Materials contained untrue statements of material fact and omissions of material fact that rendered the statements made in the registration statements misleading, as well as material omissions in violation of the affirmative disclosure obligations applicable to the registration statements. As a result of these misstatements and omissions, the information disclosed in the Offering Materials did not accurately reflect the risks associated with investments in Array common stock, and therefore the initial offering price set for the Offerings did not reflect the true value of Array common stock.

191.   As the information concealed by the registration statements' misstatements and omissions was gradually disclosed to the market, the disclosure of this new information revealed the true value of Array common stock, causing the trading price of Array common stock to decline, thereby damaging Plaintiffs and the Class.

192.   On May 11, 2021, after the close of trading, Array shocked the market by reporting, *inter alia*, lower revenues year-over-year and lower margins as a result of increased steel and shipping costs in a press release and a Form 8-K filed with the SEC:

> "Revenues for the first quarter of 2021 were in line with our expectations and Adjusted EBITDA was slightly below our expectations as a result of higher than expected logistics costs. Results were lower compared to last year because of the unseasonably high volume of shipments we had in the first quarter of 2020 to customers that were 'safe harboring' tracker systems in connection with the ITC step-down" said Jim Fusaro, Chief Executive Officer of Array Technologies.

> […]

> At the same time as we are seeing record demand for solar, our industry is contending with increases in steel and shipping costs that are unprecedented both in their magnitude and rate of change. From Q1 2020 to Q1 2021, spot prices of hot rolled coil steel, the primary

raw material used in our products, more than doubled and have continued to increase in the second quarter with spot prices up over 10% since April 1st. Steel represents almost half of our cost of goods sold and we do not hold large amounts of steel inventory, so a significant increase in the price of steel over a short period of time can negatively impact our results.

"The continuing increases in both steel and freight costs will impact our margins in the second quarter and potentially in subsequent quarters if prices do not normalize. We are taking several actions to mitigate the impact on the balance of the year, including passing through higher commodity and shipping costs to our customers, fixing commodity prices with our suppliers, entering into long-term contracts with freight providers, further diversifying our supply base, and increasing order lead-times to give us more time to procure raw material."

[…]

**First Quarter 2021 Financial Results**

Revenues decreased 44% to $245.9 million compared to $437.7 million for the prior-year period, primarily driven by a reduction in the amount of ITC safe harbor related shipments.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, higher margins on the 2020 safe harbor shipments, higher input costs due to a rapid increase in commodity prices and greater freight costs resulting in part from disruptions caused by the winter storm in Texas as well as port closures and congestion.

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of one-time costs related to our common stock follow-on offerings, and higher costs associated with being a public company and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to income of $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million, compared to $110.7 million for the prior-year period.

Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year and adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year.

193.   During a conference call with investors after the close of trading on May 11, 2021,

Defendant Fusaro stated:

Our industry is contending with increases in steel and shipping costs that are unprecedented, both in their magnitude and rate of change.

From the first quarter of 2020 to the first quarter of 2021, the spot price of hot rolled coil steel, the primary raw material used in our products, has more than doubled. Many industry analysts and market participants expected the dramatic increase in the price of steel to be temporary, which was reflected in futures markets that had indicated lower steel prices for the second half of the year throughout most of the first quarter. Based on those expectations, we felt confident in our ability to manage our input costs and maintain our margins. However, steel prices have continued to increase with spot prices of hot rolled coil up more than 10% since April 1st, and futures now indicate higher rather than lower steel prices for the remainder of the year.

Steel represents almost half of our cost of goods sold, and we do not hold large amounts of steel and inventory. So, a significant increase in the price of steel over a short period of time can negatively impact our results.

Coinciding with the increase in steel prices has been substantial increases in the cost of both, ocean and truck freight. The average cost to ship a container from Asia to the West Coast has increased by more than 145% from April 2020 to April 2021. There also remains a significant disruption across several U.S. ports, resulting from the April Suez Canal accident, and the February Texas storm, which has resulted in higher storage and expediting costs that we would not otherwise have had in a normal environment. The cost of truck freight has also increased significantly with the average cost per mile in the first quarter of 2021, up more than 30% versus last year, and costs have continued to increase in the second quarter.

The continued increases in both steel and freight costs will impact our margins in Q2, and potentially in subsequent quarters, if prices do not normalize.

194.    During that same conference call, Defendant Patel disclosed:

Revenues for the first quarter decreased 44% to $245.9 million, compared to $437.7 million for the prior year period, primarily driven by a reduction in the amounts of ITC safe harbor related shipments that I discussed earlier.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, somewhat lower ASPs compared to the 2020 safe harbor shipments, higher input costs, due to primarily to higher steel prices and higher freight costs, resulting in part from disruptions caused by the winter storm in Texas, as well as West Coast port closures and congestion.

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity- based compensation due to the transition to being a public company, $2.4 million of onetime costs related to our common stock follow-on offerings, higher costs associated with being a public company, and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million compared to $110.7 million for the prior year period. Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year. And adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year.

[. . .]

Turning to our outlook. As Jim mentioned earlier, given the continuing increases we are seeing in steel and freight costs, as well as our ongoing review of open contracts to assess what costs we will pass on to our customers, we are not able to affirm our previously

> provided guidance for the full year. Looking ahead to the second quarter, we expect commodity price increases to delay some project starts, which will result in lower revenues and adjusted EBITDA versus the first quarter.

195.    In reaction to these disclosures, analysts cut their ratings on the Company's stock citing concern about its shrinking profit margins. For example, Barclays downgraded Array stock from "Overweight" to "Underweight" noting concerns about volumes, margins, and earnings power. Piper Sandler downgraded its rating to "Neutral" from "Overweight" and similarly cited concerns regarding lack of visibility on revenues and margins.

196.    On this news, the stock dropped $11.49 a share on May 12, 2021 to close at $13.46 a share on unusually high trading volume. By the commencement of this Action, Array common stock was trading at a significant decline from its value at the time of the Offerings, injuring the Class.

## COUNT III

### For Violation of Section 11 of the Securities Act AgainstArray, the Securities Act Individual Defendants, and the Underwriter Defendants

197.    As previously stated, the claim set forth herein pursuant to Section 11 of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, it does not allege, and does not sound in, fraud—and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim. This claim does not sound in fraud.

198.    Plaintiff repeats and incorporates each and every allegation contained in ¶¶58-99, 158-189 as if fully set forth herein, excluding any allegation of fraud, recklessness, or intentional misconduct.

199.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Array, each of the Securities Act Individual Defendants, and each of the Underwriter Defendants.

200.    The Array Offering Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

201.    Array is the registrant and issuer of the common stock sold pursuant to the Array Offering Materials. As such, Array is strictly liable for the materially inaccurate statements contained in them and their failure to be complete and accurate. By virtue of the Array Offering Materials containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Array is liable under Section 11 of the Securities Act to Plaintiff and the Class.

202.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Array Offering Materials were true and without omissions of any material facts and were not misleading.

203.    The Securities Act Individual Defendants each signed the Array Offering Materials' Shelf Registration Statement and caused its issuance. The Securities Act Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Array Offering Materials. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Securities Act Individual Defendants' failure to exercise reasonable care, the Array Offering Materials contained material misrepresentations of material fact and omissions of material fact necessary to make the statements

therein not misleading. As such, each of the Securities Act Individual Defendants is liable under Section 11 of the Securities Act to Plaintiff and the Class.

204.    Each of the Underwriter Defendants served as an underwriter for at least one of the Offerings and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Array Offering Materials. Each of the Underwriter Defendants, as an underwriter of the securities offered in at least one of the Offerings, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the relevant Array Offering Materials. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Array Offering Materials contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Plaintiff and the class.

205.    None of the untrue statements or omissions of material fact in the Array Offering Materials alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Array Offering Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

206.    Each of the Securities Act defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the registration statement, which misrepresented and

failed to disclose, *inter alia*, the fact set forth above. By reasons of the conduct herein alleged, each such defendant violated Section 11 of the Securities Act.

207.     Lead Plaintiff and the Class have sustained damages. The value of Array common stock has declined substantially subsequent to and due to violations by the Securities Act defendants named in this Count.

208.     At the time of their purchases of Array common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Lead Plaintiff filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Lead Plaintiff filed this action.

## COUNT IV

### For Violation of Section 12(a)(2) of the Securities Act Against all Defendants

209.     As previously stated, the claim set forth herein pursuant to Section 12(a)(2) of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, it does not allege, and does not sound in, fraud—and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim. This claim does not sound in fraud.

210.     Plaintiff repeats and incorporates each and every allegation contained in ¶¶58-99, 158-189 as if fully set forth herein, excluding any allegation of fraud, recklessness, or intentional misconduct.

211.     This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against Array, the Securities Act Individual

Defendants, the Underwriter Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel.

212.    Each of the defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective prospectuses which respectively formed in relevant part the Array Offering Materials. The actions of solicitation by the Securities Act defendants include participating in the preparation of the false and misleading prospectuses and marketing the common stock to investors, such as Lead Plaintiff and other members of the Class.

213.    The prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

214.    Each of the Securities Act defendants owed Lead Plaintiff and other members of the Class who purchased or otherwise acquired Array common stock pursuant to the prospectuses issued in connection with the Array Offering Materials a duty to make a reasonable and diligent investigation of the statements contained in the prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of the Securities Act defendants' failure to exercise reasonable care, the prospectuses contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

215.    Lead Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectuses issued in connection with the prospectuses at the time they purchased or otherwise acquired Array common stock.

216.     By reason of the conduct alleged herein, the Securities Act defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Array common stock pursuant to the prospectuses issued in connection with the Array Offering Materials sustained substantial damages in connection therewith. Accordingly, Lead Plaintiff and the other members of the Class who hold the common stock issued pursuant to the prospectuses issued in connection with the Array Offering Materials have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members who have sold their Array common stock seek damages to the extent permitted by law.

217.     Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Lead Plaintiff filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Lead Plaintiff filed this action.

## COUNT V

### For Violation of Section 15 of the Securities Act Against the Securities Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel

218.     As previously stated, the claim set forth herein pursuant to Section 15 of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—i.e., it does not allege, and does not sound in, fraud—and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim. This claim does not sound in fraud. Lead Plaintiff repeats and

incorporates each and every allegation contained in ¶¶58-99, 158-189 as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

219.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Securities Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel.

220.    The Securities Act Individual Defendants each were controlling persons of Array by virtue of their positions as directors or senior officers of Array or ATI, Oaktree ATI, Oaktree Power, or Oaktree Power Parallel. Certain of the Securities Act Individual Defendants, as outlined in ¶¶27-36, signed the Array Offering Materials issued in connection with the Offerings and were responsible for their contents.

221.    ATI was the majority owner and controlled the Company leading up to the IPO. In addition to controlling a majority of Array's voting shares at that time, ATI, Oaktree ATI, Oaktree Power, or Oaktree Power Parallel also appointed or had significant influence over the Company's management and Board. They also were parties to various shareholder agreements with each other and the Company that gave them even further control of the Company above and beyond the amount of their voting control. The Securities Act Individual Defendants had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Array, including ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel. Certain of the Securities Act Individual Defendants, as outlined in ¶¶27-36, signed Array Offering Materials issued in connection with the Offerings and were responsible for its contents.

222.    ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel, and the Securities Act Individual Defendants each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in the Cause of Action above, and exercised control over

Array based on their having signed or authorized the signing of the Array Offering Materials, selling Array shares in the Offerings or having otherwise participated in the process that allowed the Offerings to be successfully completed.

223.    By reason of the conduct alleged herein, these Defendants violated Section 15 of the Securities Act and Plaintiff and the members of the Class have suffered harm as a result.

## VI.    CLASS ACTION ALLEGATIONS

224.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)    All persons and entities that purchased or otherwise acquired Array securities during the period from October 14, 2020, through May 11, 2021, inclusive (the "Class Period"), and were damaged thereby, except those who are excluded below, as against the Defendants (as defined *supra*) for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder; and

(b)    All persons and entities that purchased or otherwise acquired Array common stock pursuant, or traceable, or both, to: (i) the registration statement and prospectus issued in connection with the Company's October 2020 initial public offering; or (ii) the registration statement and prospectus issued in connection with the Company's December 2020 secondary offering; or (iii) the registration statement and prospectus issued in connection with the Company's March 2021 secondary offering; or (iv) any combination of the IPO, December 2020 SPO, or March 2021 SPO, as against the Securities Act Defendants (as defined *supra*) for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

(c)    Excluded from the Class are: (i) all defendants; (ii) members of the immediate family of any defendant who is an individual; (iii) any person who was an officer or director of Array during the Class Period; (iv) any firm, trust, corporation, or other entity in which

any defendant has or had a controlling interest; (v) Array's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

225.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of March 5, 2021, there were 126,994,467 shares of Array's common stock outstanding.

226.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)    Whether defendants violated the Securities Act or Exchange Act, or both;

> (b)    Whether defendants omitted or misrepresented material facts;

> (c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

> (d)    Whether, with respect to the Exchange Act claims only, Defendants knew or recklessly disregarded that their statements were false and misleading;

> (e)    Whether the price of Array securities was artificially inflated; and

> (f)    The extent of damage sustained by Class members and the appropriate measure of damages.

227.    Lead Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

228.    Lead Plaintiff will adequately protect the Class's interests. It has retained counsel experienced in securities class action litigation and its interests do not conflict with the Class's.

229.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

C.    Awarding Lead Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 7, 2021

**LABATON SUCHAROW LLP**

 /s/ Michael P. Canty
Michael P. Canty
Thomas G. Hoffman, Jr.
Corban Rhodes
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
thoffman@labaton.com
crhodes@labaton.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

**THORNTON LAW FIRM LLP**
Guillaume Buell
1 Lincoln Street
Boston, Massachusetts 02111
Telephone: (617) 720-1333
Facsimile: (617) 720-2445
gbuell@tenlaw.com

*Additional Counsel for Lead Plaintiff and the
Proposed Class*

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Robert M. Rothman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile:  (631) 367-1173

rrothman@rgrdlaw.com

*Additional Counsel for Lead Plaintiff and the
Proposed Class*