# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

PLYMOUTH COUNTY RETIREMENT
ASSOCIATION and CARPENTERS PENSION
TRUST FUND FOR NORTHERN CALIFORNIA,
Individually and on Behalf of All Others Similarly
Situated,

Plaintiffs,

v.

ARRAY TECHNOLOGIES, INC., ATI
INTERMEDIATE HOLDINGS, LLC, JIM
FUSARO, NIPUL PATEL, TROY ALSTEAD,
ORLANDO D. ASHFORD, FRANK CANNOVA,
RON P. CORIO, BRAD FORTH, PETER JONNA,
JASON LEE, ATI INVESTMENT PARENT, LLC,
OAKTREE ATI INVESTORS, L.P., OAKTREE
POWER OPPORTUNITIES FUND IV, L.P.,
OAKTREE POWER OPPORTUNITIES FUND IV
(PARALLEL), L.P., GOLDMAN SACHS & CO.
LLC, J.P. MORGAN SECURITIES LLC,
GUGGENHEIM SECURITIES, LLC, CREDIT
SUISSE SECURITIES (USA) LLC, BARCLAYS
CAPITAL INC., UBS SECURITIES LLC,
COWEN AND COMPANY, LLC,
OPPENHEIMER & CO. INC., JOHNSON RICE &
COMPANY L.L.C., ROTH CAPITAL
PARTNERS, LLC, PIPER SANDLER & CO.,
MUFG SECURITIES AMERICAS INC.,
NOMURA SECURITIES INTERNATIONAL,
INC., MORGAN STANLEY & CO. LLC,

Defendants.

Case No. 21-cv-04390-VM
(Consolidated with 21-cv-05658-VM)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
# PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT
# FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Peter L. Welsh
Lisa H. Bebchick
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Tel.: (212) 596-9000
Fax: (212) 596-9090
peter.welsh@ropesgray.com
lisa.bebchick@ropesgray.com

*Attorneys for Defendants Array Technologies and Array Intermediate Holdings, LLC*

Stefan Atkinson
Amal El Bakhar
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Tel.: (212) 446-4800
Fax: (212) 446-4900
stefan.atkinson@kirkland.com
amal.elbakhar@kirkland.com

*Attorneys for Defendants Frank Cannova, Peter Jonna, Jason Lee, ATI Investment Parent, LLC, Oaktree ATI Investors, L.P., Oaktree Power Opportunities Fund IV, L.P., and Oaktree Power Opportunities Fund IV (Parallel), L.P.*

Robert A. Sacks
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, New York 10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
sacksr@sullcrom.com

*Attorney for Defendants Jim Fusaro, Nipul Patel, Troy Alstead, Orlando D. Ashford, Ron P. Corio, and Brad Forth*

Jay B. Kasner
Scott D. Musoff
Abigail E. Davis
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
abigail.sheehan@skadden.com

*Attorneys for Defendants Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Credit Suisse Securities (USA) LLC, Barclays Capital Inc., UBS Securities LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Johnson Rice & Company L.L.C., Roth Capital Partners, LLC, Piper Sandler & Co., MUFG Securities Americas Inc., Nomura Securities International, Inc., and Morgan Stanley & Co. LLC*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................. ii

FACTUAL BACKGROUND ................................................................................................ 4

I.  PLAINTIFFS' SECTION 10(B) CLAIM MUST BE DISMISSED ................................... 7

    A.  The CAC Fails to Plead Any False or Misleading Statement or Omission .................. 7

        1.  The CAC Does Not Allege Any False or Misleading Statement About Array's Exposure to Rising Steel Prices and Freight Costs ............................................................................................ 8

        2.  The CAC Fails to Plead the Falsity of Array's Statements About Its Efforts to Mitigate Supply Chain Risk ................................. 13

    B.  The Challenged Statements Are Nonactionable as a Matter of Law .......................... 14

        1.  Numerous Statements Challenged by the CAC Are Puffery ............................... 15

        2.  The Opinions of Array's Executives Are Not Actionable .................................... 15

        3.  Array's Forward-Looking Statements Are Not Actionable ................................. 17

    C.  The CAC Fails to Plead Any Inference of the Exchange Act Individual Defendants' Scienter ....................................................................................... 18

        1.  The CAC Fails to Plead that Fusaro or Patel Had Motive to Commit Fraud ....................................................................................... 19

        2.  The CW Allegations Fail to Establish Conscious Wrongdoing ................................................................................... 19

        3.  Core Operations Allegations Cannot Salvage the CAC's Scienter Theory ...................................................................................... 21

        4.  The CAC Fails to Raise Any Scienter Inference ................................................. 21

II.  THE CAC'S SECURITIES ACT CLAIMS FAIL AS A MATTER OF LAW.................. 22

    A.  The CAC Fails to Allege Any False or Misleading Statement or Omission............... 23

    B.  The CAC Fails to Allege that Any Defendant Was a Statutory Seller........................ 24

III.  THE CAC FAILS TO STATE CONTROL PERSON CLAIMS ....................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Am. Realty Cap. Properties, Inc. Litig.*,
  2015 WL 6869337 (S.D.N.Y. Nov. 6, 2015) ..........................................................................25

*In re Anheuser-Busch InBev SA/NV Sec. Litig.*,
  2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020)........................................................................18

*Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014)......................................................................................25

*Ashland Inc. v. Morgan Stanley & Co., Inc.*,
  652 F.3d 333 (2d Cir. 2011)....................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................................................................25

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ..........................................................................24

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ...............................................................................................22

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  2017 WL 4049253 (S.D.N.Y. June 28, 2017) .........................................................................7

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .......................................................................21

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................................................................15, 19

*Fed. Housing Fin. Agency v. Stanley*,
  2012 WL 5868300 (S.D.N.Y. Nov. 19, 2012) .......................................................................25

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ...................................................................4, 15

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018).....................................................................................19

*In re Gen. Elec. Sec. Litig.*,
  2020 WL 2306434 (S.D.N.Y. May 7, 2020) ..........................................................................14

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)........................................................................18, 22

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................................19

*In re Global Crossing, Ltd. Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)................................................................................22

*Greco v. Qudian Inc.*,
    2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022)..................................................................9, 14

*Gregory v. ProNAi Therapeutics, Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................................20

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
    2021 WL 4341500 (S.D.N.Y Sept. 22, 2021)................................................................11, 20

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)................................................................................23

*Holsworth v. BProtocol Found.*,
    2021 WL 706549 (S.D.N.Y. Feb. 22, 2021)......................................................................24

*Janbay v. Canadian Solar, Inc.*,
    2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ...................................................................19

*Johnson v. Sequans Commc'ns S.A.*,
    2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ......................................................................18

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012)................................................................................18

*Lefkowitz v. Synacor, Inc.*,
    2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) ...................................................................18

*In re Lehman Bros. Sec. & ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010)................................................................................22

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)................................................................................20

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)....................................................................................7

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................................9

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)...................................................................19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)...................................................................23, 24

*Ning Yu v. State Street Corp.*,
    686 F. Supp. 2d 369 (S.D.N.Y. 2010).....................................................................9

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)...................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).....................................................................16, 17

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    2020 WL 5632901 (S.D.N.Y. Sept. 21, 2020).....................................................18

*Pozniak v. Imperial Chem. Indus. PLC*,
    2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004).....................................................10

*Ret. Sys. Of Miss. v. Merrill Lynch & Co. Inc.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)...................................................................25

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).................................................................... *passim*

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)...................................................................16

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)...................................................................15

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...............................................16, 20, 21

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498. (S.D.N.Y. 2020)...................................................................21

*Tarsavage v. Citic Tr. Co.*,
    3 F. Supp. 3d 137 (S.D.N.Y. 2014) ...................................................................25

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)...................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................7, 18, 21

*Tongue v. Sanofi,*
 816 F.3d 199 (2d Cir. 2016) ................................................................................ 16

*Villare v. Abiomed, Inc.,*
 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ....................................................... 12

*Wandel v. Gao,*
 2022 WL 768975 (S.D.N.Y. Mar. 14, 2022) ......................................................... 24

*Welgus v. TriNet Grp., Inc.,*
 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ....................................................... 15

*Wochos v. Tesla, Inc.,*
 985 F.3d 1180 (9th Cir. 2021) ............................................................................... 17

**Statutes**

15 U.S.C. § 78u-4 .......................................................................................................... 1, 7

15 U.S.C. § 78u-5 ..................................................................................................... 17, 18

**Other Authorities**

17 C.F.R. § 229.303 ......................................................................................................... 23

Defendants[1] respectfully submit this memorandum of law in support of their joint motion to dismiss the Consolidated Amended Class Action Complaint ("CAC") filed by Co-Lead Plaintiffs Plymouth County Retirement Association and Carpenters Pension Trust Fund for Northern California ("Plaintiffs") under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.

## PRELIMINARY STATEMENT

In this action, Plaintiffs seek to manufacture claims for securities fraud from Array's failure to predict the intensity and trajectory of extreme COVID-related spikes in steel and freight prices in late 2020 and throughout 2021.[2]  Plaintiffs have pleaded nothing more than a textbook case of fraud by hindsight, requiring the dismissal of the CAC in its entirety.

In late 2020, as the global economy began to re-accelerate after the onset of the COVID-19 pandemic, unprecedented volatility shook the public commodities markets, resulting in unusually steep prices for raw materials.  The price of steel, in particular, skyrocketed, increasing by a staggering 237 percent between October 2020 and May 2021 alone.  These extreme spikes were accompanied by marked increases in shipping costs in the same timeframe, as pandemic-related supply chain disruptions were further exacerbated by extraordinary events, such as the February 2021 winter storm in Texas and the March 2021 closure of the Suez Canal.

Array, a manufacturer of solar "trackers" made mostly of steel, was one of many businesses impacted by these dramatic price fluctuations.  Array—which went public in October 2020 and

---

[1] Capitalized terms not defined shall have the meaning ascribed to them in the CAC (ECF No. 163).  Citations to "¶" are to the CAC.  Citations to "Ex." are to the exhibits to the Declaration of Lisa H. Bebchick, filed herewith.  Unless indicated otherwise, all internal quotation marks and citations are omitted and all emphasis is added.

[2] The CAC asserts a claim under Section 10(b) of the Exchange Act against Array and the two Exchange Act Individual Defendants (¶ 25); a claim under Section 20(a) of the Exchange Act against the Exchange Act Individual Defendants, ATI Investment Parent, and the Oaktree Defendants (¶¶ 156-57); a claim under Section 11 of the Securities Act against Array, the Securities Act Individual Defendants (¶ 56), and the Underwriter Defendants (¶¶ 41-54); a claim under Section 12(a)(2) of the Securities Act against all Defendants (¶¶ 209-17); and a claim under Section 15 of the Securities Act against the Securities Act Individual Defendants and the Oaktree Defendants (¶¶ 218-23).

launched two follow-on offerings in December 2020 and March 2021—disclosed to investors in connection with these offerings that "[s]ignificant price changes for [] raw materials could reduce [its] operating margins," that *80%* of its COGS consisted of purchased materials such as steel, and that it might be "unable" to pass rising costs to customers.  Despite these challenges, Array actually *exceeded* its financial guidance in 2020—a fact Plaintiffs do not dispute.

In light of that success, Array expressed confidence to investors when releasing its FY2021 guidance in March 2021 that it was well-positioned to navigate commodity and freight uncertainty in the coming year.  That confidence stemmed in large part from Array's belief, shared by industry experts, that historically high steel prices would begin to normalize in the second half of 2021.  In the following weeks, however, it became apparent that steel prices were not likely to begin to flatten as anticipated.  Array recognized that its FY2021 guidance would be unattainable, and it promptly and proactively announced in May 2021 that it was withdrawing its guidance.

With the benefit of hindsight, the CAC tries to twist Array's lack of clairvoyance and eventual withdrawal of guidance into securities fraud.  The same theory underpins all of the CAC's claims:  that Array somehow concealed from investors in connection with its three offerings its true exposure to rising steel and freight prices and "create[d]" a "false impression" (¶ 64) that it would successfully manage historic cost volatility before it decided to withdraw its guidance.

Plaintiffs' claims are meritless.  With respect to Plaintiffs' Section 10(b) claim, the CAC is devoid of facts plausibly alleging—much less doing so with particularity—the falsity of any challenged statement.  Far from hiding its true risk exposure, Array told investors that it would be impacted by challenges arising from exploding steel and freight prices.  The CAC attempts to dismiss Array's extensive disclosures by asserting that the Company did not provide granular detail about how its specific business processes exposed the Company to risk, yet it offers no well-

pled contemporaneous facts to show why Array should have disclosed minutiae of its operations far beyond what the securities laws require.  Moreover, the CAC relies on several CWs—who, for the most part, did not work at Array during the Class Period—to allege that Array used "outdated" (¶ 76) future cost estimates to analyze margins, but fails to plead *how* those subjective cost estimates would render any of Array's challenged statements false when made.  And, in any event, a majority of the challenged statements are not actionable as a matter of law.

Plaintiffs also do not come close to satisfying the PSLRA's high bar for pleading scienter. Plaintiffs claim that the defendants to their Section 10(b) claim—Array's then-CEO Fusaro and CFO Patel—had a motive to defraud investors by hiding Array's risk exposure.  But the CAC does not allege any concrete, personal benefit either Fusaro or Patel received through their participation in a supposed fraud scheme.  And Plaintiffs' CWs offer only generic allegations highlighting the commodity pricing challenges that Array disclosed it was navigating, which fall woefully short of providing a basis to allege conscious misconduct by either executive with the specificity that the PSLRA requires.  Far from establishing a fraud inference, the CAC suggests only that Array was caught off-guard by the magnitude and duration of price increases and supply chain disruptions and underestimated the extent of their impact.  That is not securities fraud.

Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act fare no better.  Those claims fail to pass muster under ordinary pleading standards, let alone under Rule 9(b), which applies here because they rely on the exact same theory as the Plaintiffs' Exchange Act claims. Most notably, Plaintiffs' Securities Act claims fail on falsity grounds for the same reasons as their Section 10(b) claim.  The CAC also fails to plead that Array violated its Item 303 disclosure obligations because (i) it does not plead any "trend" that Array was required to disclose, and (ii) it expressly disclaims any allegations of actual knowledge—allegations that are required to plead a

violation of Item 303.   Moreover, the CAC fails to plead, beyond inadequate boilerplate, conclusory allegations, that any Defendant was a statutory seller under Section 12(a)(2).

Finally, Plaintiffs fail to plead claims under Section 20(a) of the Exchange Act or Section 15 of the Securities Act because the CAC does not (i) plead a primary violation, or (ii) sufficiently allege any Defendant's control over Array's offerings or culpable participation in the alleged fraud.

## FACTUAL BACKGROUND

***Array's October 2020 IPO.***   Array, a Delaware corporation headquartered in New Mexico, is one of the world's largest manufacturers of steel, single-axis solar "trackers," which move solar panels throughout the day to maximize their orientation toward the sun.   ¶ 58.

The COVID-19 pandemic caused unprecedented volatility in steel prices, a key component in Array's trackers.   ¶ 68.   In early 2020, as COVID-19 spread, demand for steel fell sharply.   *Id.* This drop-off led to reduced production, with some steel mills halting operations altogether.   *Id.*; Ex. A at 2 (cited at ¶ 71).[3]   The sinking demand caused steel prices to plummet until September 2020.   ¶ 68.   As the economy began to rebound in late 2020, demand for steel dramatically increased, but supply lagged as production ramped back to pre-pandemic levels. Ex. A at 1.   Steel mills aggressively increased prices in order to take advantage of the resulting shortage.   *Id.*

On October 15, 2020, Array launched its IPO.   Array's IPO Materials made clear that Array had exposure to fluctuating commodity prices and supply chain costs and cautioned that "product costs are affected by the underlying cost of raw materials, including steel." Ex. B at 57.   The IPO Materials specifically disclosed that steel was a significant contributor to Array's costs, *including that 80% of its COGS was purchased components such as steel*.   ¶ 102.   The IPO Materials also

---

[3] By quoting and relying upon them, the CAC incorporates by reference (i) an external report published by Monarch Metals (¶ 71), and (ii) Array's SEC filings, press releases, and earnings call transcripts (*see, e.g.*, ¶¶ 27, 86, 101,105, 107, 111, 114, 123, 125).   *See In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *8 (S.D.N.Y. Mar. 30, 2018) (documents referenced "by name" and "central to Plaintiffs' allegations" are incorporated by reference).

emphasized risks concerning supply chain issues and commodity prices that might hurt the Company's performance. Array disclosed that (i) it is "subject to risk from fluctuating market prices of . . . raw materials, including steel and aluminum, that are used in our products" and (ii) "[s]ignificant price changes for these raw materials could reduce our operating margins if we are unable to recover such increases from our customers." Ex. C at 71. The Company made clear that such fluctuations could be expected to affect its financial performance, as it did "not currently hedge against changes in the price of raw materials." Ex. B at 57.

*Array's December 2020 SPO.* On December 2, 2020, Array announced its first SPO. ¶ 111. The December SPO Materials contained the same cautionary language as the IPO Materials, warning of the potential impact of steel costs and supply chain disruptions on Array's margins and the limits to the Company's ability to pass along higher costs to customers. Ex. F at 23, 47, 74. The December SPO Materials also disclosed that since the IPO, Array's margins had "decreased primarily due to higher freight costs . . . driven by COVID-19." *Id.* at 60.

*Array's March 2021 Earnings Call, FY2021 Guidance, and SPO.* Heading into 2021, the market believed that prices would normalize as steel mills returned to full operations. Ex. A at 1. As the CAC acknowledges, industry experts predicted that supply and demand would both increase in 2021 and steel prices would "soften by mid-year." *Id.* Array shared this assumption and relied on it when preparing its financial guidance. *See, e.g.*, Ex. G at 4 (Array expected prices to "normalize" as "capacity that was idled during the pandemic comes back online").

On March 9, 2021, Array announced its FY2020 results and guidance for FY2021. Ex. G. On the same day, Fusaro and Patel held a conference call with investors to discuss the Company's FY2020 results and FY2021 guidance. Patel acknowledged that "commodity prices and freight costs have increased significantly over the past several months." Ex. H at 7. He stated that Array

"expect[ed] prices to normalize" as the year progressed, but that in light of the cost increases, Array had decided to take "a conservative approach to [FY 2021] guidance by baking these costs into the low end of our guidance assuming a delayed return to more normalized pricing." *Id.*  In response to an analyst question regarding the expected timeline for those price moderations, Patel echoed the prevailing sentiment among industry experts, explaining, "*we're thinking second half and late second half* [of the year]." *Id.* at 17.  Patel also stated that the Company had some flexibility to pass through increased commodity costs to customers, but that it was only able to do so on a "case by case basis." *Id.*[4]  Despite these commodity and freight cost headwinds, Array reported that it had still exceeded the high end of its FY2020 guidance, "with revenues and adjusted EBITDA for the full year 2020 increasing 35% and 32%, respectively."  Ex. G at 1.

On March 18, 2021, Array launched another SPO.  ¶ 123.  The March SPO Materials disclosed Array's potential exposure to "disruptions to transportation and logistics, including increases in shipping costs" and "significant changes in the cost of raw materials."  Ex. J at 18-19; Ex. K at 18-19.  The March SPO Materials also reiterated that 80% of its COGS consisted of purchased components, including steel.  Ex. J at 6; Ex. K at 6.

***Previously Disclosed Risks Materialize in 2021.***  As noted above, Array, consistent with other market observers, anticipated that steel prices would "continue their upward trajectory through at least the first quarter of 2021, *but [would then] soften by mid-year*" as "[a]dditional capacity [was] expected to come onto the market in 2021."  Ex. A at 1-2.  Instead, steel prices continued to climb, causing Array to question whether the anticipated softening in the second half of the year on which its forecast was based would materialize.  At the same time, existing freight

---

[4] The Company's 10-K, filed a day later, again emphasized that Array might be "unable" to pass rising costs to customers.  Ex. I at 57.

and logistics challenges due to the pandemic and the February Texas storm were exacerbated by the March Suez closure, leading to delays and increased supply chain costs. ¶ 193.

Array promptly withdrew its FY2021 guidance once it became apparent that the market's expectation about steel price moderation was not likely to come to fruition and that freight costs would also remain elevated. ¶ 143; Ex. L. When Array discussed its withdrawal of guidance with investors, it emphasized that Array had prepared its FY2021 projections on the basis of analysts' and market participants' view that the steep increase in steel prices would be temporary. ¶ 193.

## ARGUMENT

## I.     PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, the CAC must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). The PSLRA requires Plaintiffs to plead falsity and scienter with particularity (15 U.S.C. § 78u-4(b)(1)-(2)), a requirement that is designed to be "exacting." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). For the reasons discussed below, the CAC falls well short of that rigorous standard.

### A.     The CAC Fails to Plead Any False or Misleading Statement or Omission[5]

To plead falsity, Plaintiffs are required to allege "with specificity . . . why and how" each statement challenged by the CAC was "false *at the time it was made*."[6] *Rombach*, 355 F.3d at 174; *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis in original). Far

---

[5] The CAC employs a shotgun approach to pleading falsity that on its own warrants dismissal. The CAC challenges numerous statements and alleges that they were false for five reasons that are nearly identical as to each statement. *See* ¶¶ 106, 110, 113, 115, 122, 124. But the CAC fails to explain how each of those five reasons applies to each challenged statement, making it virtually impossible to determine the specifics of the CAC's allegations. *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (Use of "[c]onclusory formula" of repeating same "adverse facts" to cover "all" challenged statements "alone" justified dismissal).

[6] As detailed in Attachment A hereto, the CAC challenges numerous public statements by Array and Array executives.

from satisfying that strict pleading standard, Plaintiffs fail to allege facts showing falsity under even ordinary notice pleading.  Array affirmatively disclosed its exposure to climbing steel and freight costs, leaving Plaintiffs to contend that Array should have foreseen the future would be different and enumerated the specific impact the disclosed risks would have on its business—far beyond what the securities laws require.  Moreover, relying solely on five CWs, Plaintiffs allege that Array projected margins with "outdated" cost estimates (¶ 76), but neglect to plead (as they must) *why and how* those subjective estimates were wrong in the first place such that they could render any challenged statement false.  Lastly, the CAC challenges various statements that simply describe Array's strategy for mitigating supply chain risk but alleges no facts to contradict those statements or to suggest that they guaranteed that Array's strategy would, in fact, prove successful.

1.    <u>The CAC Does Not Allege Any False or Misleading Statement About Array's Exposure to Rising Steel Prices and Freight Costs</u>

Plaintiffs' centerpiece theory of falsity—which applies to every challenged statement (¶¶ 100-128)—is that Array "creat[ed] the false impression that [it] was successfully managing increases in commodity and freight costs" during the Class Period.  ¶ 64.  However, Array never told investors that it was invulnerable to spiking steel and freight costs.  Quite the opposite:  Array thoroughly disclosed those risks to investors.  And none of Array's statements could plausibly be read to guarantee that the Company was fully insulated from commodity and freight risk.

a.    *Array Thoroughly Disclosed Its Risk Exposure and Was Not Required to Disclose Granular Details About Its Business Operations*

Array could not have misled investors about how it would be impacted by rising steel and freight costs because Array "disclosed the very . . . risks about which [Plaintiffs] claim to have been misled." *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 338 (2d Cir. 2011).  As an initial matter, the CAC asserts that Array misled investors because its offering materials made "[n]o mention of the trend in steel costs."  ¶¶ 70-74.  But soaring steel prices were *public*

*knowledge*, as shown by the CAC's reliance on *public pricing data* (¶¶ 70, 72-73) and "market commentary" about price spikes. ¶ 71, Ex. A; *see In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig*., 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) (dismissing securities claims where allegedly concealed information was "publicly available").  Array had no duty to tell investors that steel prices were, in fact, on the rise, as that knowledge was "impute[d] . . . to the reasonable investor." *Ning Yu v. State Street Corp.*, 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010).

Array also thoroughly disclosed the threat that spiking costs posed to its performance in connection with its three offerings.  For example, Array told investors that its "product costs are affected by the underlying cost of raw materials, including steel," that the Company did "not currently hedge against changes in the price of raw materials" (Ex. B at 56), and that "increases in shipping costs [] could adversely impact" its financial performance.  Ex. I at 23.  In its December 2020 SPO, Array told investors that its margins had "decreased . . . due to higher freight costs as a result of logistics constraints driven by COVID-19."  Ex. F at 60.  Array also disclosed that it was "subject to risk" from volatile commodity prices in the form of decreased margins and that "80% of [its COGS] consists of purchased components, including . . . steel tubing."  ¶¶ 102, 105.  And, on its March 9, 2021 Earnings Call, Patel reminded investors of the risk posed by high steel prices, reiterating that "steel is a large component" in its tracker product.  Ex. H at 16.

Nor could the CAC allege that Array misled investors about its ability to pass higher prices to customers.  *See, e.g.*, ¶¶ 10, 67, 75.  Array's offering materials all noted that Array might be "unable to recover [raw material price] increases from [its] customers," making clear that its ability to adjust prices in response to such fluctuations was not ironclad.  *See, e.g.*, Ex. B at 70.  The CAC also may not "cherry pick" Array's statements as saying that Array could invariably pass costs to customers (*Greco v. Qudian Inc.*, 2022 WL 4226022, at *8 (S.D.N.Y. Sept. 13, 2022)) while

ignoring that Array explicitly told investors that it would do so only on a "case by case" basis. ¶ 117.

Faced with these disclosures, the CAC resorts to a theory that Array committed securities fraud because it did not describe in detail all the various ways that continued rises in steel and freight costs, contrary to its expectations, might impact its business.  For example, Plaintiffs contend that Array should have disclosed the *exact* percentage of its COGS attributable to steel or that it bore commodity pricing risk for 90 days after contracting with customers.  ¶¶ 74, 94.  But the securities laws do not impose any obligation to disclose at that level of specificity or to quantify the degree to which a disclosed risk might affect the business depending on unknown future economic conditions.  Array was not required to itemize "every . . . aspect" of its operations that might bear on its fully disclosed exposure to well-known steel pricing and supply chain volatility. *Pozniak v. Imperial Chem. Indus. PLC*, 2004 WL 2186546, at *7 (S.D.N.Y. Sept. 28, 2004).[7]

That principle applies equally here.  The CAC's core theory is that Array needed not only to disclose its risk exposure—which it did—but also to inundate investors with information about how it ran its business.  Yet, the CAC pleads no facts to suggest why such disclosures would have been necessary *at the time that Array spoke to investors*.  The CAC challenges statements around three offerings at different points in time in a constantly shifting pricing environment.  Despite that fact, the CAC does not bother to link any challenged statement to contemporaneous market dynamics that would render the statement false *at that specific juncture*.  For example, the CAC alleges that Array was "gambling on commodity prices" (¶¶ 67, 75) without explaining how

---

[7] *Pozniak* is instructive.  There, as here, plaintiffs alleged that the company had concealed "that the rising costs of raw materials, along with [its] business practice of buying raw materials on the spot market" were negatively impacting the company's performance.  *See* 2004 WL 2186546, at *2.  The court rejected the theory that the company should have disclosed that it was "particularly vulnerable to raw material price increases because of its business practices" as "wholly unsupported by case law," and held that the securities laws do not require disclosure of "every . . . questionable aspect of the business model" that a plaintiff might identify with the benefit of hindsight. *Id.* at *7.

Array's strategy could be viewed as such other than in hindsight, *i.e.*, with knowledge that Array's widely shared expectations about steel prices would prove to be incorrect—particularly since Array also disclosed that it did not hedge its commodity exposure.  Rather than relying on specific facts to plead falsity, the CAC alleges that Array's business model made its eventual setbacks an inevitability.  But it does so without alleging *how and why* that was so, especially where that model *had allowed Array to exceed its guidance in 2020 despite similar headwinds*.  The securities laws do not require the granular disclosures demanded by the CAC and Plaintiffs cannot recast Array's statements as false by second-guessing its business model with the benefit of hindsight.

### b. *The CAC Fails to Plead the Falsity of Array's Cost Estimates*

The CAC alleges that Array's public statements about the impact of steel and freight cost spikes were false because "Defendants [] instructed employees to use lower, outdated prices when evaluating project costs."  ¶ 106; *see also* ¶¶ 110, 113, 115, 122, 124.  Plaintiffs hang this theory exclusively on the deficient allegations of five CWs who purport to be former employees of Array.  *See* ¶¶ 76-85.  Those CWs do not even plausibly allege the falsity of any of Array's statements.

First, as detailed by <u>Attachment B</u> hereto, *four of the five* CWs either did not work for Array during the Class Period or departed the Company at the very beginning of it.[8]  Because these CWs were not at the Company at any point from the October 2020 IPO forward, they can offer *no* facts that any of the challenged statements was false *when made.  See In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *18 (S.D.N.Y Sept. 22, 2021) (CWs' pre-Class Period allegations were "stale").  And CW1, the lone CW who actually worked at Array during the Class Period, offers no specific facts at all.

---

[8] *See* ¶¶ 63 n.3 (CW2 departed "mid-2020"), 80 n.9 (CW3 departed April 2019), 81 n.10 (CW4 departed March 2020), 82 n.12 (CW5 departed October 2020).

Moreover, none of the five CWs explains *how and why* any purported instructions regarding cost inputs would render any of Array's statements false. *See Rombach*, 355 F.3d at 174. The CAC's foundational allegation is that "higher current prices" (¶ 85) should have been used in the Company's margin forecasts rather than lower cost inputs that the CWs describe as "outdated" or "old and stale." ¶¶ 77-78. But the Company's margin projections were based not on *current* costs, but on forecasts and estimates of what steel and freight costs might be in the future. And even the CAC acknowledges that projecting costs involved subjective evaluation and balancing of various future risks. ¶ 77 (explaining that Array's "forecasting and cost estimates included looking at the price of steel futures" and "assign[ing] a percentage of risk to the forecast in [a] model"). At best, the CWs only offer *their view* that lower input prices were "stale" (¶ 78), not that those prices were incorrect by any objective measure. The CAC alleges no facts to suggest that Array's cost inputs were wrong in anything other than the CWs' personal estimation. *See Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021) (rejecting CW allegations that "largely reflect[ed] the subjective assessments of the [CWs] themselves").

More fundamentally, beyond the CWs' conclusory labeling of cost inputs as outdated or stale, the CAC makes no effort to plead—let alone with particularity—*why* (other than using the benefit of hindsight) those inputs were incorrect at the time Array spoke *about expectations for the future*. For example, CW1 asserts that unnamed members of "the executive team" ordered the use of "old and stale" cost estimates and that "projects quoted in the first quarter of 2021 should have had price increases" because "Array was alerted by freight forwarders" about "increases in the cost of freight." ¶¶ 78-79. But CW1 offers no explanation as to *why* Array's leadership could not have reasonably expected currently increasing freight costs to decrease months down the line, and CW1's disagreement with such expectations of future cost behavior does not establish falsity.

CW2 similarly asserts that unnamed executives ordered the use of "lower, outdated cost estimates" instead of "higher prices reflected in the model."  ¶ 77.  But CW2 alleges nothing about what that model actually said, why those executives would have been wrong to question its conclusions, or why, months later, they might have an updated view of anticipated prices.  The CAC offers no explanation, for instance, as to why it would be inappropriate to use lower cost estimates for forecasting future margins when the Company, like many others in the market, expected that elevated prices would begin to return to historic levels in the second half of 2021.  The CWs' deficient allegations do not plausibly allege the falsity of any of Array's public statements.

### 2. The CAC Fails to Plead the Falsity of Array's Statements About Its Efforts to Mitigate Supply Chain Risk

The CAC also contorts several statements describing the Company's efforts to mitigate supply chain risk into purported guarantees that the Company would be able to successfully navigate volatility in the steel market and other disruptions.  *See* Attach. A Nos. 1-2, 5, 12.  However, Array made no such guarantee, and the CAC alleges no specific facts showing why any such statement was actually false when made.

*First*, the CAC challenges several statements about Array's efforts to manage cost volatility, including that Array "manage[d] and monitor[ed] all commodities accordingly" (¶ 119), was "continu[ing] to build out [its] supply chain" (*id.*), "employ[ed] components that are mass produced and widely available" (¶ 102), and aimed to "continually reduce [its] costs of goods sold."  ¶ 103.  The CAC asserts that these statements misled investors because they somehow created the perception that the Company would, as a factual matter, avoid negative margin impacts from steel and freight cost increases.  *See, e.g.*, ¶ 64.  But that allegation mischaracterizes the statements themselves, which merely describe the efforts Array employed without guaranteeing any outcome.  The CAC does not allege that the Company had not taken steps to build out its

supply chain by adding new suppliers, or that the Company did not "monitor" commodities pricing. "A reasonable investor would not understand these factual statements . . . to constitute a guarantee of success." *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *9 (S.D.N.Y. May 7, 2020).

*Second*, the CAC challenges factual recitations of Array's past performance without actually alleging that those facts were untrue. For example, the CAC challenges statements about Array's "demonstrated ability to reduce the cost of [its] products while increasing profit margins" (¶¶ 102, 177), but it challenges *none* of Array's prior financial results and offers no explanation as to why, in Plaintiffs' view, Array had not demonstrated such an ability. The CAC also challenges Array's statement that it "made substantial investments in [its] systems and supply chain" (¶¶ 102, 177), but it alleges nothing about what investments the Company made (or did not make). Ultimately, the CAC's allegations amount to a theory that Array's struggles managing unprecedented volatility in 2021 rendered its descriptions of its past successes misleading. That fraud-by-hindsight critique is insufficient to plead falsity. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) (no liability "under the securities laws for accurate reports of past successes, even if present circumstances are less rosy").[9]

**B.    The Challenged Statements Are Nonactionable as a Matter of Law**

Even beyond the flawed falsity theories addressed above, a vast majority of the statements challenged in the CAC are nonactionable because they are "puffery," opinions, or forward-looking statements that fall squarely into the PSLRA's safe harbor.

---

[9] The CAC's misleading "cherry pick[ing]" of two statements from Array's November 2020 Earnings Call is unavailing. *See Greco*, 2022 WL 4226022, at *8. *First*, Patel's comment about there being no "changes in the pricing environment" related only to the average selling price of Array's trackers *as a whole*, not steel or freight costs. Attach. A, No. 5 n.2. *Second*, Fusaro's statement about "trends" that "strengthen the basis of our value proposition" concerned customer activity and was not related to the management of steel or freight volatility. *See id.*, No. 6 n.3.

1.    <u>Numerous Statements Challenged by the CAC Are Puffery</u>

Generalized statements of "corporate optimism," *i.e.*, "puffery," cannot give rise to liability under the securities laws.  *Rombach*, 355 F.3d 164, 174, 175 (2d Cir. 2004).  Such "general statements" are not actionable because they "make no specific claims on which [reasonable persons] can rely.  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011).

Here, many of the statements challenged by the CAC convey nothing more than vague optimism about the administration of Array's business.  *See* Attach A. (Nos. 1-2, 6, 12-13).  For example, statements about Array's "rigorous supply chain management" (¶¶ 65-66), its ability to "[l]everag[e] [its] global supply chain and economies of scale to reduce product cost" (¶¶ 103, 178), or that it "manages and monitors" commodities (¶ 119) are "merely generalizations regarding [Array's] business practices." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  Such statements are not "anything like [] guarantee[s] as to [Array's] invulnerability to commodity risk." *Ferrellgas*, 2018 WL 2081859, at *11-12 (statements touting "fully integrated logistics-focused model which is not dependent on commodity prices" and "best-in-class capabilities" were puffery).  Nor are Array's statements about its projected financial performance actionable.  No reasonable investor would interpret Array's comments about its guidance being "conservative" (¶116) or its "high visibility into margins" (¶¶ 87, 120) as statements that Array had a "crystal ball" into its future financial performance.  *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *11-12 (N.D. Cal. Dec. 18, 2017) (statements about "visibility" into future financials were "textbook examples" of puffery).

2.    <u>The Opinions of Array's Executives Are Not Actionable</u>

The CAC also challenges several statements that reflect Array executives' opinions about the Company's performance or market dynamics.  *See* Attach. A (Nos. 4, 6-9, 11, 13).  Many of these statements are prefaced with telltale opinion language like "we view" (¶ 107), "we feel"

(¶ 118), or "we expect" (¶¶ 114, 116).  *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) ("I think" and similar language signals opinions).  But even absent such language, these statements—for example, about business drivers that "continue to strengthen on the basis of our value proposition" (¶ 109), that Array has "taken a conservative approach to the guidance" (¶ 116), or that Array had "high visibility" into margins (¶ 120)—convey subjective views about Array's business prospects and strategy.  They are not assertions about "presently existing, objective facts."  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015).

The CAC fails to plead that any of these opinion statements are actionable.  "[A] sincere statement of pure opinion" is not actionable.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  A securities plaintiff may premise a claim on opinions only in three narrow circumstances: (i) "the speaker d[oes] not hold the belief [] professed"; (ii) the "fact[s] [ ] supplied" in support of the belief are "untrue"; or (iii) the speaker "omits information" that "makes the statement misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  The CAC lacks any allegation that Array's management did not sincerely believe the views they disclosed about Array's ability to maintain its performance in the face of changes in steel costs and freight expenses.  *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *15-17 (S.D.N.Y. Apr. 2, 2020) (rejecting opinion-based claims where plaintiffs failed to allege facts that showed "defendants did not believe" their "expectations" about margins).  Nor does the CAC allege with particularity any false supporting factual statements.  *Id.*

Moreover, it is "no small task" for Plaintiffs to plead the opinions' falsity via an omissions theory, as Plaintiffs purport to do here.  *Omnicare*, 575 U.S. at 189-90, 194.  The CAC fails to allege that any of the opinions did not "fairly align" with information in the Exchange Act Individual Defendants' possession at the time they spoke.  Indeed, the CAC confirms that their

opinions had a valid basis by relying on a public report expressing the same critical assumption underlying Array's guidance:  that steel prices would begin to normalize by the second half of 2021.  *See* Ex. A at 1.  Plaintiffs cannot make out a false statement by showing that assumption turned out to be incorrect—classic (and impermissible) "fraud by hindsight"—and they make no real attempt to "identify particular (and material) facts going to the basis" of Array's opinions that would render them misleading.  *Omnicare*, 575 U.S. at 194.  For example, the CAC fails to plead facts showing that Array knew at the time it offered guidance based upon the expectation that costs would normalize by the second half of 2022 that its guidance was unattainable and it would be unable to mitigate cost headwinds.  *See id.* at 187; *see also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) (opinion "that 'great progress' was being made" could be actionable "only if . . . Tesla had been making no progress at all.").  At best, the CAC marshals facts "cutting the other way" from the Company's assessments—for example, that Array's disclosed decision not to hedge commodity costs might impact the likelihood of hitting guidance—but the mere existence of such challenges does not make the opinions misleading.  *Omnicare*, 575 U.S. at 176.

### 3.   Array's Forward-Looking Statements Are Not Actionable

The PSLRA protects statements that are identified as forward-looking and are (i) accompanied by meaningful cautionary language or (ii) immaterial or (iii) made without actual knowledge of their falsity.  15 U.S.C. § 78u-5(c).  Forward-looking statements include those containing "a projection of revenues," "earnings (including earnings loss) per share," "future economic performance," "the plans and objectives of management for future operations," and "the assumptions underlying or relating to" those plans and objectives.  *Id.* § 78u-5(i)(1)(A)-(D).

Many of the statements challenged in the CAC are squarely protected by the PSLRA's safe harbor.  *See* Attach. A (Nos. 4, 6-11, 14).  These statements are "expressions of optimism or projections about the future" that "concern[] an uncertain future event" and are quintessentially

forward-looking.  *In re Anheuser-Busch InBev SA/NV Sec. Litig.*, 2020 WL 5819558, at *5 (S.D.N.Y. Sept. 29, 2020).  Most notably, Array's predictions about its FY2021 performance, such as its projected EBITDA (¶¶ 114, 188) "involve the plans and objectives of management for future operations and future economic performance."  *Adient*, 2020 WL 1644018, at *18; *Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956, at *9 (S.D.N.Y. Aug. 28, 2019).  Similarly, the Company's expectations about future price trends (¶¶ 107, 116) are prototypical forward-looking statements.[10] These statements were also accompanied by full risk disclosures.[11]  *See supra* at 4-7; *Gissin v. Endres*, 739 F. Supp. 2d 488, (S.D.N.Y. 2010) (cautionary language was meaningful where it "point[ed] to the principal contingencies" that could affect performance, including "volatility and uncertainty" in "commodity prices").[12]

### C.      The CAC Fails to Plead Any Inference of the Exchange Act Individual Defendants' Scienter

The PSLRA requires Plaintiffs to plead with particularity a "strong" scienter inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  That compelling inference must be established for the Exchange Act Individual Defendants (*i.e.*, Fusaro or Patel) to plead *Array*'s scienter.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Scienter can only be demonstrated by pleading "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Glaser v.*

---

[10] Beyond being forward-looking themselves, several challenged statements about future steel prices (¶ 114) or the Company's ability to pass costs to customers (¶¶ 116-17, 121) reflect assumptions underlying the Company's projections and are thus also protected by the safe harbor.  *See* 15 U.S.C. § 78u-5(i)(1)(D).

[11] The statements are also protected by the "bespeaks caution" doctrine in light of these disclosures.  *See Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *14-16 (S.D.N.Y. Jan. 17, 2013).  The CAC fails to plead any violation of Item 503 for the same reason.  *See* ¶ 175; *In re Philip Morris Int'l Inc. Sec. Litig.*, 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020).

[12] Moreover, as discussed *infra*, Plaintiffs "cannot avoid [the] safe harbor" because they fail to plead any scienter inference.  *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 180 (S.D.N.Y. 2012).

*The9, Ltd.*, 772 F. Supp. 573, 586 (S.D.N.Y. 2011).  The CAC fails on both counts.

1. <u>The CAC Fails to Plead that Fusaro or Patel Had Motive to Commit Fraud</u>

The CAC fails to plead that Fusaro or Patel had any motive to commit fraud.  To do so, Plaintiffs must plead with particularity "concrete and *individual* gain to *each defendant* resulting from the fraud."  *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 581 (S.D.N.Y. 2007) (Marrero, J.).

Despite this well-settled pleading requirement, the CAC musters only a generalized motive theory untethered to Fusaro and Patel.  The CAC contains no allegation that Fusaro or Patel "[made] a misrepresentation in order to sell their *own* shares at a profit."  *ECA, Local 134 IBEW*, 553 F.3d at 198; *See* ¶¶ 133-38.  In fact, outside of boilerplate, conclusory allegations that they "participated in the fraudulent scheme" (¶¶ 137-38), the CAC's motive allegations do not mention Fusaro or Patel at all.  ¶¶ 133-38.  The glaring absence of any factual allegations about Fusaro's and Patel's alleged incentives hamstrings any attempt to plead scienter on a motive theory.  *See Rombach*, 355 F.3d at 177 (motive allegations failed to raise scienter inference where "[p]laintiffs [did] not allege that defendants . . . profited in any way during the relevant period").[13]

2. <u>The CW Allegations Fail to Establish Conscious Wrongdoing</u>

Plaintiffs' failure to advance any compelling motive allegations places upon them a "correspondingly greater" burden to plead particularized facts establishing conscious wrongdoing or recklessness.  *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 219 (S.D.N.Y. 2018) (Marrero, J.).  The CAC does not meet that burden.

As with Plaintiffs' falsity allegations, the pre-Class Period departures of CWs 2, 3, 4, and 5 undercut any allegations they make about Fusaro's and Patel's mental state.  *See* ¶¶ 76-85.

---

[13] The CAC's stray assertion that Array sold stock "to prepay approximately $125 [million]" of outstanding debt (¶ 133) also cannot establish motive because paying down debt is a motive "common to most for-profit companies." *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *10 (S.D.N.Y. Mar. 28, 2013).

Courts regularly find that a CW cannot speak to an individual defendant's state of mind at the time of alleged misstatements made after the CW's separation. *See Schaffer*, 2018 WL 481883, at \*8 ("[B]ecause [the CWs] were not employees for most of the Class Period, the Court cannot rely on their statements to support" scienter); *see also Hebron*, 2021 WL 4341500, at \*18 (same). As such, the Court should give no weight to these allegations in its scienter analysis.

Even beyond that fatal deficiency, *none* of the CWs provide particularized allegations that could raise the requisite strong inference of Fusaro's or Patel's fraudulent intent. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798 (S.D.N.Y. 2020) ("insufficiently particular" CW allegations "are apt to be discounted or disregarded"). Plaintiffs' conscious misconduct theory boils down to the CWs' claim that they were told to use what they regarded as "outdated" or "stale" steel and freight prices in margin forecasts. ¶¶ 77-79. But the CAC offers no specifics about these supposed directives. For example, CW1 alleges that "the executive team" decided to use "old and stale" freight prices—a quote not attributed to anyone, let alone Fusaro or Patel. ¶ 78. This decision was purportedly conveyed to CW1 "at some point in the fourth quarter of 2020 or in early 2021" (*id.*)—a period of *at least* three months, at a time when global steel and freight costs (and expectations about those costs) were changing constantly. *See Gregory v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018) (discrediting CW allegations "unmoored in time"). CW2 and CW3 offer similarly vague allegations that unnamed Array "executives" or members of "leadership" instructed them to use lower costs at unspecified times. ¶¶ 77, 80. These assertions must be discredited because they cannot "impute such [] instruction[s] to any specific individual, let alone any of the Individual Defendants," and fail utterly to plead the who, what, where, and when of the alleged fraud. *Schaffer*, 2018 WL 481883, at \*13.

### 3.    Core Operations Allegations Cannot Salvage the CAC's Scienter Theory

Unable to plead specific facts about motive or conscious misconduct, Plaintiffs try to contrive a scienter inference by alleging that steel and freight costs related to Array's core operations and thus Fusaro and Patel *must* have acted with scienter.  ¶¶ 129-32.  But nothing in the CAC suggests that Fusaro and Patel did not actually believe their views about what steel and freight cost assumptions Array should use in addressing changing and uncertain economic conditions. And in any event, the core operations doctrine is at best "a buoy, not a life raft." *In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at \*15 (S.D.N.Y. Mar. 30, 2021).  It cannot by itself save Plaintiffs' scienter theory from the "utter absence" of compelling allegations of motive or conscious misconduct.  *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528-29. (S.D.N.Y. 2020) (core operations theory cannot be sole basis for pleading scienter).

### 4.    The CAC Fails to Raise Any Scienter Inference

The CAC gives rise only to a nonculpable inference: that Array, like the rest of the market, simply failed to predict the magnitude and duration of COVID-19-related price increases and supply chain disruptions when preparing its FY2021 guidance. *See Tellabs,* 551 U.S. at 314.  The CAC is peppered with allegations that Array *should have* had a different business model to better address risks that were more severe than expected when viewed with 20/20 hindsight.  *See, e.g.*, ¶ 79 (Array should have hedged against steel prices), ¶ 94 (Array should have locked in commodity pricing).  While Array may ultimately have been wrong, nowhere does the CAC allege why Array should not have expressed public confidence in its business practices *at the time it spoke*— practices that had permitted the Company to *exceed* its guidance in 2020 despite similar headwinds—much less that anyone at Array *knew* that those expressions of confidence were false. The *only* inference that can be drawn from the CAC is that Array's beliefs were genuine and that

it, like others in the market, did not predict unprecedented market developments. *See Gissin*, 739 F. Supp. at 514 ("faulty presumption" about commodity prices evinced non-culpable inference).

## II.  THE CAC'S SECURITIES ACT CLAIMS FAIL AS A MATTER OF LAW

The CAC's claims under Sections 11 and 12(a)(2) of the Securities Act fare no better than its Section 10(b) claim. As a threshold matter, both claims are defective because the CAC fails to allege purchases traceable to each of the three offerings. Where, as here, "a company has issued shares in multiple offerings under more than one registration statement . . . a greater level of factual specificity will be needed [to] . . . reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." *In re Century Aluminum Co. Sec. Litig*., 729 F.3d 1104, 1107 (9th Cir. 2013); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) ("Only those who purchase securities that are subject to allegedly false registration statement, and not those who buy identical stocks already being traded, can sue under section 11."). The CAC does not even allege that Plaintiffs purchased shares in or traceable to the December 2020 SPO (¶¶ 20-21), so claims based on that SPO must surely be dismissed, and otherwise contains no information sufficient to trace any alleged purchases to the March 2021 SPO. *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490-91 (S.D.N.Y. 2010) (dismissing claims where "plaintiffs ha[d] not alleged any injury traceable to the Certificates issued in th[e] offerings" at issue).[14] And the only shares arguably purchased in the IPO were sold a day later by Plaintiff Carpenters *at a 75% profit* and thus could not be the basis for any Securities Act claim. *See* ¶¶ 20-21 (citing Lead Plaintiff Certifications, ECF No. 79-1).

Further, while both claims are defective even under a Rule 8 standard, they must be pled with particularity under Rule 9(b) because they sound in fraud. *See Rombach*, 355 F.3d at 170-

---

[14] Indeed, certain of the Underwriter Defendants allegedly underwrote only one or two of the offerings, so the allegations concerning the other offerings cannot establish any basis for liability as to them. *See* ¶¶ 49-54.

71.  The gravamen of Plaintiffs' Securities Act claims is identical to their Section 10(b) claim—*i.e.*, that Defendants made false statements by concealing Array's exposure to rising steel and freight costs—allegations that are "classically associated with fraud." *Id.* at 172.[15]  In any event, the Securities Act claims also fail because the CAC fails to plead (i) falsity, as required by both claims, and (ii) that any Defendant was a statutory seller, as Section 12(a)(2) requires.

###### A.    The CAC Fails to Allege Any False or Misleading Statement or Omission

Plaintiffs' Section 11 and Section 12(a)(2) claims both fail because they require Plaintiffs to plead a false statement—in either a registration statement (Section 11) or a prospectus or oral communication (Section 12(a)(2)).  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-60 (2d Cir. 2010).  As discussed above, Plaintiffs do not do so.  Their claims are an attack on subjective statements of future performance that do not identify any false statement of fact.

The CAC also fails to plead falsity by alleging that Array violated Item 303, which requires a registrant to "[d]escribe any known trends or uncertainties" reasonably expected to have a material impact on "net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  This requirement applies only where the relevant information was both: (i) presently known to management and (ii) reasonably likely to have material effects on the registrant's financial condition or results of operation.  17 C.F.R. § 229.303(a) instruction 3.

The CAC does not plead a violation of Item 303 for two reasons.  *First*, the CAC alleges no undisclosed "trend" that Array would be obligated to reveal to investors.  Array, like others in the industry, projected that steel prices would stabilize and then decrease in the second half of 2021 and disclosed the risk that longer-term increases might impact its operations.  The CAC does

---

[15] In a superficial effort to escape the application of Rule 9(b), the CAC incorporates boilerplate disclaimers (*e.g.*, ¶¶ 158, 162) and segregates its Securities Act allegations in a separate section.  Such formalisms are irrelevant given that the Securities Act and Exchange Act claims are "mirror image[s]."  *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021).

not (and plausibly could not) allege that Array knew at the time of the offerings that prices would continue to climb for longer than expected. *Second*, the CAC fails to plead that any Defendant had "actual knowledge" of any such trend. *Wandel v. Gao*, 2022 WL 768975, at *11 (S.D.N.Y. Mar. 14, 2022). While Securities Act claims generally do not require pleading scienter, for purposes of Item 303's knowledge requirement "[i]t is *not* enough that [management] *should have known* of the existing trend, event, or uncertainty." *Id.* Here, the CAC *expressly disclaims* any allegation of actual knowledge for its Securities Act claims. *See, e.g.*, ¶¶ 158, 162. The CAC cannot have it both ways—either it does not plead actual knowledge of an Item 303 "trend" or its disclaimers cannot be taken at face value. *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010). As such, the CAC does not plead an Item 303 violation.

### B.     The CAC Fails to Allege that Any Defendant Was a Statutory Seller

The CAC fails to allege that any Defendant was a statutory seller under Section 12(a)(2). Here, the CAC contains no allegation that any Defendant passed title of Array securities, and thus must allege that each Defendant "solicit[ed] the purchase [of a security]" (*Morgan Stanley Info. Fund*, 592 F.3d at 359) in the form of *active* or *direct* solicitation of investors. *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021).

The CAC does not even meaningfully attempt to plead solicitation. For example, with respect to the Underwriter Defendants, the CAC offers only a bare, circular assertion that "[e]ach of the Underwriter Defendants served as an underwriter for at least one of the offerings" and thus "participated in the solicitation" of investors. ¶¶ 159, 204. Beyond that, the CAC offers only a scattershot allegation that *every* Defendant, apparently including the Underwriter and Oaktree Defendants, solicited investors by "participat[ing] in the preparation" of offering materials and "marketing" Array stock to investors (¶ 212) without alleging how each Defendant actually

solicited investors.  *See Fed. Housing Fin. Agency v. Stanley*, 2012 WL 5868300, at *4 (S.D.N.Y.

Nov. 19, 2012) (insufficient to "broadly" assert that "solicitation included assisting in preparing"

offering documents "and/or assisting in marketing and selling the [securities]").  Such boilerplate

allegations fail to state a Section 12(a)(2) claim under any pleading standard.

## III.    THE CAC FAILS TO STATE CONTROL PERSON CLAIMS

Plaintiffs' Section 20(a) and Section 15 claims fail to meet the required elements for control

person liability.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  *First*,

the CAC fails to plead a primary violation.  *See supra* at 7-25.  *Second*, the CAC fails to plead

actual control over the transactions at issue.  *See Tarsavage v. Citic Tr. Co.*, 3 F. Supp. 3d 137,

149-50 (S.D.N.Y. 2014).  As to ATI Investment Parent and the Oaktree Defendants, Plaintiffs

allege control through majority ownership of Array (¶ 221), yet provide only sparse and confusing

accounts of equity positions throughout the Class Period.  Similarly, the allegations concerning

director and officer defendants (¶¶ 25, 56, 157, 220) rely exclusively on their "status as a director

or officer," which is insufficient to establish control.  *Pub. Emps.' Ret. Sys. Of Miss. v. Merrill*

*Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010).  *Third*, the CAC fails to plead that

each "defendant was, in a meaningful sense, a culpable participant in" the alleged fraud, let alone

rising to the level of recklessness.  *Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482,

486 (S.D.N.Y. 2014).[16]  Both control person claims should be dismissed.

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed with prejudice.

---

[16] Courts in the Second Circuit have held that a plaintiff must plead culpable participation in the context of a Section 15 claim.  *See, e.g. In re Am. Realty Cap. Properties, Inc. Litig.*, 2015 WL 6869337, at *4 (S.D.N.Y. Nov. 6, 2015).

Dated:  October 17, 2022
New York, New York

Respectfully submitted,

/s/ *Peter L. Welsh*
Peter L. Welsh
Lisa H. Bebchick
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Tel.: (212) 596-9000
Fax: (212) 596-9090
peter.welsh@ropesgray.com
lisa.bebchick@ropesgray.com

*Attorneys for Defendants Array Technologies
and Array Intermediate Holdings, LLC*

/s/ *Robert A. Sacks*
Robert A. Sacks
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, New York 10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
sacksr@sullcrom.com

*Attorney for Defendants Jim Fusaro, Nipul
Patel, Troy Alstead, Orlando D. Ashford, Ron
P. Corio, and Brad Forth*

/s/ *Stefan Atkinson*
Stefan Atkinson
Amal El Bakhar
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Tel.: (212) 446-4800
Fax: (212) 446-4900
stefan.atkinson@kirkland.com
amal.elbakhar@kirkland.com

*Attorneys for Defendants Frank Cannova,
Peter Jonna, Jason Lee, ATI Investment
Parent, LLC, Oaktree ATI Investors, L.P.,
Oaktree Power Opportunities Fund IV, L.P.,
and Oaktree Power Opportunities Fund IV
(Parallel), L.P.*

/s/ *Jay B. Kasner*
Jay B. Kasner
Scott D. Musoff
Abigail E. Davis
**SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP**
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
abigail.sheehan@skadden.com

*Attorneys for Defendants Goldman Sachs &
Co. LLC, J.P. Morgan Securities LLC,
Guggenheim Securities, LLC, Credit Suisse
Securities (USA) LLC, Barclays Capital Inc.,
UBS Securities LLC, Cowen and Company,
LLC, Oppenheimer & Co. Inc., Johnson Rice
& Company L.L.C., Roth Capital Partners,
LLC, Piper Sandler & Co., MUFG Securities
Americas Inc., Nomura Securities
International, Inc., and Morgan Stanley & Co.
LLC*

**Attachment A – Table of Challenged Statements**

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| 1. | "***Demonstrated ability to reduce the cost of our products while increasing profit margins***.  In order to enhance the competitiveness of our products and increase our margins, ***we continually work to reduce the cost of our products through innovation and rigorous supply chain management***.  These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019.  This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, ***while simultaneously increasing gross profits and gross margins.*** […] ***Rigorous supply chain management*** supported by a **sophisticated enterprise resource planning ("ERP") system.  *We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold*** while enabling us to rapidly deliver large volumes of our products to project sites around the world.  To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites.  ***To lower our cost of goods sold, we*** | Exchange Act Securities Act | 65-66, 74, 102, 104, 113, 124, 177, 183, 187 | 10/13/2020 Form S-1 at 5, 6, 76-77 10/16/2020 Prospectus at 6, 77-78 11/30/2020 Form S-1 at 6-7, 80-81 12/2/2020 Prospectus at 6-7, 80-81 3/10/2021 Form 10-K at 3-4 | *Exchange Act:* Insufficient Falsity Allegations; Puffery *Securities Act:* Insufficient Falsity Allegations; Puffery |

---

[1] Bolded and italicized text herein matches the formatting contained in the CAC.

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | *employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale.*" [...] **Highly scalable manufacturing with low capital intensity.** We are an engineering and technology centric company with an assembly-focused manufacturing model. *Approximately 80% of our cost of goods sold consists of purchased components, including motors, gearboxes, electronic controllers and steel tubing* that we source from third-party suppliers. The remainder of our cost of goods sold is primarily labor to fabricate and assemble certain specialized parts of our system. As a result, our business requires minimal capital investment and generates significant cash flow, which has allowed us to make investments in research and development, repay debt and make distributions to our stockholders." | | | 3/16/2021 Form S-1 at 5-6  3/22/2021 Prospectus at 5-6 | |
| 2. | "*Leveraging our global supply chain and economies of scale to reduce product cost.* Purchased components are the largest contributor to our cost of goods sold. *Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions*." | Exchange Act  Securities Act | 103-104, 113, 124, 178, 183, 187 | 10/13/2020 Form S-1, at 7, 77  10/16/2020 Prospectus at 7, 78 | *Exchange Act:* Insufficient Falsity Allegations; Puffery  *Securities Act:* Insufficient Falsity Allegations; Puffery |

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | | | | 11/30/2020 Form S-1 at 7, 81 | |
| | | | | 12/2/2020 Prospectus at 7, 81 | |
| | | | | 3/10/2021 Form 10-K at 4 | |
| | | | | 3/16/2021 Form S-1 at 7 | |
| | | | | 3/22/2021 Prospectus at 7 | |
| 3. | **"Quantitative and Qualitative Disclosures about Market Risk** We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that ***may*** impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is | Exchange Act<br><br>Securities Act | 105, 179, 183, 187 | 10/13/2020 Form S-1, at 69-70<br><br>10/16/2020 Prospectus at 70-71 | *Exchange Act:* Insufficient Falsity Allegations<br><br>*Securities Act:* Insufficient Falsity Allegations |

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | primarily a result of fluctuations in steel and aluminum prices and customer concentrations. […] *Commodity Price Risk* We are subject to risk from fluctuating market prices of certain commodity raw materials, including steel and aluminum, that are used in our products.  Prices of these raw materials ***may*** be affected by supply restrictions or other market factors from time to time, and we do not enter into hedging arrangements to mitigate commodity risk.  Significant price changes for these raw materials ***could*** reduce our operating margins ***if*** we are unable to recover such increases from our customers, and could harm our business, financial condition and results of operations." | | | 11/30/2020 Form S-1 at 73-74 12/2/2020 Prospectus at 73-74 3/10/2021 Form 10-K 1 at 56-57 | |
| 4. | "Gross margins in the third quarter were lower than the prior year period as a result of ***having less revenue to absorb fixed costs as well as higher logistics costs***, largely driven by the global shipping constraints due to COVID-19.  Importantly, ***we view both of these dynamics as short term in nature and not indicative of longer-term margin pressure***. . . . […] Now turning to our 9-month results. . . . Gross margins increased 24.2% from 21.3% in the prior year period, ***driven by reductions in purchase materials resulting from improved supplier arrangements and shifting volumes for certain*** | Exchange Act | 107 | 11/6/2020 Earnings Call Tr. at 5-6 | Insufficient Falsity Allegations; Opinion; PSLRA Safe Harbor |

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | *components to new lower-cost suppliers* and greater leverage of fixed costs against higher sales volumes. . . ." | | | | |
| 5. | "**Brian K. Lee**, Goldman Sachs Group, Inc., Research Division: Okay.  That's helpful.  And then you mentioned, Nipul, the ASPs were flat from 2Q to 3Q.  I assume that's a comment on the overall mix of business.  Would you say the trends, ASP wise, were pretty similar across the 2 regions? **Nipul A. Patel**, Chief Financial Officer: Yes. *We're not seeing any changes in the pricing environment.*" [2] | Exchange Act | 108 | 11/6/2020 Earnings Call Tr. at 8 | Cherry-Picked Statement Does Not Relate to Rising Steel/Freight Costs; Insufficient Falsity Allegations |
| 6. | "So our customers continue to see the value of our product, and *those trends really haven't changed.  If anything, they continue to strengthen on the basis of our value proposition*." [3] | Exchange Act | 109 | 11/6/2020 Earnings Call Tr. at 10 | Cherry-Picked Statement Does Not Relate to Rising Steel/Freight Costs; Insufficient Falsity |

[2] The full statement is as follows: "[Analyst]: Hey, guys.  Thanks for taking the questions and congrats on your first quarter out as a public company. I guess just a couple of questions around the model to begin with maybe.  Can you give us what the U.S. and rest of world mix was for the quarter on revenue and megawatts? [Patel]: Hey Brian, it's Nipul. How are you?  Yes, we're not going to be reporting megawatts.  I can give you the mix of that revenue for the quarter.  It was 10% international and the remainder are U.S.  [Analyst]: Okay, that's helpful. And then you mentioned, Nipul, the ASPs were flat from 2Q to 3Q. I assume that's a comment on the overall mix of business.  Would you say the trends, ASP wise, were pretty similar across the two regions? [Patel]: Yes.  We're not seeing any changes in the pricing environment."

[3] The full statement is as follows: "[Analyst]: I wanted to just pick up on the commentary you laid out in the release about increased customer activity, discussions around some potential sizable new orders.  Are there any particular drivers you're seeing?  Any trends?  Or is this just specific to different customers?  I'm just curious sort of, of late, if you're seeing something different than what you've seen in the past.  [Fusaro]: No, Stephen, it's really the same.  Our thesis remains the same with respect to the growth of solar overall.  Having said that, we will be announcing, in very short order, a large deal with a very strategic customer that includes not only domestic but international growth as well.  So, our customers continue to see the value of our product, and those trends really haven't changed. If anything, they continue to strengthen on the basis of our value proposition."

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | | | | | Allegations; Puffery; Opinion; PSLRA Safe Harbor |
| 7. | "***Gross margin decreased from 27% to 20% driven by less revenue to absorb fixed costs and project mix***. […] ***Gross margin was flat versus the prior year period driven by reductions in the cost of purchased materials which offset higher logistics costs in the second half of the year caused by COVID-19 related freight increases***. […] **Full Year 2021 Guidance** For the full year 2021 ending December 31, 2021, the Company expects: •Revenues to be in the range of $1,025 million to $1,125 million •***Adjusted EBITDA to be in the range of $164 million to $180 million*** •***Adjusted net income per share to be in the range of $0.82 to $0.92***" | Exchange Act | 114, 140 | 3/9/2021 Earnings Release at 2-3, 5 | Insufficient Falsity Allegations; Opinion; PSLRA Safe Harbor |
| 8. | "Commodity prices and freight costs have increased significantly over the past several months as business activity levels are increasing in response to the availability of a COVID-19 vaccine and capacity that was idled during the pandemic comes back online. ***While we currently expect*** | Exchange Act | 114, 140 | 3/9/2021 Earnings Release at 5 | Insufficient Falsity Allegations; Opinion; PSLRA Safe Harbor |

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | *commodity prices and shipping costs to normalize, the low end of our Adjusted EBITDA guidance range contemplates a delayed return to a normal pricing environment[.]"* | | | | |
| 9. | "And finally, commodity prices and freight costs have increased significantly over the past several months as a result of the reacceleration of the global economy while certain transportation and raw material capacity remains offline as a result of the pandemic.  *While* we expect prices to normalize and *our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by making these cost into the low end of our guidance assuming a delayed return to more normalized pricing.*" | Exchange Act | 86, 116 | 3/9/2021 Earnings Call Tr. at 7 | Insufficient Falsity Allegations; Opinion; PSLRA Safe Harbor |
| 10. | "We've held prices relatively flat, and we think they're stable. *However, we do have the option, as mentioned, as – to go back into the market.  We built in that range in our guidance to allow us to evaluate case by case, Brian.  But yes, we do have that option.*" | Exchange Act | 117 | 3/9/2021 Earnings Call Tr. at 8 | Insufficient Falsity Allegations; PSLRA Safe Harbor |
| 11. | [Analyst]: "as we sort of think about margins maybe in the medium term, say post-'21, should we assume some incremental margin compression further from what we're seeing today as you're guiding . . . [o]r should we assume maybe that 16% is a pretty good floor for our modeling purposes as we think about post-'21?" | Exchange Act | 118 | 3/9/2021 Earnings Call Tr. at 9 | Insufficient Falsity Allegations; Opinion; PSLRA Safe Harbor |

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | [Patel]: "With the commodity pricing as it is right now, that's – and the investments we're making consciously for the revenues that will be coming, ***we feel that that is kind of near the floor where we feel***." | | | | |
| 12. | [Analyst]: "[I]s the cost of steel becoming a problem for you, world steel [*sic*]?" [Fusaro]: "***So, we obviously manage and monitor all commodities accordingly, and then we build in productivity measures to address that to continue to drive our value***. If your question was pertaining to our supply chain, – sorry, Michael, could you clarify your question?" [Analyst]: "I'm thinking about the pressure on margins from cost inputs." [Fusaro]: "***Yes. I mean, there is always going to be pressure on cost. That's pretty much market-agnostic and product-agnostic. But that said, we've actually built up, we continue to build out our supply chain***. We added 15 new suppliers in four new countries. So that's just going to be an area that we remain focused on going forward as we grow both domestic here and internationally." | Exchange Act | 87, 119 | 3/9/2021 Earnings Call Tr. at 13 | Insufficient Falsity Allegations; Puffery |
| 13. | [Analyst]: "[Y]ou're talking about the first half of the year fully booked based on the backlog and when would you be buying that steel[,] just as it's been moving quite a bit? So have you locked in the steel as you locked in that pricing, so you have high visibility into the margins or not necessarily so?" | Exchange Act | 120 | 3/9/2021 Earnings Call Tr. at 16 | Insufficient Falsity Allegations; Puffery; Opinion |

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | [Patel]: "**Yes**[…]."[4] | | | | |
| 14. | [Analyst]: "So in the guidance, you highlight your expectation that commodity prices and freight charges to normalize over time.  Just curious what drives that normalization view and then how long it would take – how long the cost would need to remain elevated before you seriously decided are considered passing it on to customers, and then how to think about any concerns surrounding implications to demand from customers from higher costs?"<br>[Patel]: "So as far as that first part of the question, as far as how long we think it is and obviously, it's unknown. . . . And as far as your second half of the question, *we're always evaluating all our pricing on our projects and we know that we have that ability and we'll look at it on a case by case basis*, so." | Exchange Act | 121 | 3/9/2021 Earnings Call Tr. at 17 | Insufficient Falsity Allegations; PSLRA Safe Harbor |
| 15. | "[W]e are dependent on transportation and logistics providers to deliver our products in a cost efficient manner.  Disruptions to transportation and logistics, including increases in shipping costs, *could* adversely impact our financial condition and results of operations;<br>[…] | Exchange Act | 125 | 3/10/2021 Form 10-K at iv, 23-24 | Insufficient Falsity Allegations |

---

[4] Patel's full response is as follows: "Yes.  So we typically – I'll just give you our typical order patterns.  We typically order material between six and 12 weeks from the date of the shipment.  So we keep very low inventory.  So the impact obviously, if the COGS, the recent run up prices would impact second half more than it would first half."

| No. | Statement[1] | Claims | CAC ¶¶ | Source | Reasons Why Statements Are Not False or Misleading or Are Not Actionable |
|---|---|---|---|---|---|
| | We rely on transportation and logistics providers for the delivery of our products.  We may also incur additional shipping costs when we need to accelerate delivery times.  Our ability to deliver our products in a cost efficient manner **could** be adversely impacted by shortages in available cargo capacity, changes by carriers and transportation companies in policies and practices, such as scheduling, pricing, payment terms and frequency of service or increases in the cost of fuel, taxes and labor, disruptions to shipping facilities as a result of the COVID-19 or other epidemics, and other factors not within our control.  Disruptions to transportation and logistics, including increases in shipping costs, **could** adversely impact our financial condition and results of operations." | | | | |

**Attachment B – Confidential Witnesses**

| CW # | Alleged Job Title in CAC | Alleged Period of Employment in CAC | Reasons Allegations Should Not Be Credited |
|---|---|---|---|
| CW1 | Employed in Array's "finance organization" (specific job title not alleged) (¶ 62 n.1) | Q3 2019 to Q2 2021 (specific months not alleged) (¶ 62 n.1) | Fails to plausibly allege that Array's cost estimates rendered any challenged statement false or misleading.<br><br>Generic allegations of misconduct lack particularity and cannot create a scienter inference as to any Exchange Act Individual Defendant. |
| CW2 | Worked in "procurement at Array" (specific job title not alleged) (¶ 63 n.3) | Before Class Period (mid-2018 through mid-2020) (¶ 63 n.3) | Not employed at Array during the Class Period and cannot speak to contemporaneous falsity or scienter at time of challenged statements.<br><br>Fails to plausibly allege that Array's cost estimates rendered any challenged statement false or misleading.<br><br>Generic allegations of misconduct lack particularity and cannot create a scienter inference as to any Exchange Act Individual Defendant. |
| CW3 | Director of Contracts & Procurement (¶ 80 n.9) | Before Class Period (May 2018 to April 2019) (¶ 80 n.9) | Not employed at Array during the Class Period and cannot speak to contemporaneous falsity or scienter at time of challenged statements.<br><br>Fails to plausibly allege that Array's cost estimates rendered any challenged statement false or misleading.<br><br>Generic allegations of misconduct lack particularity and cannot create a scienter inference as to any Exchange Act Individual Defendant. |

| CW # | Alleged Job Title in CAC | Alleged Period of Employment in CAC | Reasons Allegations Should Not Be Credited |
|---|---|---|---|
| CW4 | Procurement Manager (¶ 81 n.10) | Before Class Period (June 2018 to March 2020) (¶ 81 n.10) | Not employed at Array during the Class Period and cannot speak to contemporaneous falsity or scienter at time of challenged statements.<br><br>Fails to plausibly allege that Array's cost estimates rendered any challenged statement false or misleading.<br><br>Generic allegations of misconduct lack particularity and cannot create a scienter inference as to any Exchange Act Individual Defendant. |
| CW5 | Senior Commodity Manager (¶ 82 n.12) | Almost Entirely Before Class Period (June 2020 to October 2020) (¶ 82 n.12) | Only employed at Array at very start of Class Period and cannot speak to contemporaneous falsity or scienter at time of challenged statements.<br><br>Fails to plausibly allege that Array's cost estimates rendered any challenged statement false or misleading.<br><br>Generic allegations of misconduct lack particularity and cannot create a scienter inference as to any Exchange Act Individual Defendant. |