USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/19/2023

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PLYMOUTH COUNTY RETIREMENT ASSOCIATION
and CARPENTERS PENSION TRUST FUND FOR
NORTHERN CALIFORNIA, Individually and
on Behalf of All Others Similarly
Situated,

                    Plaintiffs,

          - against -

ARRAY TECHNOLOGIES, INC., ATI
INTERMEDIATE HOLDINGS, LLC, JIM FUSARO,
NIPUL PATEL, TROY ALSTEAD, ORLANDO D.
ASHFORD, FRANK CANNOVA, RON P. CORIO,
BRAD FORTH, PETER JONNA, JASON LEE, ATI
INVESTMENT PARENT, LLC, OAKTREE ATI
INVESTORS, L.P., OAKTREE POWER
OPPORTUNITIES FUND IV, L.P., OAKTREE
POWER OPPORTUNITIES FUND IV (PARALLEL),
L.P., GOLDMAN SACHS & CO. LLC, J.P.
MORGAN SECURITIES LLC, GUGGENHEIM
SECURITIES, LLC, CREDIT SUISSE
SECURITIES (USA) LLC, BARCLAYS CAPITAL
INC., UBS SECURITIES LLC, COWEN AND
COMPANY, LLC, OPPENHEIMER & CO. INC.,
JOHNSON RICE & CO. LLC, ROTH CAPITAL
PARTNERS, LLC, PIPER SANDLER & CO.,
MUFG SECURITIES AMERICAS INC., NOMURA
SECURITIES INTERNATIONAL, INC., and
MORGAN STANLEY & CO. LLC,

                    Defendants.

**21 Civ. 4390 (VM)**

**DECISION AND ORDER**

---

**VICTOR MARRERO, United States District Judge.**

     Lead Plaintiffs Plymouth County Retirement Association

("Plymouth") and the Carpenters Pension Trust Fund for

Northern California ("Carpenters" and together with Plymouth,

"Plaintiffs") brought this suit on behalf of a putative class

of "[a]ll persons and entities that purchased or otherwise

acquired Array securities during the period from October 14, 2020, through May 11, 2021, inclusive," (the "Class Period"). (See "Consolidated Class Action Complaint" or "CAC," Dkt. No. 163 ¶¶ 7(a)-(b).) During the Class Period, Array Technologies, Inc. ("Array" or the "Company") conducted three public offerings of common stock in October 2020, December 2020, and March 2021. (See Id.) Plaintiffs assert claims pursuant to Sections 10(b)[1] and 20(a)[2] of the Securities Exchange Act of 1934, 15 U.S.C. Section 78a *et seq.* (the "Exchange Act"), plus Rule 10b-5 of the Securities and Exchange Commission promulgated thereunder ("Rule 10b-5"), 17 C.F.R. Section 240.10b-5, as well as under Sections 11,[3]

---

[1] Count I of the CAC, claiming violation of Exchange Act Section 10(b) and Rule 10b-5, is brought against Array, Jim Fusaro ("Fusaro"), and Nipul Patel ("Patel") (Fusaro and Patel, together, the "Individual Exchange Act Defendants" and collectively with Array, the "Exchange Act Defendants").

[2] Count II of the CAC, claiming violation of Exchange Act Section 20(a), is brought against the Individual Exchange Act Defendants and ATI Investment Parent, LLC ("ATI"), Oaktree ATI Investors, L.P. ("Oaktree ATI"), Oaktree Power Opportunities Fund IV, L.P. ("Oaktree Power"), and Oaktree Power Opportunities Fund IV (Parallel), L.P. ("Oaktree Power Parallel") (collectively, the "Control Defendants"), as control persons.

[3] Count III of the CAC, claiming violation of Section 11 of the Securities Act is brought against Fusaro, Patel, Troy Alstead, Orlando D. Ashford, Frank Cannova, Ron P. Corio, Brad Forth, Peter Jonna, and Jason Lee (collectively, the "Individual Securities Act Defendants" or "Board of Directors" and, excluding Fusaro and Patel, the "Director Defendants"), Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Credit Suisse Securities (USA) LLC, Barclays Capital Inc., UBS Securities LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Johnson Rice & Co. LLC, Roth Capital Partners, LLC, Piper Sandler & Co., MUFG Securities Americas Inc., Nomura Securities International, Inc., and Morgan Stanley & Co. LLC (collectively, the "Underwriter Defendants"), and Array.

12(a)(2),[4] and 15[5] of the Securities Exchange Act of 1933, 15 U.S.C. Section 77a *et seq.* (the "Securities Act").

Defendants filed the instant Motion to Dismiss the CAC pursuant to Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. Section 78u-4 (see "Motion," Dkt. No. 174), supported by their memorandum of law (see "Br.," Dkt. No. 175) and the declaration of Lisa H. Bebchick (see "Bebchick Decl.," Dkt. No. 176). For the reasons discussed below, Defendants' Motion is **GRANTED** with leave to replead.

## I.   BACKGROUND

A.   FACTUAL BACKGROUND[6]

1.   The Parties

Array is a Delaware Corporation with its principal offices located in New Mexico. Array is a manufacturer of

---

[4] Count IV of the CAC, claiming violation of Section 12(a)(2) of the Securities Act, is brought against all Defendants.

[5] Count V of the CAC, claiming violation of Section 15 of the Securities Act, is brought against the Individual Securities Act Defendants and the Control Defendants.

[6] The factual summary below, except where otherwise noted explicitly, derives from the CAC and the documents cited or relied upon for the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss under Rule 12(b)(6). See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir.1995)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Except where specifically quoted, no further citation will be made to the CAC or the documents referred to in it.

systems that allow solar panels to move throughout the day, redirecting the panels' orientation to optimize exposure to the sun. Array's "trackers" comprise an integrated system consisted mainly, and importantly here, of steel as well as other accompanying components, such as motors, gear boxes, and electrical control systems.

Prior to conducting its initial public offering ("IPO") in October 2020, Array was known as ATI Intermediate Holdings, LLC. Post-IPO, the NASDAQ Global Market listed Array's stock under the ticker, "ARRY."

During the Class Period, Fusaro and Patel were, respectively, the CEO and CFO of Array. The Individual Securities Act Defendants (Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee) were all members of the Board of Directors of Array during the Class Period. Fusaro, Patel, and the members of the Board of Directors signed each of the registration statements identified in the CAC. The IPO and the supplemental public offerings ("SPO") made in December 2020 and March 2021 were underwritten by a veritable horde of the biggest financial institutions in the world, as named as defendants in the caption to this action.[7]

---

[7] They include Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Credit Suisse Securities (USA) LLC, Barclays Capital Inc., UBS Securities LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Johnson Rice & Co. LLC, Roth Capital Partners, LLC, Piper Sandler & Co., MUFG Securities Americas Inc., Nomura Securities

Plaintiffs provide retirement and/or pension benefits to their members and manage assets on their members' behalf. As part of those activities, Plaintiffs' PSLRA certifications indicate they combined to purchase over 89,000 shares of ARRY during the Class Period at a cost of over $3 million. (See "PSLRA Cert.," Dkt. No. 79-1.)

>	2.	The Public Offerings

To raise funds and allow the Oaktree parties and founders of Array, specifically Ron Corio ("Corio"), to cash out their holdings, Array organized three public offerings of stock during the Class Period. The first, Array's IPO, closed in October 2020 with proceeds totaling over $1.035 billion. Then, in December 2020, Array made an SPO that closed in December 2020 ("December 2020 SPO"), generating an additional $1.1 billion in proceeds. Finally, Array made another SPO that closed in March 2021 ("March 2021 SPO") resulting in an additional $870 million in proceeds. For each offering, Array filed the required S-1 Registration Statements with the Securities and Exchange Commission (the "SEC") along with a Prospectus, each of which were signed by the Individual Securities Act Defendants and Fusaro and Patel.

---

International, Inc., and Morgan Stanley & Co. LLC.

Corio and Oaktree, the latter an early investor in Array, beneficially owned the majority of Array's common stock prior to the IPO. At the time of each of the offerings, Corio and Oaktree sold Array common stock, reducing their beneficial ownership of the Company. During the IPO, Corio and Oaktree earned proceeds on sales of Array common stock worth approximately $840 million; during the December 2020 SPO, they earned proceeds totaling around $1.08 billion; during the March 2021 SPO, Corio and Oaktree netted another $845 million from Array common stock sales. After cashing out almost all of their stock and beneficial ownership of Array, Oaktree and Corio had cleared around $2.75 billion.

Of course, as with all financial market events occurring during the years 2020 and 2021, each of Array's offerings was underscored by the tumult stirred by the COVID-19 pandemic. As COVID-19 spread in early 2020, demand for raw materials, including steel, fell sharply. Steel mills, matching the falling demand, reduced production or ceased operation all together. But the lack of demand was short-lived. As the economy began to reopen toward late-2020, demand for steel rebounded. However, the decreased production and the havoc the pandemic wreaked on supply chains of many vital products caused the price of steel to rise.

Based on the U.S. Midwest Domestic Hot-Rolled Coil Steel ("CRU") Index, which Array used as a proxy for its steel costs, in the three months before Array's IPO closed in October 2020, the price of steel rose by $165 per short ton, from $475 to $640, a 35 percent increase. The increase did not stop there. Between the October 2020 IPO and December 2020 SPO, the CRU Index rose another $174 per short ton, from $640 to $814, a 42 percent increase. And then, in even more dramatic fashion, steel costs rose another 56 percent between the December 2020 SPO and March 2021 SPO -- a colossal $454 -- to $1268 per short ton. Prices continued to rise in April 2021, and by the end of the Class Period, the CRU Index reflected the cost of steel at over $1500 per short ton, an $1100 premium from pre-pandemic pricing.

The soaring price of steel forms the backdrop for Plaintiffs' allegations. Plaintiffs identify and challenge several statements -- upwards of fifteen -- made in the IPO Registration Statement and Prospectus (statements that were repeated verbatim in the materials Array provided to investors in conjunction with the December 2020 and March 2021 SPOs and in other SEC filings) as well as those made by Fusaro and Patel in earnings calls and press releases. Generally, Plaintiffs allege that Array failed to "timely disclos[e] the impact of the increases in steel and freight

costs on the Company's margins and business prospects" and continued to mislead investors as to Array's purported insulation from and ability to manage the risk stemming from rising commodity costs "despite direct questions from analysts." (CAC ¶ 74.)

3.   The Registration Statements and Prospectuses[8]

Plaintiffs allege that Array made several false or misleading statements in the Form S-1 and Prospectuses filed with the IPO and repeated in the December 2020 SPO and March 2021 SPO (collectively, the "Offering Materials"). In the Offering Materials, Array stated that it had a "*[d]emonstrated ability to reduce the cost of [its] products while increasing profit margins*" and that Array "*continually work[s] to reduce the cost of our products through innovation and rigorous supply chain management . . . while simultaneously increasing gross profits and gross margins.*" (See, e.g., CAC ¶ 102.) Array also declared that it had "*[r]igorous supply chain management supported by a sophisticated enterprise resource planning ('ERP') system,*" and that Array "*made substantial investments in our systems*

---

[8] In this section and the next, the Court adopts the formatting contained in the CAC, understanding that Plaintiffs' use of bold and italics was for the purpose of highlighting the particular portions of the statements alleged to be false or misleading. Given the broad scope and complexity of Plaintiffs' allegations concerning false or misleading statements expressed in the Offering Materials, the Court quotes relevant text extensively.

*and supply chain designed to minimize material movement, working capital investment and costs of goods sold*[.]" (Id.)

In the same section, Array stated that "*To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale.*" (Id.) Array also represented that "*Approximately 80% of [its] cost of goods sold consists of purchased components, including motors, gearboxes, electronic controllers and steel tubing.*" (Id.)

Array's statements in its Offering Materials also explained its strategy to "*[l]everag[e] [its] global supply chain and economies of scale to reduce product cost.*" (Id. ¶ 103.) As part of that, Array stated it sought to "*continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.*" (Id.)

The Offering Materials also contained risk disclosures that Plaintiffs assert were false or misleading. Specifically, the Offering Materials state the following:

> **Quantitative and Qualitative Disclosures about Market Risk**
>
> We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that *may* impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in steel and aluminum prices and customer concentrations. . . .
>
> *Commodity Price Risk*
>
> We are subject to risk from fluctuating market prices of certain commodity raw materials, including steel and aluminum, that are used in our products. Prices of the raw materials *may* be affected by supply restrictions or other market factors from time to time, and we do not enter into hedging arrangements to mitigate commodity risk. Significant price changes for these raw materials *could* reduce our operating margins *if* we are unable to recover such increases from our customers, and could harm our business, financial condition and results of operations.

(Id. ¶ 105.)

4.   <u>November 6, 2020 Earnings Call</u>

Plaintiffs also allege that Fusaro and Patel made actionable statements on earnings calls during the Class Period. For instance, during a November 6, 2020 Earnings Call, Patel allegedly stated that "Gross margins in the third quarter were lower than the prior year period as a result of *having less revenue to absorb fixed costs as well as higher logistics costs*, largely driven by the global shipping constraints due to COVID-19." (Id. ¶ 107.) Patel explained that Array "view[ed] both of these dynamics as short term in

nature and not indicative of longer-term margin pressure."
(Id.) Turning to the nine-month results, Patel said "Gross
margins increased 24.2% from 21.3% in the prior year period,
***driven by reductions in purchase materials resulting from
improved supplier arrangements and shifting volumes for
certain components to new lower-cost suppliers*** and greater
leverage of fixed costs against higher sales volumes." (Id.)

Later in the November 6, 2020 Earnings Call, Patel was
asked by a Goldman Sachs analyst whether he agreed that "the
trends, A[verage ]S[elling ]P[rice] wise, were pretty similar
across the [two] regions," to which Patel responded: "Yes.
***We're not seeing any changes in the pricing environment***."
(Id. ¶ 108.) Then, another analyst asked Fusaro about "Any
trends" or "particular drivers" he was seeing related to
"increased customer activity," to which Fusaro answered that
Array's "customers continue to see the value of [Array's]
product, and ***those trends really haven't changed. If
anything, they continue to strengthen on the basis of our
value proposition***." (Id. ¶ 109.)

     5.   March 9, 2021 Earnings Release and Earnings
           Call

Array issued an earnings release on March 9, 2021 and
later held an earnings call during which Fusaro and Patel
made statements Plaintiffs identify as false or misleading.

In the release, Plaintiffs challenge Array's statement that "***Gross margin decreased from 27% to 20% driven by less revenue to absorb fixed costs and project mix***," as well as that "***Gross margin was flat versus the prior year period driven by reductions in the cost of purchased materials which offset higher logistics costs in the second half of the year caused by COVID-19 related freight increases***." (Id. ¶ 114.)

In the same release, Array announced its full year 2021 guidance, for which it expected "***Adjusted EBITDA to be in the range of $164 million to $180 million***" and "***Adjusted net income per share to be in the range of $0.82 to $0.92***." (Id. ¶ 140.)

The March 9, 2021 earnings release also disclosed commodities and logistics risks Array was facing:

> Commodity prices and freight costs have increased significantly over the past several months as business activity levels are increasing in response to the availability of a COVID-19 vaccine and capacity that was idled during the pandemic comes back online. ***While we currently expect commodity prices and shipping costs to normalize, the low end of our Adjusted EBITDA guidance range contemplates a delayed return to a normal pricing environment***.

(Id. ¶ 140.)

On the earnings call, Patel stated that "commodity prices and freight costs have increased significantly over the past several months" and reiterated the statement made in the earnings release that "***[w]hile*** [Array] expect[ed] prices

12

to normalize and ***our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by making [sic] these cost [sic] into the low end of our guidance assuming a delayed return to more normalized pricing***." (Id. ¶ 116.)

Then, Patel reaffirmed the ability to pass on costs, stating that Array had "held prices relatively flat, and we think they're stable. ***However, we do have the option, as mentioned, as -- to go back into the market. We built in that range in our guidance to allow us to evaluate case by case, Brian. But yes, we do have that option***." (Id. ¶ 117.)

Patel then stated, in response to an analyst's question regarding "incremental margin compression" beyond the 16 percent stated in the earnings release, that "[w]ith the commodity pricing as it is right now, that's -- and the investments we're making consciously for the revenues that will be coming, ***we feel that that [16 percent] is kind of near the floor where we feel***." (Id. ¶ 118.)

An analyst then asked Fusaro if "the cost of steel [was] becoming a problem for you." (Id. ¶¶ 87, 119.) Fusaro answered that "***we obviously manage and monitor all commodities accordingly, and then we build in productivity measures to address that to continue to drive our value***." (Id.) And after clarifying the analyst's question, Fusaro continued that

13

"***Yes . . . there is always going to be pressure on cost. That's pretty much market-agnostic and product-agnostic. But that said, we've actually built up, we continue to build out our supply chain.***" (<u>Id.</u>)

Another analyst, pointing to the price of steel "moving quite a bit," asked Patel whether Array "locked in the steel as you locked in that pricing, so you have high visibility into the margins or not necessarily so." (<u>Id.</u> ¶ 120.) Patel answered, "***Yes***" (<u>id.</u>) and continued to explain Array's "typical order pattern. We typically order material between six and 12 weeks from the date of the shipment. So we keep very low inventory. So the impact obviously, if the COGS, the recent run up prices would impact second half more than it would first half." (Bebchick Decl. Ex. 8 at 17.)

Patel then responded to two more questions from an analyst who asked what drove Array's view that prices would normalize, and "how long the cost would need to remain elevated before you seriously decided [or] considered passing it on to customers." As to how long, Patel stated that "obviously, it's unknown" and explained that Array was "***always evaluating all our pricing on our projects and we know that we have that ability and we'll look at it on a case by case basis.***" (CAC ¶ 121.)

14

6.   <u>March 10, 2021 Form 10-K</u>

Array also released a Form 10-K on March 10, 2021. In that disclosure, Array addressed risks the Company was exposed to stemming from the COVID-19 pandemic's supply chain disruptions:

> [W]e are dependent on transportation and logistics providers to deliver our products in a cost efficient manner. Disruptions to transportation and logistics, including increases in shipping costs, ***could*** adversely impact our financial condition and results of operations; . . . We rely on transportation and logistics providers for the delivery of our products. We may also incur additional shipping costs when we need to accelerate delivery times. Our ability to deliver our products in a cost efficient manner ***could*** be adversely impacted by shortages in available cargo capacity, changes by carriers and transportation companies in policies and practices, such as scheduling, pricing, payment terms and frequency of service or increases in the cost of fuel, taxes and labor, disruptions to shipping facilities as a result of the COVID-19 or other epidemics, and other factors not within our control. Disruptions to transportation and logistics, including increases in shipping costs, ***could*** adversely impact our financial condition and results of operations.

(<u>Id.</u> ¶ 125.) After making these disclosures, in sum, that increasing commodity and logistics costs were driving down margins, Array's stock decreased by 4.31 percent to close, on March 10, 2021, at $33.52 per share. The March 2021 SPO, the final offering at issue here, closed roughly two weeks later, on March 23, 2021.

15

7.   The Alleged Fraud Revealed

About six weeks after the close of the March 2021 SPO, Array made additional disclosures regarding the effect that rising commodity and logistics costs were having on its bottom line. On May 10, 2021, Array disclosed that steel comprised around 50 percent of its cost of goods and, because steel prices were not normalizing at the rate Array previously envisioned, it was withdrawing its full year 2021 guidance issued in March. Array also indicated it was reviewing contracts to pass some of those costs along to its customers. Reacting to this news, Array's stock prices fell by $11.49 per share, closing at $13.46 per share -- a 46 percent drop -- on May 12, 2021.

8.   Post-Class Period Statements

About three months later, on August 18, 2021, Array hosted another earnings call to discuss the Company's Second Quarter 2021 earnings. During that call, citing the "magnitude of the increases, and particularly the unprecedented speed with which they occurred," Array indicated it felt "significant pressure on [its] margins." (CAC ¶ 96.) That quarter, Array disclosed its gross margin was "down 610 basis points." (Id.) Fusaro also provided additional detail into Array's steel procurement process:

> Historically, we would agree to a price with our customers when they would award us a project. Once the project was awarded, we would start the process of final design and engineering, the result of which was a detailed bill of materials. Once we have that bill of materials, we would place orders from suppliers. The process of finalizing the design and generating the bill of materials could take up to 90 days. The result was that if input costs moved down during that period, our expected gross margin on the order would increase. And if they moved up, it would decrease. Historically, prices from our suppliers didn't really move much during the 90-day window. And in most cases, they actually went down. At the same time, by ordering later and only after the full bill of materials was complete, we minimized our working capital investment and the chance that we would order too much or too few of a particular component. That changed in early April when prices for nearly every one of our inputs moved up dramatically in a very short period of time.

(Id. ¶ 97 (emphasis omitted).) Defendants also announced remedial measures the Company would take to "close that gap" to help Array "lock in our margin on the order." (Id.) Yet, despite changing its business processes, by November 2021, citing continued pressure from steel and logistics prices, the Company disclosed further decreased margins for the third quarter of 2021.

   B.   PROCEDURAL HISTORY

   Plymouth and Julien Keippel filed dueling putative class action complaints in May and June 2021. Having found that the complaints and other papers filed in both actions involved the same or substantially similar underlying conduct, claims, and parties, the Court consolidated the cases along with

others that had been filed. The Court then appointed Plymouth and Carpenters as Lead Plaintiffs and granted their motion to appoint Labaton Sucharow LLP as lead counsel for the putative class. (See Dkt. No. 137.)

After the CAC was filed, and pursuant to the Court's Individual Practices, Defendants filed a pre-motion letter identifying grounds on which dismissal of the CAC would be appropriate. (See Dkt. No. 165.) Plaintiffs responded by letter, opposing those grounds (see Dkt. No. 166), and Defendants then informed the Court that the informal letter exchange had failed to resolve the dispute and sought a pre-motion conference or a briefing schedule on a motion to dismiss (see Dkt. No. 169).

The Court denied the request for a pre-motion conference and directed the parties to propose a briefing schedule if they sought to fully brief the motion to dismiss. (See Dkt. No. 171.) The Court adopted the parties' briefing schedule. Defendants then filed their Motion, Brief, and supporting declaration. (See Dkt. Nos. 174-176.) Plaintiffs filed their opposition ("Opposition" or "Opp.," Dkt. No. 182.) And Defendants filed their reply. ("Reply," Dkt. No. 183.)

## II.  LEGAL STANDARD

Defendants move to dismiss the CAC under Rule 12(b)(6), Rule 9(b), and the PSLRA. To survive a motion to dismiss,

pursuant to Rule 12(b)(6), "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'" Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 544, 570 (2007)). A complaint satisfies this standard
when it contains sufficient "factual content that allows the
court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." Id. A complaint should be
dismissed if the plaintiff has not offered factual
allegations sufficient to render the claims facially
plausible. See id. However, if the factual allegations
sufficiently "raise a right to relief above the speculative
level," then a court should not dismiss a complaint for
failure to state a claim. Twombly, 550 U.S. at 555.

When resolving a motion to dismiss, the Court's task is
to "assess the legal feasibility of the complaint,
not . . . the weight of the evidence which might be offered
in support thereof." In re Columbia Pipeline, Inc., 405 F.
Supp. 3d 494, 505 (S.D.N.Y. 2019) (quoting Eternity Glob.
Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d
168, 176 (2d Cir. 2004)). At this stage, a court must "accept
as true all factual allegations and draw from them all
reasonable inferences; but [it is] not required to credit
conclusory allegations or legal conclusions couched as

factual . . . allegations." <u>Dane v. UnitedHealthcare Ins.</u>, 974 F.3d 183, 188 (2d Cir. 2020).

Plaintiffs claiming fraud -- including securities fraud concerning material misstatements and omissions -- must also satisfy the heightened pleading requirements of Rule 9(b) by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "In short, a plaintiff must set forth the who, what, when, where and how of the alleged fraud." <u>Telenor E. Invest AS v. Altimo Holdings & Invs. Ltd.</u>, 567 F. Supp. 2d 432, 441-42 (S.D.N.Y. 2008) (internal citations and quotation marks omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007).

The PSLRA also imposes heightened pleading standards for plaintiffs alleging securities fraud. When a plaintiff alleges that defendants made misleading statements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs "must do more than say that the statements . . .

were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004). To adequately plead scienter, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A court shall grant a motion to dismiss a securities fraud complaint if these requirements are not met.

### III. **DISCUSSION**

#### A.   SECTION 10(b) AND RULE 10b-5

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). In accord, and as relevant here, Rule 10b-5 provides that it is unlawful for any person, in connection with the purchase or sale of any security, "[t]o make any untrue statement of a material fact or to omit to state a material fact." 17 C.F.R. § 240.10b-5. "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Emps.' Ret.

<u>Sys. of Gov't of the V.I. v. Blanford</u>, 794 F.3d 297, 305 (2d
Cir. 2015) (quoting <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>,
493 F.3d 87, 105 (2d Cir. 2007)).

The PSLRA requires allegations that the defendant made
"[m]isleading statements and omissions . . . of a material
fact," 15 U.S.C. § 78u-4(b)(1), and acted with the "required
state of mind." <u>Id.</u> § 78u-4(b)(2); <u>see also</u> <u>ATSI Commc'ns</u>,
493 F.3d at 99. This case turns almost entirely on the falsity
of the statements by Defendants identified by Plaintiffs as
set forth above, and so the Court focuses its attention there.

### 1.   False or Misleading Statements of Material Fact

Under Rule 9(b), Plaintiffs must "(1) specify the
statements that [they] contend[] were fraudulent, (2)
identify the speaker, (3) state where and when the statements
were made, and (4) explain why the statements were
fraudulent." <u>Rombach</u>, 355 F.3d at 170 (internal quotation
marks omitted). The PSLRA similarly requires that the
complaint state "the reason or reasons why the statement is
misleading." 15 U.S.C. § 78u-4(b)(1)(B). As discussed above
in Sections I.A.3-6, Plaintiffs identify more than 15
statements by various defendants that they contend are false
or misleading. They do so with specificity by bolding and
italicizing the portions of the statements they assert are

false. (See CAC ¶ 100.) In doing so, Plaintiffs describe the
speaker of the statement, and the documents and earnings calls
in which the statements were made, largely satisfying the
first three requirements to state a claim. Plaintiffs' claims
are deficient as regards the fourth element.[9]

In explaining "why" a certain challenged statement is
fraudulent, "[t]he Second Circuit has repeatedly stated that
plaintiffs must do more than simply assert that a statement
is false -- 'they must demonstrate with specificity why that
is so.'" In re Lululemmon Sec. Litig., 14 F. Supp. 3d 553,
571 (S.D.N.Y. 2014) (quoting Rombach, 355 F.3d at 174)).

Among the other reasons why Plaintiffs' claims fail is
that Plaintiffs use the same formulaic response as to why the
statements are false. That standard declares that the

---

[9] Although helpful that Plaintiffs used bold and italics formatting to
identify the statements they argue are false or misleading, it is less
than clear from the CAC whether Plaintiffs actually consider the entirety
of those statements to be false or misleading, as in the CAC and their
Opposition to this Motion they attack and explain why only portions of
statements are alleged to be fraudulent. For example, paragraphs 102 and
103 of the CAC identify nine separate phrases occurring within four
different sections with Plaintiffs' formatting but, in paragraph 104,
they attempt to demonstrate the falsity of only a subset of the challenged
clauses. (Compare CAC ¶¶ 102-103, with id. ¶ 104.) The lack of specificity
here not only fails the required pleading standard but also leaves the
Court mired in having to ascertain exactly which statements Plaintiffs
allege to be false or misleading -- and how they are so. Accordingly, the
Court primarily assesses only those statements for which Plaintiffs
attempted to provide an explanation. See In re PetroChina Co Ltd. Sec.
Litig., 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) (explaining that "[t]he
Second Circuit has commented that district courts should not have to
'search the long quotations in the complaint for particular false
statements, and then determine on its own initiative how and why the
statements were false'") (quotation omitted).

statement was "false or misleading when made because [Array] failed to disclose that: (1) over 50 percent of Array's COGS was steel, (2) Array held commodity risk for up to 90 days after being awarded a contract, that (3) Defendants instructed employees to use lower, outdated prices when evaluating project costs . . . and (4) at the time of the [offerings] steel [prices] had risen . . . which *was already* having a material impact on project costs that the Company would be unable to recover from its customers." (CAC ¶ 104 (emphasis in original).) Plaintiffs repeat this formula nearly verbatim for each of the at least 15 statements they challenge. (See id. ¶¶ 106, 110, 113, 115, 122, 124, 126.) The statements challenged are not only varied but are broad and multifaceted and, at times, complex. Plaintiffs' shotgun approach thus falls short of what Rule 9(b) requires: it "does not comport with [the Second Circuit's] exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading." Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 F. App'x 32, 37-38 (2d Cir. 2012) (quoting Rombach, 355 F.3d at 174)). Viewing Plaintiffs' articulation of what is false or misleading in the specific context of each of the statements challenged reveals a fundamental disconnect between the "why" Plaintiffs put forth and each statement made, as discussed

below. Although Plaintiffs contend that each statement made by Array is false for one or more of the four reasons articulated in its standard formulation (and it is anyone's guess as to which of the four is most apt), each attempt fails to explain with sufficient specificity why or how the statement is false or misleading. Our precedents require a more detailed demonstration than the conclusory assertions Plaintiffs aver.

Although it would be sufficient for the Court to rest its decision on Plaintiffs' lack of specificity under Rule 9(b), Plaintiffs' claims fail for other independent reasons. First, many of the statements are non-actionable as a matter of law because they constitute mere corporate puffery. See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015) ("Statements of general corporate optimism . . . do not give rise to securities violations."). Second, several of the statements appear to have been true when made, rendering Plaintiffs' challenges unactionable fraud by hindsight. See Gluck v. Hecla Mining Co., No. 19 Civ. 4884, --- F. Supp. 3d ----, 2023 WL 2161958, at *12 (S.D.N.Y. Feb. 22, 2023) ("A statement believed to be true when made, but later shown to be false, is insufficient.") (citation omitted); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[R]efus[ing] to

allow plaintiffs to proceed with allegations of 'fraud by hindsight.'").

Other claims Plaintiffs assert are false or misleading constitute forward-looking statements protected by the PSRLA's safe harbor. And others still, which Plaintiffs characterize as omissions, were actually disclosed during the Class Period. The Court categorizes the statements in an effort to streamline its discussion.

a)   <u>Supply Chain Statements</u>

Plaintiffs identify several statements in the Form S-1 and accompanying prospectuses released along with the IPO, the December 2020 SPO and March 2021 SPO that they claim are false or misleading. They also identify a statement made during the November 6, 2020 Earnings Call.[10] In the first statement, Array disclosed its strengths as including a "[d]monstrated ability to reduce the cost of our products . . . while simultaneously increasing gross profits and margins." (CAC ¶ 104). Array also stated it had "rigorous supply chain management" and that it was "leveraging [its]

---

[10] The statement challenged by Plaintiffs reported that "Gross margins increased 24.2% from 21.3% in the prior year period, ***driven by reductions in purchase materials resulting from improved supplier arrangements and shifting volumes for certain components to new lower-cost suppliers.***" (CAC ¶ 107.) Neither the CAC nor Plaintiffs' Opposition persuasively explains how this accurate reporting on Array's past performance is false or misleading, let alone how it is actionable. <u>See</u> <u>Rombach</u>, 355 F.3d at 174 ("Accurate statements about past performance are self evidently not actionable under the securities laws.").

supply chain and economies of scale to reduce product costs."
(Id. (alteration in original).) Plaintiffs claim this
statement is actionable by articulating the standard formula
described above. But, as the Court regards it, Plaintiffs'
main falsity argument here is that when Array made these
statements, steel prices had already risen and so these
statements misled investors about Array's ability to manage
commodity costs. (See CAC ¶ 64.) Even so, Plaintiffs' claims
fail.

First, the Court finds that these statements constitute
"[u]nactionable puffery" and are "too general to cause a
reasonable investor to rely upon them." City of Pontiac
Policemen's and Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173,
183 (2d Cir. 2014) (internal quotation marks omitted). That
Array was optimistic about its past ability to reduce costs
and leverage the supply chain network it had built, and
continued to develop, merely describes Array's business focus
and past performance "without providing anything like a
guarantee as to its invulnerability to commodity risk." In re
Ferrellgas Partners, L.P., Sec. Litig., No. 16 Civ. 7840,
2018 WL 2081859, at *11-12 (S.D.N.Y. Mar. 30, 2018) (finding
that several statements about "best-in-class capabilities"
and "fully integrated logistics-focused model," similar to
those alleged here, were corporate puffery).

As discussed below, Array's statements that it had demonstrated an ability to reduce costs and leverage its supply chain was "consistent with reasonably available data," e.g., Array's actual past performance in reducing costs. Novak, 215 F.3d at 309. It is not actionable under the securities law for corporate officers to paint a rosy view of the future based on accurate data; "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." Rombach, 355 F.3d at 174.

Second, Plaintiffs fail to explain with specificity how these statements were fraudulent or false when made. It appears true that, at the time the statements at issue were made, Array had demonstrated an ability to reduce costs. Indeed, Array disclosed in the same section that it was able to reduce "cost of goods sold per watt by approximately 23% from 2017 through 2019." (CAC ¶ 102.) And a close read of these statements reveals that each are backwards looking, describing Array's past performance with accuracy that Plaintiffs do not challenge.

It is settled law in this Circuit that no liability arises for "literally true historical statements that create an implicit promise as to future company success." See River Birch Capital, LLC v. Jack Cooper Holdings Corp., No. 17 Civ. 9193, 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019) (internal

quotation marks omitted) (first citing <u>In re Coty Inc. Sec.</u>
<u>Litig.</u>, No. 14 Civ. 919, 2016 WL 1271065, at *6 (S.D.N.Y.
Mar. 29, 2006), then citing <u>Rombach</u>, 355 F.3d at 174). "The
disclosure of accurate historical data does not become
misleading even if less favorable results might be
predictable by the company in the future." <u>In re Initial Pub.</u>
<u>Offering Sec. Litig.</u>, 358 F. Supp. 2d 189, 210 (S.D.N.Y.
2004).

    Although Plaintiffs allege steel prices were rising
around the time that Array first made these disclosures, in
connection with the October 2020 IPO, that publicly available
fact does not make Array's statements false. Array's
"officials need not be clairvoyant; they are only responsible
for revealing those material facts reasonably available to
them." <u>Novak</u>, 216 F.3d at 309.

    To the extent that Array was not able to manage the
unprecedented rise in commodities prices that occurred during
the COVID-19 pandemic, rendering statements about its
demonstrated ability no longer wholly correct for the
specific fiscal quarter, such circumstances constitute
classic fraud by hindsight and not actionable. To illustrate,
had steel prices normalized, as Array and other experts
predicted, the challenged statements likely would have

continued to be accurate. They are incorrect only because the future did not unfold exactly how Array had hoped.

Plaintiffs raise no other meaningful explanation for how else these statements could be false. The three other descriptions included in Plaintiffs' formula for how the statements about supply chain efforts were false have scant connection to the statements themselves. That around fifty percent of Array's costs pertained to steel does not render the statements regarding the Company's past ability to reduce overall costs false. Nor does Array's practice of purchasing steel within 90-days of locking in a contract. As described more below, the 90-day period was one of the mechanisms that Array used to reduce costs and does not render the statements misleading. And the Court struggles to understand how allegations regarding inputs into forecasts have any connection to the challenged statements. With nothing else, Plaintiffs' argument collapses to merely a quarrel with Array's inability to accurately predict the future. Such arguments do not pass muster as sufficient to sustain claims of fraud.

> b)   Cost of Goods Statements

Plaintiffs challenge the statement made in the Offering Materials that "80% of [Array's] cost of goods sold [("COGS")] consists of purchased components, including . . . steel

tubing." (CAC ¶ 102.) Plaintiffs again repeat their formula here for why this statement is false. (Id. ¶ 104.) The most pertinent is Plaintiffs' assertion that Array failed to disclose that "over 50 percent of Array's COGS was steel." (Id.)

Plaintiffs' Opposition does not directly discuss why this statement is actionable. As far as the Court can discern, Plaintiffs' argument is that Array's disclosure that 80 percent of its cost of goods consisted of purchased components was not detailed enough to put investors on notice of the extent to which major fluctuations in steel prices would impact Array's costs. The Court is aware of no cases, and the parties cite none, requiring issuers of securities to disclose the exact breakdown of their costs with such precision. And while "once a party chooses to speak, it has a duty to be both accurate and complete," Tecku v. Yieldstreet, Inc., No. 20 Civ. 7327 (VM), 2022 WL 1322231, at *7 (S.D.N.Y. May 3, 2022), that premise does not extend to the situation at hand. Case in point, had Array disclosed only that 80 percent of its costs of goods were related to purchased goods and nothing further, it may then have had a duty to disclose what comprised those good. Array took that extra step here by including steel tubing in its list of

costs. The Court cannot discern a duty for Array to go
further.

To the extent Plaintiffs assail this disclosure as
misleading, or as an omission of material fact, because it
underplayed Array's exposure to rising steel prices, the
total mix of information available dispels that attack. See
United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d
1190, 1198 (2d Cir. 1993) ("Plaintiff must show that there
was 'a substantial likelihood that the disclosure of the
omitted fact would have been viewed by the reasonable investor
as having significantly altered the "total mix" of
information made available.'"). Array disclosed that the vast
majority of its COGS was associated with purchased products,
including steel. Array also disclosed that it was "subject to
risk from fluctuating market prices of certain commodity raw
materials, including steel." (CAC ¶ 105.) And publicly
available information made clear that steel prices were
atypically (even unprecedentedly) high. The Court is
persuaded that Array's omissions of the exact percentage of
costs attributed to steel are, at least, immaterial, making
the statement unactionable.

c)   Risk Disclosures

Next, Plaintiffs probe Array's risk disclosure
statements, but only to the extent that Array used "may,"

32

"could," and "if" to describe its exposure. Array stated that
"[m]arket risk represents the risk of loss that **_may_** impact
our financial position due to adverse changes"; that
"[p]rices of these raw materials **_may_** be affected by supply
restrictions or other market factors from time to time"; and
that "[s]ignificant price changes for these raw materials
**_could_** reduce our operating margins **_if_** we are unable to recover
such increases from our customers." (CAC ¶ 105.) In a March
10, 2021 10-K, Array stated that "Disruptions to
transportation and logistics, including increases in shipping
costs, **_could_** adversely impact our financial condition." (CAC
¶ 125.)

Plaintiffs repeat their formula for why these statements
are misleading or false. In their Opposition, Plaintiffs
explain that the use of "may" "could" or "if" expresses only
the possibility of risk, but that, at the time the statements
were made, Array was already facing a concrete risk from
rising prices that Array did not disclose.

The Court is persuaded that Array disclosed its risk to
price pressure from steel increases during the Class Period
sufficient to render these statements not misleading.
Plaintiffs note correctly that "[c]autionary words about
future risk cannot insulate from liability the failure to
disclose that the risk has transpired." Rombach, 355 F.3d at

173. Here, however, Array made sufficient disclosures about the pressure it was facing from increased commodity costs. On the November 6, 2020 Earnings Call, mere weeks after the IPO closed, Patel explained that "[g]ross margins in the third quarter were lower than the prior year period as a result of having less revenue to absorb fixed costs as well as higher logistics costs, largely driven by the global shipping constraints due to COVID-19." (Bebchick Decl. Ex. D at 6-7.) Taken together with other information available in the market (see, e.g., id. Ex. A (discussing how the COVID-19 pandemic and transportation costs affected the price of steel)), Array injected sufficient information into the market to put investors on notice that the Company was facing price pressure from steel costs.

Array continued to disclose this pressure throughout the Class Period, although continuing to hope that steel prices would normalize. For example, on March 9, 2021, when an analyst asked Fusaro whether the "cost of steel [was] becoming a problem" and clarified that he was asking about "the pressure on margins from cost inputs," Fusaro responded, unequivocally, "Yes." (Id. Ex. H at 14.) Fusaro continued that "there's always going to be pressure on cost." (Id.) And earlier in that call, Patel highlighted that the Company had been considering that "commodity prices and freight costs

[had] increased significantly over the past several months."
(Id. at 8.) Metaphorically, Array not only advised investors
that "there might be a ditch ahead" to be wary of falling
into, but also that Array was aware of the ditch's location
and was actively trying to manage it. See In re Prudential
Secs. Inc. P'Ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)
("The doctrine of bespeaks caution provides no protection to
someone who warns his hiking companion to walk slowly because
there might be a ditch ahead when he knows with near certainty
that the Grand Canyon lies one foot away.").

The primary issue that Plaintiffs take with Array's risk
disclosures, an issue that reverberates throughout the CAC
and their briefing, involves Array's statement that it could
isolate itself from cost increases by passing those costs on
to its customers. Plaintiffs say Array's ability to do so was
illusory.

Specifically, Array disclosed that "[s]ignificant price
changes for [steel and aluminum] **could** reduce our operating
margins **if** we are unable to recover such increases from our
customers." (CAC ¶ 105.) Then, during the March 9, 2021
Earnings Call, Patel commented that "[w]hile [Array]
expect[ed] prices [of steel] to normalize [] **our contracts
allow us to pass on these costs to our customers**." (Id.
¶ 116.) He also stated that Array had "the option, as

mentioned, as -- to go back into the market" and that Array had built pricing pressure into their "***guidance to allow us to evaluate case by case***." (<u>Id.</u> ¶ 117.) Later in the call, Patel responded to a question regarding commodity costs and stated that Array was "***always evaluating all our pricing on our projects and we know that we have that ability and we'll look at it on a case by case basis***." (<u>Id.</u> ¶ 121.)

Due to Plaintiffs' failure to plead with particularity, it is murky at best how these statements are false or misleading. And, at first blush, the post-Class Period statements made by analysts and Array appear to confirm the veracity of the statements made. The CAC recites one analyst explaining that Array's "management [was] currently undertaking a herculean exercise to re-evaluate roughly 100 open contracts for price and timing" and that "[a]s [steel] pricing began to shift in April [2021], management found itself going back once, twice, and some cases, three time to re-quote or adjust timelines." (CAC ¶ 95.) These reports indicate that Array did, in fact, have the ability to reevaluate its contracts with its customers to adjust price, and, in fact, was doing so. This capacity makes the challenged statements truthful at the time they were made. <u>See</u> <u>In re Weight Watchers Int'l Inc. Sec. Litig.</u>, 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020) ("A violation of securities laws premised

on misstatements cannot occur unless an alleged material misstatement was false at the time it was made.").

Insofar as Plaintiffs' argument is that Array misled investors by suggesting that Array's ability to pass on costs was a guarantee, that argument is meritless. The plain language of the challenged statements makes clear that the ability to pass on costs was only an option and one that would be evaluated only on a case by case basis. The Offering Materials' risk disclosures make clear through the singular word "if" that the ability to pass along costs was not guaranteed but contingent.

Finally, to the extent that Plaintiffs contend that these statements were false because Array failed to disclose that it held some amount of commodity risk for 90 days after signing a contract with customers, that argument also is unavailing. In a post-Class Period Statement, Plaintiffs allege that Fusaro, for the first time, explained that "[o]nce [a] project was awarded, we would start the process of final design and engineering, the result of which was a detailed bill of materials." (CAC ¶ 97.) Only after the bill of materials was generated would Array place orders from suppliers for the raw steel. (See id.) That process "could take up to 90 days," and so the price of steel could be in flux that entire time. (Id.) Plaintiffs say that Array was

gambling by holding this risk for such a long time. But Fusaro explained that, historically, the 90-day period was generally helpful to Array's costs because "prices from our suppliers didn't really move much during the 90-day window. And in most cases, they actually went down." (Id.)

Defendants contend that this statement is immaterial, and that Array was not required to disclose this level of detail into its business processes to investors. (See Br. at 9-11.) On the other hand, Plaintiffs counter that, when Fusaro explained these processes, it rendered "Patel's representations [regarding Array's ability to pass on costs] flatly untrue." (Opp. at 9.) For one, the Court is not persuaded that holding commodity risk for 90 days makes Patel's statements regarding Array's ability to renegotiate pricing untrue; the two can coexist. Indeed, the CAC itself strongly evidences that Array was renegotiating open contracts at the same time as it was reassessing its historical business practices. (See CAC ¶¶ 91, 95, 97.)

Perhaps more importantly, however, Patel appears to have fully disclosed the very practice that Plaintiffs complain was omitted. During the Class Period, on the March 9 Earnings Call, Patel responded to an analyst's question about Array's margin visibility by explaining Array's "typical order pattern." (Bebchick Decl. Ex. H at 17.) That pattern was that

Array would "typically order material between six and 12 weeks from the date of the shipment. So we keep very low inventory. So the impact, obviously, if the COGS, the recent run up prices would impact second half more than it would first half." (Id.) In other words, Patel described to investors exactly what Plaintiffs maintain Fusaro disclosed for the first time months later: that the raw materials, namely steel, would be ordered up to 90 days -- i.e., 12 weeks -- from when the contract was signed. Patel's disclosure leaves Plaintiffs' theory wanting: "omissions are not actionable where the truth was fully disclosed." Wandel v. Gao, 590 F. Supp. 3d 630, 642 (S.D.N.Y. 2022) (quotation marks omitted).

> d) <u>Margin Guidance and Price Normalization Statements</u>

The next category of statements Plaintiffs contend are false or misleading relates to Array's margins forecast for fiscal year 2021, released in March 2021, and Array's statements, throughout the Class Period, regarding the rising costs of steel. Plaintiffs challenge several statements in this category. First, Plaintiffs challenge the statement made by Patel during the November 6, 2020 Earnings Call.[11] Patel

---

[11] Plaintiffs' challenge of two other statements made on the November 6, 2020 Earnings Call also fails. First, Patel said that Array was "***not seeing any changes in the pricing environment.***" (CAC ¶ 108.) When read in context of the full exchange, it is clear that the pricing referred to the "Average Selling Price" of Array's trackers across various regions rather than a reference to the changing prices of steel or logistics

said that "Gross margins . . . were lower than in the prior year period as a result of ***having less revenue to absorb fixed costs as well as higher logistics costs***, largely driven by the global shipping constraints due to COVID-19." (CAC ¶ 107.) Patel continued: "***we view both of these dynamics as short term in nature and not indicative of long-term margin pressure.***" (<u>Id.</u>)

Array then announced its margin guidance in a March 9, 2021 Earnings Release. Plaintiffs challenge Array's disclosure of its margin guidance which projected that "***Adjusted EBITDA [would] be in the range of $164 million to $180 million***" and that "***Adjusted net income per share [would] be in the range of $0.82 to $0.92.***" (CAC ¶ 114.) The March 9 Earnings Release continued that "***[w]hile [Array] currently expect[s] commodity prices and shipping costs to normalize, the low end of our Adjusted EBITDA guidance range contemplates a delayed return to a normal pricing environment.***" (<u>Id.</u>)[12] Later, during the March 9 Earnings Call, in responding to an analyst's questions about Array's margin guidance, Patel

---

costs. (Bebchick Decl. Ex. D at 9.) Second, Fusaro commented that certain "***trends really haven't changed. If anything, they continue to strengthen on the basis of our value proposition***." (CAC ¶ 109.) Again, the full statement shows that the trends being discussed relate to increased customer activity in the solar space and that "customers continue[d] to see the value of [Array's] product." (Bebchick Decl. Ex. D at 11.)

[12] Patel echoed this statement on the earnings call later that day. (CAC ¶ 116.)

stated that "[w]ith the commodity pricing as it is right now, . . . **_we feel that [the low end of the margin guidance] is kind of near the floor where we feel_**." (Id. ¶ 118.)

Plaintiffs rely on the statements of many Confidential Witnesses ("CWs") to bolster their claims that this margin guidance was false or misleading because the CWs had been instructed to use "old and stale" inputs in their forecasts. (See, e.g., CAC ¶¶ 76-78.) Plaintiffs' argument and reliance on the CWs fail.

As a general matter, it was certainly proper for Plaintiffs to rely on the CWs insofar as "they are described in the complaint with sufficient particularity to support the probability that the person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314. Even so, our precedents require this Court "to view such [anonymous] attributions with caution and care," Long Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 797 (S.D.N.Y. 2020) (surveying case law on CW statements), crediting a CW's statements only when they are, among other considerations but as pertinent here, "corroborated by independent adequately pled facts." In re Hebron Tech. Co., Ltd. Sec. Litig., No. 20 Civ. 4420, 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021) (citing Long Miao, 442 F. Supp. 3d at 798)). Courts are also loath to sustain uncorroborated statements by CWs "where CWs

make 'insufficiently particular' allegations." (Id.) For these reasons, the CWs statements fail to pass muster.

Plaintiffs assert that one of the CWs, CW2, reported that "executives at Array instructed CW2 not to use the higher prices reflected in the model and instead use lower, outdated cost estimates." (CAC ¶ 77.) Yet, this information is corroborated only by another CW who also vaguely asserts that "executives preferred when CW1 used outdated cost estimates because on paper they allowed Array to project better margins." (Id. ¶ 78.) Thus, the CWs' statements are not corroborated by "independent adequately pled factual allegations." In re Hebron Tech. Co., Ltd. Sec. Litig., 2021 WL 4341500, at *17.

Nor are the CWs' statements sufficiently particular standing alone. Who these "executives" are who instructed the CWs to take such action, the CWs do not say. Nor do the CWs specify what inputs they were told to use, how those inputs differed from those they preferred, or the impact that using the purportedly "outdated" inputs had on the forecast. The CWs' uncorroborated and, apparently, subjective views should be accorded little weight. See Villare v. Abiomed, Inc., No. 19 Civ. 7319, 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) (rejecting CW statements in the context of scienter where the

CWs' "accounts largely reflect the subjective assessments of the confidential witnesses themselves").

Further, the Court is persuaded by Defendants' argument that, as far as the margin guidance itself is concerned, as well as the Company's comments on just when steel prices would normalize, those statements are all unactionable. (See Br. at 15-18.) The margin guidance is a forward-looking statement regarding the underlying assumptions of Array. The PSLRA provides that an issuer "shall not be liable with respect to any forward-looking statement . . . if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial." 15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1). The full year 2021 margin guidance that Array provided satisfies the first prong as it was forward-looking and accompanied by appropriately detailed language. The Court's view is bolstered by other courts' findings that predictions regarding a company's gross margins, when characterized as forecasts, qualify for safe harbor protection, and especially when accompanied by cautionary and forward-looking language. See, e.g., In re Cisco Sys. Inc. Sec. Litig., No. 11 Civ. 1568, 2013 WL

1402788, at *16 (N.D. Cal. Mar. 29, 2013); <u>City of Warren Police and Fire Ret. Sys. v. Zebra Tech. Corp.</u>, No. 19 Civ. 5782, 2020 WL 6118571, at *7 (N.D. Ill. Oct. 16, 2020) ("Since th[e] [gross margin] guidance was a forecast, it falls within the 'safe harbor' provided by the PSLRA.") (citing <u>Asher v. Baxterm</u>, 377 F.3d 727, 734 (7th Cir. 2004)). Such is the case here where the margin guidance was preceded by the statement that it was only what "the Company *expects*" and the Earnings Release advised "Forward-looking statements . . . can be identified by terms such as . . . '*expect*.'" (Bebchick Decl. Ex. 7 at 5-6 (emphasis added).)

The remaining of the challenged statements above meet the same fate. They are preceded by or include sufficient cautionary and/or forward-looking language to be protected by the PSLRA safe harbor.

Further, insofar as Plaintiffs allege that it was misleading for Array to expect steel prices to normalize, Plaintiffs do not seriously contest that this was the prevailing market view at the time, nor that Array's executives sincerely held that belief.

* * *

In sum, none of the Array statements challenged by Plaintiffs are adequately pled to be false or misleading. This case is thus ripe for dismissal on that ground alone.

2. <u>Scienter</u>

As the Court finds Plaintiffs fail to state a claim under Section 10(b) and Rule 10b-5 primarily because none of the challenged statements are sufficiently pleaded as false or misleading, the Court addresses scienter only briefly.

To plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This may be done by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." <u>ATSI Commc'ns Inc.</u>, 493 F.3d at 99.

Plaintiffs advance three different scienter theories, none of which is sufficiently pled. First, Plaintiffs allege that Fusaro and Patel acted with conscious misbehavior by ignoring CWs' caveats and the public knowledge of soaring steel prices, and actively concealing that knowledge by using outdated costs in Array's margin guidance. But as discussed above, Fusaro and Patel consistently disclosed margin pressure from rising costs throughout the Class Period. And the Court accords the CWs' allegations little weight given their vague nature. Further, the Court finds Defendants persuasive as far as the CAC fails to rebut the inference

that Fusaro and Patel genuinely believed steel would return to pre-pandemic pricing, regardless of the contemporaneous reports they received about the current, and rising, costs of steel. As discussed above, the CAC fails to plead that it was inappropriate for Array to use the figures it chose to model its margin forecast.

Second, Plaintiffs offer that defendants Corio and Oaktree's sale of around $2.75 billion of Array common stock provided motive and opportunity because the stock was sold at inflated prices during each of the three offerings. Corio and Oaktree are not, however, among the Exchange Act defendants and are not alleged to have made any of the false or misleading statements alleged as part of this cause of action.

The inference that Plaintiffs seek to have the Court draw from these allegations is one, perhaps, based on conspiracy theory. Specifically, Plaintiffs apparently contend that Fusaro and Patel took the opportunity to mislead investors to the benefit of Corio and Oaktree. This allegation does not raise a strong inference of scienter. Such an inference "must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310 (2007) ("A complaint will survive only if a reasonable person would deem the inference

of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."). There is no concrete and compelling allegation in the CAC that Fusaro and Patel received any benefit from their supposed misleading statements. See Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 581 (S.D.N.Y. 2007) (requiring plaintiffs to plead "concrete and individual gain to each defendant resulting from the fraud"). Thus, the more compelling and plausible opposing inference that could be drawn from Plaintiffs' theory is that Corio and Oaktree planned to sell off their interest in Array during each of the Offerings as a means to cash out of the business regardless of Array's stock price. The Court is not persuaded that Corio and Oaktree's activities sufficiently bolster any of Plaintiffs' scienter allegations.

Finally, Plaintiffs suggest that because steel and freight costs are Array's core operations (see CAC ¶¶ 129-32), Fusaro and Patel *must* have acted with scienter. "Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (quotation marks omitted).

The Court has no doubt that Fusaro and Patel were aware of rising steel and freight costs as their statements throughout the Class Period indicate their awareness. Indeed, Fusaro and Patel's knowledge is clear from the statement of their belief that steel prices would eventually normalize; there is no persuasive indication that they did not genuinely hold such belief. Thus, Plaintiffs' reference to this theory -- one abandoned in their Opposition -- is of no moment: "the core operations theory -- at best -- constitutes supplemental support for alleging scienter but does not independently establish scienter. In other words, the core operations doctrine can only be a buoy, not a life raft." In re Diebold Nixdorf, Inc., Sec. Litig., No. 19 Civ. 6180, 2021 WL 1226627, at *15 (S.D.N.Y. 2021). As Plaintiffs offer no other compelling inference of scienter, their argument flounders.

* * *

Plaintiffs have failed to adequately plead the first two prongs of a claim under Section 10(b) and Rule 10b-5 and thus those claims must be dismissed. As it is sufficient to do so on those grounds alone, the Court does not address the remaining factors.

B.   SECTION 20(A) CLAIMS

As the Court concludes that Plaintiffs have failed to plead primary liability for Defendants' alleged false or

misleading statements under Section 10(b) and Rule 10b-5, the Court also finds that Plaintiffs have failed to plead control person liability under Section 20(a). Those claims must be dismissed.

### C.   SECURITIES ACT CLAIMS

Plaintiffs also bring claims against the Securities Act Defendants under Sections 11 and 12(a)(2) of the Securities Act. Those sections "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). Both Sections 11 and 12(a)(2) prohibit the inclusion of materially misleading statements or omissions in such documents. See id. at 358-59.

There are various differences between claims brought under Section 10(b) and those brought under Sections 11 and 12(a)(2). Under Sections 11 and 12(a)(2), claims need not allege scienter, and thus, need not sound in fraud. See id. at 359 ("Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) [e.g., underwriters

and statutory sellers] may be held liable for mere negligence.").

To state a claim under Section 11, a plaintiff must allege that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under [S]ection 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" Id.

The *prima facie* elements under Section 12(a)(2) are that "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" Id.

In assessing claims brought under Sections 11 and 12(a)(2), courts must "distinguish between allegations of fraud and allegations of negligence, applying Rule 9(b) only to claims pleaded under Section 11 and Section 12(a)(2) that sound in fraud." Rombach, 355 F.3d at 170. Thus, "insofar as

[] claims are premised on allegations of fraud" Rule 9(b) would apply. <u>Id.</u> at 171. Where they are not grounded on fraud, Rule 8 applies.

Plaintiffs go to great lengths in the CAC to dispel the notion that their claims under Sections 11 and 12(a)(2) are premised on fraud. Plaintiffs must do so as they rely on the same alleged misstatements and omissions in the Offering Materials as in their Section 10(b) claims discussed above. The CAC emphasizes that "[t]he Securities Act claims are based solely on strict liability and negligence and are not based on any knowing or reckless conduct by or on behalf of any defendant -- i.e., these claims do not allege, and do not sound in, fraud -- and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims." (<u>See</u>, <u>e.g.</u>, CAC ¶ 158.)

Plaintiffs' blanket statement may be effective as a disclaimer only so far. Despite the disclaimer, "the wording and imputations of the complaint are classically associated with fraud," <u>Rombach</u>, 355 F.3d at 171-72, at least insofar as the CAC applies to Fusaro and Patel; both are also named as Securities Act Defendants. Thus, to the extent the Section 11 and Section 12(a)(2) claims are directed at them, Rule 9(b) properly applies despite the disclaimer, and the claims sound in fraud. But, as it relates to the remaining Securities Act

Defendants, the Underwriters and Director Defendants are alleged only to have signed the documents as opposed to participating in their creation. To those groups, Rule 8 properly applies. See id. (holding that Rule 9(b) applied to individual defendants where the claims sounded in fraud and Rule 8 applied to underwriter defendants where the claims sounded in negligence). The claims against the latter group of Underwriters and Director Defendants are more properly characterized as sounding in negligence because they extend only to the extent of their "negligent failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements." (CAC ¶ 161.)

Yet, under either Rule 9(b) or Rule 8, Plaintiffs' claims fail. As discussed at length above, none of the statements or omissions alleged to be false or misleading are alleged to be so as a matter of law. That remains true under Rule 8. Although under Rule 8 the statements challenged as fraudulent before need not be pleaded with heightened particularity, the Court found that the statements were also insufficiently false or misleading or were otherwise protected. Thus, Plaintiffs fail to state a claim under Rule 8 for the Section 11 and 12(a)(2) violations regardless of the first two prongs required to establish a *prima facie* case.

The Court also finds that Plaintiffs have failed to plead that Defendants violated Regulation S-K as part of the Securities Act claims. See 17 C.F.R. § 229.303(b)(2) ("Item 303"). Item 303 requires registrants to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." Id. Interpretive guidance from the SEC, which has been endorsed by courts in this Circuit, clarifies that Item 303 imposes a duty of disclosure "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Litwin v. Blackstone Group, L.P., 634 F.3d 706, 716 (2d Cir. 2011) (citing Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)). The Court is persuaded that Array made adequate disclosures under Item 303 regarding the trends and uncertainties it faced.

First, Array's disclosures satisfied Item 303. The failure to specifically disclose the minutiae of steel futures trends was not material, given the "total mix of

information" available to investors, including "information already in the public domain and facts known or reasonably available." <u>Litwin</u>, 634 F.3d at 718 (citing <u>United Paperworkers Int'l Union v. Int'l Paper Co.</u>, 985 F.2d 1190, 1199 (2d Cir. 1993)) (assessing the materiality of the disclosures under Item 303 on motion to dismiss). A review of Array's S-1A Registration Statement, filed in connection with the IPO, reveals that Array disclosed that its costs were "affected by the underlying cost of raw materials, including steel and aluminum." (Bebchick Decl. Ex. B. at 66.) The statement further disclosed that Array was "subject to risk from fluctuating market prices of certain commodity raw materials, including steel," that those "raw materials may be affected by supply restrictions or other market factors," and that "[s]ignificant price changes for these raw materials could reduce [Array's] operating margins." (<u>Id.</u> at 80.)

Array also made disclosures about the uncertainties and trends it was facing as a result of the COVID-19 pandemic. Those disclosures included that COVID-19 was affecting Array's "suppliers and vendors in India" as well as causing "disruptions to ports and other shipping infrastructure." (<u>Id.</u> at 32.) Further, Array explained that COVID-19 had already "adversely affected the economics and financial markets of many countries" that "could affect . . . [Array's]

operating results." (Id.) Array stated that the full effects
of COVID-19 were "highly uncertain" but that the disruptions
it was causing could "have a material and adverse effect on
[its] business operations." (Id.) Finally, Array explained
that COVID-19 "may also have the effect of heightening many
of the other risks described in this 'Risk Factors' section,"
which included Array's caveats regarding the effect
significant fluctuations in steel price could have on Array's
margins. (Id. at 33.)

When the above disclosures are viewed alongside the
public information available to investors, Array's omission
of the disclosures Plaintiffs seek are rendered immaterial.
For example, the Monarch Metals Report, incorporated by
reference in the CAC, directly attributes the rise in steel
prices to the effects of the COVID-19 pandemic and disruptions
in supply chain and business operations at steel mills. (See
Bebchick Decl. Ex. A. at 3 (reporting that "[w]hat drove steel
prices higher in 2020" was that "many factories were forced
to pause operations during the global Covid-19 health
pandemic").) Further, the rising price of steel was public
knowledge, a point neither party disputes. And, as described
above, Fusaro and Patel both made public statements
indicating that the downstream effects of COVID-19 had put

pressure on Array's margins. It is not difficult to connect all of these dots.

The Court is also not persuaded that Array "reasonably expect[ed]" steel prices to keep rising and thus have a "material" and "unfavorable impact" on its bottom line. See 17 C.F.R. § 229.303(a)(3)(ii). Array publicly stated its belief that steel prices would normalize in the near term, a belief supported by publicly available reporting. (See Bebchick Decl. Ex. A at 2 ("[Steel] [p]rices in the US are forecasted to continue their upward trajectory through at least the first quarter of 2021, but are expected to soften by mid-year.").) Plaintiffs do not contest that these beliefs were not genuinely held or that Array reasonably expected otherwise.

In all, Plaintiffs fail to allege that Array's omission of the increasing price of steel was something "that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161-62 (2d Cir. 2000). Additionally, Plaintiffs do not adequately allege that Array violated Item 303 as part of their Sections 11 and 12(a)(2) claims.

D.   <u>SECTION 15</u>

As stated above, Plaintiffs have failed to allege primary violations of the Securities Act. Accordingly, Plaintiffs' Section 15 claim also fails.

\* \* \*

Ultimately, the core of Plaintiffs' allegations that leads to dismissal of their claims, is that investors, like Plaintiffs, were harmed when Array failed to accurately predict the future. The securities laws do not require any issuer, including Array, to have such prescience for divining market volatility with the precision that Plaintiffs seek, especially not in the context of all the financial market challenges, uncertainties, and volatility engendered by the COVID-19 pandemic. Plaintiffs' claims must be dismissed.

## IV.  <u>ORDER</u>

For reasons discussed above, it is hereby

**ORDERED** that the motion (Dkt. No. 174) of Defendants to dismiss lead plaintiffs', Plymouth Country Retirement Association and the Carpenters Pension Trust Fund for Northern California (collectively, "Plaintiffs"), Consolidated Class Action Complaint ("CAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act, 15 U.S.C. Section 78u-4, is **GRANTED** in its entirety.

Within twenty-one (21) days of the date of this Decision and Order, Plaintiffs may, by letter not to exceed five pages, seek leave to replead, setting forth with particularity what amendments to the CAC they would make to cure the deficiencies in the CAC described above. Defendants may respond within ten days thereafter by letter not to exceed five pages.

**SO ORDERED.**

Dated:  19 May 2023
        New York, New York

_____
                Victor Marrero
                  U.S.D.J.